UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DANIEL AHNERT and
BEVERLY AHNERT,

        Plaintiffs,

v.                              Case No. 10-cv-156-pp
                                     Case No. 13-cv-1456-pp

EMPLOYERS INSURANCE COMPANY OF
WAUSAU, SPRINKMANN SONS CORPORATION,
WISCONSIN ELECTRIC POWER COMPANY,
and PABST BREWING COMPANY,

        Defendants.

**MEMORANDUM OF LAW SUPPORTING THE COURT'S
DENIAL OF WISCONSIN ELECTRIC POWER COMPANY'S
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 52)**

## I.    BACKGROUND

Plaintiffs Daniel and Beverly Ahnert filed this asbestosis case on

February 25, 201. Dkt. No. 1. The complaint alleged that plaintiff Daniel

Ahnert had been exposed to asbestos, which had caused his medical condition.

On May 4, 2010, the United States Judicial Panel on Multidistrict Litigation

transferred the case to the federal court for the Eastern District of

Pennsylvania, where Judge Eduardo C. Robreno was presiding over

multidistrict litigation ("MDL") involving thousands of asbestosis cases. Dkt.

No. 28.

Some two and a half years later, Beverly Ahnert—individually, and as the executrix of the estate of Daniel Ahnert (who since had passed away)—filed a new case in the Eastern District of Wisconsin. Ahnert v. Employers Ins. Co. of Wausau, et al., Case No. 13-cv-1456-cnc (E.D. Wis.) ("the 2013 case") alleged that on July 7, 2011, Daniel Ahnert had passed away as a result of asbestos-related diseases. This case was assigned to Judge Charles N. Clevert; it was not transferred to an MDL court.

On September 8, 2014—while the 2013 case was pending before Judge Clevert—the MDL court remanded this case back to the Eastern District of Wisconsin. Dkt. No. 34. In his suggestion of remand order, Judge Robreno stated that he had denied the summary judgment motions filed by defendants Pabst Brewing Company and Wisconsin Electric Power Company; he had granted in part and denied in part defendant Sprinkmann Sons Corporation's motion for summary judgment. Dkt. No. 34-1 at 6-7. Judge Robreno found that the case was ready for trial (subject to any trial-related motions in limine and Daubert motions). Dkt. No. 34-1 at 7. He severed "[a]ny demand for punitive damages," and the MDL court retained "claims for punitive or exemplary damages." Id. In a footnote, Judge Robreno noted that he was severing the issue of punitive damages with regard to all of the cases in the MDL proceeding. Id. at 8, n.1.

A few months later, Beverly Ahnert moved to consolidate this case with the 2013 case. Dkt. No. 35. This court deferred ruling on that motion until Judge Clevert could decide the outstanding motions for summary judgment in

the 2013 case. Dkt. No. 44. The court also ordered that defendants Pabst and Sprinkmann could "update" their summary judgment motions (the ones upon which Judge Robreno had ruled) on two discrete issues that Judge Robreno did not address: the Wisconsin Construction Statute of Repose ("CSOR") and the Safe Place Act. Id.

The court issued a second, text-only order, extending the deadline for Sprinkmann and Pabst to file their updates on these issues. Meanwhile, Wisconsin Electric—whom the court had *not* given permission to update its summary judgment motion—filed a summary judgment motion. Dkt. No. 52. In its brief, Wisconsin Electric asked for summary judgment based on the Safe Place Statute and the CSOR. With regard to the Safe Place Statute, Wisocnsin Electric argued that plaintiff Daniel Ahnert had been employed by an independent contractor while working on its premises. It asserted that because Wisconsin law provides that a principal employer is not liable in tort for injuries sustained by the employee of an independent contractor, and because neither of the two exceptions to that rule applied, Wisconsin Electric was not liable to the plaintiffs for his injuries. With regard to the CSOR, it argued that the work done by Ahnert and others constituted an improvement to the property, and not maintenance. Finally, it argued that the plaintiffs were not entitled to punitive damages. Dkt. No. 53.

Ignoring the court's instructions, Sprinkmann (dkt. no. 55) and Pabst (dkt. no. 58) filed *new* summary judgment motions (although Pabst captioned its motion as an amended motion).

On January 6, 2016, Judge Clevert denied Employers' and Sprinkmann's motion for summary judgment in the 2013 case. <u>Ahnert v. Employers Insurance of Wausau</u>, Case No. 13-cv-1456-cnc at Dkt. No. 199. The next day, he denied Pabst's motion for summary judgment. <u>Id.</u> at Dkt. No. 200. A couple of weeks later, he denied Wisconsin Electric's motion for summary judgment. <u>Id.</u> at Dkt. No. 201. The plaintiffs then filed another motion in this court, asking the court to consolidate the two cases. Dkt. No. 89.

On March 31, 2017,[1] this court denied the defendants' pending summary judgment motions, and granted the plaintiffs' second motion to consolidate the two cases. Dkt. No. 101.

---

[1] There was a delay between the date on which Judge Clevert decided the summary judgment motions in the 2013 case and the date this court ruled on the motion to consolidate/motions for summary judgment in this case. There are a number of reasons for that delay, many of which have to do with congestion on the court's calendar. The court notes, however, that Civil Local Rule 56(b)(2)(B)(i) of the Eastern District of Wisconsin requires a party opposing summary judgment to file a statement of facts, containing a "reproduction of each numbered paragraph in the moving party's statement of facts followed by a response to each paragraph, including, in the case of any disagreement, specific references to the affidavits declarations, parts of the record, and other supporting materials relied upon." It also requires that party to file a statement of any additional facts that require the denial of summary judgment, with citations to the record.

In responding to the defendants' summary judgment motion, the plaintiffs construed this court's order as requiring *them* to supplement the briefs *they* had filed in the Pennsylvania MDL. Despite the fact that the plaintiffs were filing their response briefs in the Eastern District of Wisconsin, they followed the "briefing format used in submitting the original MDL briefs to the Eastern District of Pennsylvania." Dkt. No. 63 at 2, fn. 3. The plaintiffs did not comply with the local rules of the Eastern District of Wisconsin, including the one quoted above. Without the responses to the proposed findings of fact, the court was forced to scour the record to identify disputed issues of fact. <u>Ritchie v. Glidden Co.</u>, 242 F.3d 713, 723 (7th Cir. 2001) (court is not required to scour the record or permitted to conduct a paper trial on the merits of the

Despite the fact that the court did not authorize Wisconsin Electric to update its summary judgment motion on the Safe Place and CSOR issues, the court has considered the defendant's arguments on those issues. The court finds that genuine issues of material fact preclude summary judgment on the issue question of whether the Safe Place Statute and the CSOR bar the plaintiffs' claims, and will deny the defendant's motion for summary judgment on those issues. The court will not address the defendant's arguments on the issue of punitive damages, because Judge Robreno retained all punitive damages issues for decision by the MDL court.

## II.    SUMMARY JUDGMENT STANDARD

Rule 56 requires that a moving party identify each claim or defense on which the party seeks summary judgment. Fed. R. Civ. P. 56(a). If the moving party can show there is no genuine issue of material fact and an entitlement to judgment as a matter law, the court should grant the motion. Id. However, to prove there are no genuine, factual disputes, the moving party must support the motion with citations to the record, such as "depositions, documents . . . affidavits or declarations, stipulations." Fed. R. Civ. P. 56(c)(1)(A). The moving party may show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). In ruling,

claim.) This contributed in some part to the delay in the court issuing its decisions.

the court may consider the other materials in the record and not judgment just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

## III.    FINDINGS OF FACT

Plaintiff Beverly Ahnert resides in White Settlement Texas, where she lived with Daniel Ahnert prior to his death on July 7, 2011. Dkt. No. 1 at ¶1; Dkt. No. 53-7. The complaint contains allegations that Daniel Ahnert was exposed to and inhaled airborne asbestos fibers released while he was using or removing such products,  or was working in proximity to others using or removing such products. Dkt. No. 1 at ¶25. Dr. Stephen Haber determined that Daniel Ahnert developed asbestos-related pleural disease from his occupational exposure to asbestos. Dr. Haber further opined, based on Ahnert's work history, that the cumulative asbestos exposure contributed to his disease. Case No. 10-cv-67443 (E.D. Pa.), Dkt. No. 396-4.[2]

The plaintiffs allege that Wisconsin Electric is the "owner or operator of premises where asbestos products were used." Dkt. No. 1 at ¶15. There are three Wisconsin Electric facilities relevant to this case: the Oak Creek Power Plant, Port Washington and Lakeside. Id. at ¶¶48-57, Ex. B.

In the MDL litigation before Judge Robreno, the plaintiffs produced Wisconsin Electric's 1958 contracts with the companies it hired to install insulation materials for Unit 5 in the Oak Creek Power Plant. Case No. 10-67443 (E.D. Pa.), Dkt. No. 396-18, 19 and 20. Wisconsin Electric provided

---

[2] All citations to documents filed in the Eastern District of Pennsylvania reference the docket number and the exhibit number assigned when electronically filed.

insulation requirements to bidders, and the products contained asbestos. Id. at 396-13 at 5154, 396-18-20. Its contract with Sprinkmann (one of the companies retained to provide and install insulation) provided specifications for materials containing asbestos. Id. at 396-17, 37 at WE 52138. Asbestos was used throughout the boiler. Id. at 396-16, 18-20.

In the 1980s, Daniel Ahnert and other co-workers began to work on the burner deck of Unit 5 at the Oak Creek Power Plant. Jon Shorougian—who, like Ahnert, had been a member of Local 601—testified that Ahnert was his partner for six months, and that the work involved overtime hours (shifts longer than eight hours). Case No. 10-156, Dkt. No. 64-5 at 6, 20. The insulation removal was done in part by Sprinkmann, but Wisconsin Electric told Shorougian and Ahnert that they, too, were safe to remove the insulation. Id. at 9, 11, 12, 18, 49, 50. The insulation removal made the surrounding environment "always really dusty." Id.

According to Shorougian, he and Ahnert were "replacing some of the old coal-fired pieces with natural gas-fired pieces, which involved a lot of cutting, grinding, [and] welding." Id. at 7. Coal was the main process of burning fuel, even after the additional of gas nozzles to the burner deck. Id. at 14. The replacement process involved tearing off casing to reveal insulation that went from the floor up to the burner deck, twenty-five to thirty feet up. Id. at 8, 10, 11. Behind the boiler jacket was a fibrous insulation material, both hard and soft. Id. at 9. The brick insulation underneath the boiler was soft and crumbly. Id. at 10.

Shorougian testified that Wisconsin Electric initially told him and Ahnert that the insulation was not asbestos, so they continued to strip the boiler down to the fibrous material like insulation. Id. at 9. But, as the facility became "really dusty," the workers began to worry, and they "took a sample and gave it to one of [the] union representatives and asked him to have it tested … and found out it was positive." Id. at 12. Both Shorougian and Ahnert still were on the job when the results came back. Id. at 50.

There were approximately sixteen gaskets inside the boiler that Shorougian and Ahnert were removing. Id. at 14, 15 and 74. The gaskets were eight by eight inches, and took about an hour each to remove. Id. at 74. Shorougian and Ahnert's noses were about six to eight inches away from this work, and they breathed the gasket dust. Id. at 75. The gaskets were removed and a scraper or power grinder with a wire wheel was used to clean up the faces of the gaskets. Id. at 15, 74. Shorougian and Ahnert also removed the metal cover on the burner deck, which disturbed insulation material. Id. at 76. Dust would be kicked up, and would float around the areas where they were working. Id. Finally, there were bricks and insulation between the floors, that the workers believed contained asbestos. Id. at 47.

The Sprinkmann employees on site worked to install and remove the insulation. Id. at 16-17, 89-90. Dust was in the air, but Wisconsin Electric assured the workers that there were no hazardous materials. Id. at 18. The foreman of Foster Wheeler (a company which manufactured and sold

insulation products)[3] worked with a Wisconsin Electric engineer. Id. at 34-35. The Wisconsin Electric engineer wore a Wisconsin Electric hard hat, and was involved in the whole process with the workmen and Ahnert. Id.

The plaintiffs produced an unauthenticated document dated April 27, 1989.[4] Dkt. No. 53-5. The document states that members of Local 601 were working on the job on that date, piping coal and air lines to burners, and that the covering on the primary air lines contained 15% chrysotile amosite asbestos.

Shorougian and Ahnert breathed the dust for the entire six months they worked at the Oak Creek Power Plant, and the dust remained in the air and stuck to some of the metal in the area where Shorougian and Ahnert worked. Id. at 6, 19. They did not have respirators on the job; they had "little paper masks that went over your face." Id. at 43-44. They did not feel it was necessary to use the paper masks, because they were told the insulation was not asbestos. Id. at 50.

Wisconsin Electric produced a copy of its 1989 contract with Babock & Wilcox ("B&W"), in which it retained that company to upgrade and overhaul Unit 5 to increase its efficiency and power output. Dkt. No. 53-6 at ¶14. The contract required that B&W remove all asbestos-containing insulation by January 23, 1989, and complete the demolition phase by February 22, 1989.

---

[3] Foster Wheeler was a defendant in this case; the parties stipulated to its dismissal on May 16, 2016. Dkt. No. 95.

[4] Wisconsin Electric accepts this document as true for the purposes of the summary judgment motion, but asserts that in 1989, Shorougian and Ahnert worked for a company called Babcock and Wilcox ("B&W") at the Oak Creek Power Plant. Dkt. No. 53-5.

Id. at ¶¶6, 8, 11, Ex. A 5-1. It allowed B&W to hire subcontractors to conduct the asbestos remediation, to be completed in the demolition phase by January 23, 1989. Id. at ¶8. B&W signed the contract describing the scope of work and safety requirements for its employees and subcontractors. Id. at ¶¶6-13, Ex. A 1-3.

The contract between Wisconsin Electric and B&W provided that the only areas within the specification known to be "asbestos-free" were to the rear wall radiant super heater (elevation 45 and lower), south side wall radiant reheater (elevation 82 to elevation 30), and north side wall radiant reheater (entire wall). Id. at ¶6, Ex. A 5-5. With respect to the burner deck referred to in the statement from 1989, the contract provides:

> All of the insulation with the 10 inch high space between the burner deck and the roof of the secondary air duct shall be removed and scrapped by the Contractor. It should be noted that in the past this area has been filled with a variety of insulation materials, from poured to block, and in varying thicknesses, leaving a patchwork of materials. All of the insulation shall be considered to contain "asbestos," and shall be appropriately handled/disposed by the Contractor.

Id. at ¶6, Ex. 1 at 5.11.2.3.

B&W had to comply with all pertinent state and federal safety regulations; its employees had to wear respiratory protection based upon OSHA requirements; and it had to employ all necessary materials and safeguards, and work so as to ensure all personnel in direct and adjacent work areas were protected from exposure to airborne asbestos. Id. at ¶¶6-11, Ex. A 2-4, 2-8.

Under the terms of the contract, Wisconsin Electric was not responsible for overseeing, directing, or assigning B&W's or Daniel Ahnert's work. Id. at ¶12. The contract expressly made B&W responsible for the work conducted on the burner deck of Unit No. 5. Id. at ¶13. At the same time, the contract provided that Wisconsin Electric had the power to determine whether additional measures would be necessary to provide safe and healthful working conditions and could suspend work at any time. Case No. 10-cv-67443 (E.D. Pa.), Dkt. No. 396-49 at 028174. The contract called for Wisconsin Electric to approve all asbestos handling and inspect the work of B&W, and it called for meetings concerning activities in the workplace. Id. at 396-49 at 028167, 028168, 028182, 028261, 028103, 028104, and 028067.

In its 1996 Centennial publication, Wisconsin Electric admitted that during its "formative years," it took a "somewhat casual attitude toward the physical world around it," and that "workers who spent their days insulating steam pipes with asbestos went home looking as if they'd been dipped in flour." Case No. 10-cv-67443 (E.D. Pa.), Dkt. No. 396-42. In the 1950s, Wisconsin Electric had a medical director and safety staff with access to all relevant medical information. Id. at 396-39. That director had knowledge of the Wisconsin Industrial Commission regulations enacted in the 1940s, which declared asbestos a toxic substance. Id. at 396-40.

## IV. CONCLUSIONS OF LAW

### A. Wisconsin Safe Place Statute

#### 1. *Applicable Law*

The Wisconsin Safe Place Statute, Wis. Stat. §101.11, creates a non-delegable statutory duty for premises owners distinct from legal obligations arising under common law. Anderson v. Proctor & Gamble Paper Prods. Co., 924 F. Supp. 2d 996, 1001 (E.D. Wis. 2013). The statute provides:

> Every employer shall furnish employment which shall be safe for the employees therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters. Every employer and every owner of a place of employment or a public building now or hereafter constructed shall so construct, repair or maintain such place of employment or public building as to render the same safe.

Wis. Stat. §101.11(1).

The statute establishes a duty greater than that of ordinary care imposed under common law. Barry v. Employers Mut. Cas. Co., 245 Wis. 2d 560, 569, 630 N.W.2d 517 (2001). Premises owners must construct, repair, and maintain premises to make them safe for employees and frequenters. Anderson, 924 F. Supp. 2d at 1001 (citing Barth v. Downey Co., Inc., 71 Wis. 2d 775, 778, 239 N.W.2d 92, 94 (976)). "Frequenters" include an employee of an independent contractor doing work on the premises. Hortman v. Becker Const. Co., Inc., 92 Wis. 2d 210, 226, 284 N.W.2d 621 (1979).

The Wisconsin Safe Place Statute demands that owners "furnish and use safety devices and safeguards," and "adopt and use methods and processes reasonably adequate to render the place of employment safe." Anderson, 924 F. Supp. 2d at 1001. This does not mean that owners must guarantee absolute safety. Id. Rather, owners "must provide an environment as free from danger to the life, health, safety, or welfare of employees and frequenters as the nature of the premises reasonably permit." Id. at 1001-1002.

Although the statute discusses the obligations of the owner, the case law focuses on the condition of the structure causing the injury. Wagner v. Cincinnati Cas. Co., 334 Wis. 2d 516, 525, 800 N.W.2d 27 (Ct. App. 2011). Generally, there are three unsafe property conditions: structural defects, unsafe conditions associated with the structure of the building and unsafe conditions not associated with the structure. Barry, 245 Wis. 2d at 570. The classification is important, particularly between the first two types of unsafe conditions, because there are different notice requirements for each classification. Wagner, 334 Wis. 2d at 525. With a structural defect, a property owner or employer is liable regardless of whether he knew or should have known the defect existed. Id. In contrast, when the property condition arises from an unsafe condition associated with the structure, the Wisconsin Supreme Court has provided a notice requirement. Barry, 245 Wis. 2d at 571. To give rise to constructive notice, the hazard must have existed for a sufficient length of time to allow a vigilant owner an opportunity to discover and remedy the situation. Anderson, 924 F. Supp. 2d at 1003. Whether a premises owner

had actual or constructive notice generally is a jury question. Id. (citing Gulbrandsen v. H & D, Inc., 321 Wis. 2d 410, 419, 773 N.W.2d 506 (Ct. App. 2009).

2. *Cases Applying the Applicable Law*

In a state-court suit against Wisconsin Electric by a different plaintiff, the Wisconsin Court of Appeals denied Wisconsin Electric's summary judgment motion after concluding that the presence of asbestos dust in the air at the Oak Creek Power Plant could be an unsafe condition under the Safe Place Statute. Viola v. Wisconsin Elec. Power Co., 352 Wis. 2d 541, 561, 842 N.W.2d 515 (Ct. App. 2013). The amended complaint in Viola alleged that the plaintiff worked in premises where the pipes were covered with asbestos-containing insulations, that regular maintenance and repair required that the asbestos be disturbed, and that the defendant knew or should have known about the asbestos and its health hazards. Id. The plaintiff, in opposition to themotion for summary judgment, raised a genuine issue of material fact through evidence that he was in constant contact with the asbestos dust while in the building during the installation, repair and removal of asbestos-containing products; that Wisconsin Electric did nothing to alleviate the dangers of the asbestos exposure; and that the exposure caused death. Id at 562.

Similarly, the Wisconsin Court of Appeals has held that the release of asbestos dust during regularly-conducted repair of steam pipes created an unsafe condition sufficient to support a claim that the factory owner violated Wis. Stat. §101.11. Calewarts v. CR Meyer and Sons, 344 Wis. 2d 124, 2012

WL 25 2546946, *6 (Ct. App. July 3, 2012). In <u>Calewarts</u>, witnesses testified that the asbestos insulation was "removed or released by intentional or accidental impacts or cutting," which the Court of Appeals determined fell "squarely within the failure to maintain or repair framework." <u>Id.</u> There was no evidence that the insulation was improperly installed or otherwise defective. <u>Id.</u>

In this district, Chief Judge William Griesbach denied a defendant's summary judgment motion when he found that a plaintiff came forward with sufficient evidence to support his claim that the defendant failed to meet its duty to make a mill safe for those who frequented the premises. <u>Anderson</u>, 924 F. Supp. 2d at 1001–1002. In <u>Anderson</u>, the parties did not discuss whether the alleged exposure was a product of the design and construction of the building itself or the result of a failure to properly maintain or repair the asbestos-laden insulation and materials. <u>Id.</u> The court did have evidence, however, that the defendant knew or should have known that the asbestos insulation on was installed in its pipes, that it was regularly disturbed and released in to the air during pipe repairs, and that a sizeable amount of dust was generated. <u>Id.</u>

3.    *Analysis*

Relying heavily on a contract that required B&W to remove any asbestos prior to Ahnert's employment, the defendant argues that it had no duty under the Safe Place Statute because it did not supervise or control Daniel Ahnert. Dkt. No. 53 at 14 (citing <u>Hortman v. Becker Constr. Co. Inc.</u>, 92 Wis. 2d 210, 226 (Wis. 1979)). It argues that Ahnert's exposure occurred as a result of

Ahnert's own actions, and that Wisconsin Electric did not have to protect Ahnert from his own actions or from the actions of his employer and its subcontractors.

This argument amounts to a claim that the defendant delegated its Safe Place duties to B&W. The law does not support that claim. The duty under the Safe Place Statute is nondelegable, and it extends to frequenters, including an employee of an independent contractor. <u>Anderson</u>, 924 F. Supp. 2d at 1001.

The defendant also maintains that no unsafe conditions existed on the premises and that it did not fail to repair or properly maintain the premises. The evidence shows is a genuine dispute as to this material fact.

Evidence presented to the MDL court indicated that by the 1930s or 1940s "occupational health and the general medical literature documented the hazard of asbestos inhalation, and that the injury caused by asbestos could be expressed as several clinical diseases including asbestosis, lung cancer and mesothelioma." Dkt. No. 64-9. Evidence before Judge Robreno demonstrated that as of the 1950s, Wisconsin Electric had a safety director on staff, who should have been aware of these findings. Case No. 10-cv-67443 (E.D. Pa.), Dkt. No. 396-39. The plaintiffs also submitted evidence that by 1996, Wisconsin Electric had admitted that, during its formative years, workers insulating steam pipes with asbestos looked like they had been dipped in flour. <u>Id.</u> at Dkt. No. 396-42.

Shorougian testified that a Wisconsin Electric employee told him and Ahnert that the area was safe and asbestos-free. A Wisconsin Electric

Supervisor, wearing a Wisconsin Electric hard hat, was on site for the whole process. Shorougian also testified that asbestos insulation was being removed while he and Daniel Ahnert worked at the Oak Creek Power Plant.

It is not for this court to decide whether Shorougian's testimony is reliable. That is the job of the fact-finder—the jury. As the evidence stands, there are disputed questions about whether the defendant knew or should have known that the people working on its premises during the relevant time period were exposed to asbestos. There is a dispute over whether the defendant knew or should have known such exposure was harmful. There is a dispute as to whether Daniel Ahnert was exposed—and how frequently—to asbestos dust when he worked on the defendant's premises. The defendant may have evidence relevant to each of these questions, and it may believe that its evidence is more persuasive than the evidence the plaintiffs have presented. But it is the job of a jury to make that determination, not the job of a court at the summary judgment phase.

     B.     The Wisconsin Construction Statute of Repose

The defendant also argues that the CSOR bars the plaintiffs' claims. Wisconsin's CSOR limits the time in which a plaintiff may bring an action for injury resulting from improvements to real property. See Wis. Stat. §893.89. The purpose of the CSOR is to "provide protection from long-term liability for those involved in the improvement to real property." Kohn v. Darlington Cmty. Schs., 283 Wis. 2d 1, 39, 698 N.W.2d 794 (2005). The exposure period runs ten years from the date immediately following the substantial completion of the

improvement. Wis. Stat. §893.89(1). The Wisconsin legislature limited such causes of actions by stating that:

> no cause of action may accrue and no action may be commenced . . . against the owner or occupier of the property or against any person involved in the improvement to real property after the end of the exposure period, to recover damages . . . for any injury to the person, or for wrongful death, arising out of . . . the improvement to real property. This subsection does not affect the rights of any person injured as the result of any defect in any material used in an improvement to real property to commence an action for damages against the manufacturer or producer of the material.

Wis. Stat. §893.89(2). The statute does not apply in the following four situations:

> (a) A person who commits fraud, concealment or misrepresentation related to a deficiency or defect in the improvement to real property.
>
> (b) A person who expressly warrants or guarantees the improvement to real property, for the period of that warranty or guarantee.
>
> (c) An owner or occupier of real property for damages resulting from negligence in the maintenance, operation or inspection of an improvement to real property.
>
> (d) Damages that were sustained before April 29, 1994.

Wis. Stat. §893.89(4)(a)-(d). Finally, "[e]xcept as provided in sub. (4)," the statute "applies to improvements to real property substantially completed before, on or after April 29, 1994." Wis. Stat. §893.89(5). The defendant maintains that no exceptions apply.

Although there is no dispute that the defendant is an owner of the premises, the defendant has not met its burden to show that Daniel Ahnert's injuries arose from work intended to make improvements to real property. The

18

Wisconsin Supreme Court has defined an improvement as a "permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable." <u>Kohn</u>, 283 Wis. 2d at 16 (citing <u>Kallas Millwork v. Square D Co.</u>, 66 Wis. 2d 382, 386 (1975)). In contrast, maintenance is "the 'work of keeping something in proper condition; upkeep.'" <u>Hocking v. City of Dodgeville</u>, 326 Wis. 2d 155, 177, 785 N.W.2d 398 (2010). "This distinction is reasonable because improvements to real property have a completion date whereas regular repairs and maintenance can continue *ad infinitum*." <u>Peter v. Sprinkmann Sons Corp.</u>, 360 Wis. 2d 411, 427, 860 N.W.2d 308 (Ct. App. 2015).

To prevail on its motion for summary judgment, then, the defendant had the burden of establishing that the work that Ahnert performed constituted an "improvement" to the premises. According to the defendant, the overhaul of Unit 5 constituted such an improvement; in support of this assertion, it relied on the B&W contract, which provided for the renovation of the boiler, the installation of new piping and the installation of new insulation; the defendant also points to the amount of money spent with the expectation of capital improvements.

Viewing the evidence in the light most favorable to the plaintiffs, there is evidence that Daniel Ahnert's alleged exposures at the Oak Creek Power Plant involved replacing parts, and cleaning out parts, of an existing boiler system. The defendant has not submitted sufficient evidence to demonstrate, as a

matter of law, that that work was an improvement, and not maintenance. A reasonable fact-finder could conclude that, even though the project was large, expensive and labor-intensive, it actually constituted maintenance on an existing boiler system. That fact-finder could conclude that replacing and cleaning the parts of a large industrial boiler—renovating it—is the kind of work that could continue *ad infinitum*, work that will need to be done again and again. On the other hand, depending on what new parts were installed—parts that never would need replacing? parts that were self-cleaning?—the work improved the property, by making the boiler maintenance-free and improving the value of the boiler, and even the plant. The fact-finder's determination would turn on evidence that the defendant has not provided. The defendant will have the opportunity to present evidence on those issues to the jury.

Because the court concludes that the defendant has not met its burden of establishing that the CSOR bars the plaintiffs' claims as a matter of law, and because, construed in the light most favorable to the plaintiffs, the evidence reveals genuine issues of material fact, the court will deny the defendant's motion for summary judgment on this issue.

## V.  CONCLUSION

For these reasons, the court denied the defendant's summary judgment motion on March 31, 2017. The court will confer with the parties at the May 15, 2017 status conference as to the estimated length of trial, and possible

final pretrial conference and trial dates.

Dated in Milwaukee, Wisconsin this 15th day of May, 2017.

BY THE COURT:

_____
HON. PAMELA PEPPER
United States District Judge