UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION


DANIEL AHNERT, ET AL.,          )   CASE NO:  2:10-CV-00156-PP
                                )
              Plaintiffs,       )          CIVIL
                                )
     vs.                        )      Milwaukee, Wisconsin
                                )
EMPLOYERS INSURANCE COMPANY     )   Thursday, January 4, 2018
OF WAUSAU, ET AL.,              )
                                )   (1:43 p.m. to 4:02 p.m.)
              Defendants.       )   (4:16 p.m. to 5:54 p.m.)


HEARING RE: DAUBERT MOTIONS AND MOTIONS IN LIMINE

BEFORE THE HONORABLE PAMELA PEPPER,
UNITED STATES DISTRICT JUDGE



<u>APPEARANCES</u>:              SEE PAGE 2


Courtroom Deputy:         Kristine Wrobel

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988






Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>

Plaintiffs:                    ROBERT G. MC COY, ESQ.
                               Cascino Vaughan Law Offices
                               220 S. Ashland Ave.
                               Chicago, IL 60607

Defendants:                    TRAVIS J. RHOADES, ESQ.
                               LAURA E. SCHUETT, ESQ.
                               Crivello Carlson
                               The Empire Building
                               710 N. Plankinton Ave., Suite 500
                               Milwaukee, WI 53203

                               JOSHUA C. SCHUMACHER, ESQ.
                               Hepler Broom
                               2 Mark Twain Plaza
                               130 N. Main St.
                               P.O. Box 510
                               Edwardsville, IL 62025

1       <u>**Milwaukee, Wisconsin; Thursday, January 4, 2018; 1:43 p.m.**</u>

2                          **(Call to order)**

3             **THE CLERK:**  Court calls civil case 2010-cv-156,

4    *Daniel Ahnert, et al. versus Employers Insurance Company of*

5    *Wausau, et al.*  Please state your appearances, starting with

6    the attorney for the Plaintiffs.

7             **MR. MC COY:**  Yes, Robert "Bob" McCoy for the

8    Plaintiff.

9             **MR. RHOADES:**  Good afternoon, Your Honor, Travis

10   Rhoades of Crivello Carlson, for Employers Insurance Company of

11   Wausau, Sprinkmann Sons Corporation, and Wisconsin Electric

12   Power Company.

13            **MS. SCHUETT:**  And Laura Schuett as well, Your Honor,

14   for the same parties.

15            **MR. SCHUMACHER:**  Joshua Schumacher of Hepler Broom

16   for Pabst.

17            **THE COURT:**  And do we have anybody on the phone?

18      (No audible response)

19            Okay, sorry, got confused for a second.  All right,

20   good afternoon, everybody.  Welcome to the refrigerator.  We

21   had scheduled this hearing this afternoon for a *Daubert*

22   hearing, ruling on *Daubert* motions, and I do want to get to

23   that in a minute, and some other things as well.  But before we

24   do that, I wanted to pick up a couple of, I guess for lack of a

25   better term, odds and ends and see if there wasn't something we

1    could do with those as well.  Back on July 20th, the Plaintiff

2    filed a motion asking that I apply one of the orders that was

3    entered in the MDL case and 2010 case when it was MDL

4    litigation to this now-consolidated case.  That is for your

5    information for our docket, Docket Number 110, and it is the

6    motion to apply MDL number 875, expert deposition protocol

7    order for fee payment to the consolidated Ahnert case.  And

8    basically what that motion does is explain that when the case

9    was in MDL, Magistrate Judge Strawbridge put into place or set

10   up a protocol for payment of expert witness fees.  And the

11   motion just generally asks that I apply that same motion to

12   both the '13 and the '10 case, of course what are now

13   consolidated into one case.  There was objection to it and then

14   a response or a reply.  The motion was filed I think before the

15   2017 depositions were taken, I believe, or at least around the

16   time they were about to -- some of them were about to start.

17   And then the responses and replies were filed afterward.  And

18   unless I'm misunderstanding something, it seems to me that the

19   bottom line here, I don't know what the relevance of the

20   protocol in the MDL case is or isn't.  The bottom line is that

21   if under the Federal Rules of Civil Procedure somebody requests

22   payment for expert fees that the opposing side feels are

23   excessive, the opposing side can object.  Now, the MDL order

24   seemed to set a timeframe for that and requirement as to when

25   those objections should be filed and that sort of thing.  Okay,

1  grand idea in MDL cases I think, and probably other cases as

2  well.  But the bottom line issue here seems to be whether or

3  not people agree over whether certain portions of the fees

4  ought to be compensable.  And I don't know what that has to do

5  or not to do with the MDL order.  It seems just a natural

6  question that arises in any case involving expert witnesses.

7  And so it seems to me rather than taking an order from one case

8  and applying it in another case and -- I don't know why if

9  there is still a dispute about payment of fees -- and as far as

10  I could tell from that string of emails that you may recall the

11  Plaintiff attached to the motion, the parties were in the

12  process of discussing getting itemized bills and going through

13  and separating out what were administrative expenses versus

14  what were prep expenses and what were testimony expenses, what

15  the -- you know, separating out travel and things like that.  I

16  don't know where that really ended up but the string of emails

17  seemed to have kind of stopped as people were still discussing

18  things.  If itemized bills or invoices have not been completely

19  exchanged, then I would think that the solution would be that

20  we do that.  And then if the Plaintiff has any objection to any

21  specific fees, the Plaintiff -- I can set a deadline and the

22  Plaintiff can explain what the objections are and I can rule on

23  that.  And same I guess if the Defendants have any objections

24  to Plaintiffs' experts.  It seems to me that -- I hate to be

25  overly simplistic, but it seems to me that that might solve

1 whatever the issue is, unless you all have worked through some

2 of these issues yourselves already. Mr. McCoy?

3      **MR. MC COY:** That has been resolved, the expert fee

4 issue. But the timeframe I think was the key as to when it

5 should happen. And that's really all that's needed. So if we

6 have a timeframe for providing the bills -- I can't remember

7 whether we submitted bills or not, I just can't remember that.

8      **THE COURT:** Yeah, there were some. I don't -- to be

9 totally frank, I can't tell you whether all of them were

10 submitted. I know there were some that were submitted.

11      **MR. MC COY:** I mean, I'm sure my firm's paid all

12 these bills by now so we have the bills and we can submit those

13 to the defense within -- you know, within seven days, and then

14 a period of time for objections. I don't believe we took any

15 depositions of defense experts.

16      **THE COURT:** Okay, so you think seven days then to get

17 the bills to the defense?

18      **MR. MC COY:** Right, and then --

19      **THE COURT:** And then I'll set a deadline, okay, thank

20 you. And then, Mr. Rhoades, what kind of time do you -- would

21 you think -- well, first of all, any comments on what I've

22 already said? And then, second of all, what kind of time do

23 you think you need to get invoices?

24      **MR. RHOADES:** Well, the only issue for us was to get

25 the itemizations because we -- and I'm working from memory here

1  so forgive --

2          **THE COURT:**  I know, sorry.

3          **MR. RHOADES:**  -- me if I get this wrong, but I

4  believe we have at least one expert and maybe a couple that

5  billed us at their normal expert rate for gathering their file-

6  type activities and we just didn't think that that was fair,

7  and we didn't think we owed that under the rules.  And so what

8  we asked for was for these experts to give us some -- in their

9  bills, give us some sense of what was administrative work and

10  what was actual expert work, and that we didn't have an

11  objection to paying the expert fees but we didn't want to pay

12  them for paperclipping their reports together.

13          **THE COURT:**  Right.

14          **MR. RHOADES:**  And so to the extent we get bills that

15  actually divide that out, then I think we can relatively

16  quickly turn around any objections to that, maybe ten days

17  after.

18          **THE COURT:**  Okay.  Mr. Schumacher?

19          **MR. SCHUMACHER:**  I don't have anything to add.  I

20  would be in full agreement with Mr. Rhoades.

21          **THE COURT:**  Okay.  So then why don't we do this?

22  Today being the 4th, how about, Mr. McCoy, I give you until the

23  end of the day on the 12th, so next Friday, if that's enough

24  time?  I think you asked for a week and it's a little bit

25  longer.

1          **MR. MC COY:**  That's okay.

2          **THE COURT:**  Okay.  And then objections, the deadline

3    for objections, why don't we say the 26th of January, a few

4    days over ten days, but give the Defendants that amount of

5    time.  And then, Mr. McCoy, if you get any objections, how

6    about the 9th of February for a response?

7          **MR. MC COY:**  That's okay, Judge.  The only

8    qualification I might have on this is if we need to contact

9    some expert to get more information about an item on the

10   bill --

11         **THE COURT:**  Then just let me know that --

12         **MR. MC COY:**  -- they may -- some of them may not

13   always be available, they may be gone.  But, I mean, I don't

14   know who is or who isn't gone.

15         **THE COURT:**  Then all you need to do is just let me

16   know you need more time because somebody's M-I-A, then we can

17   work around that.  I'm just picking a date so that assuming no

18   difficulty, we kind of know where this is tracking to.  So what

19   I'm going to do is deny the motion to apply MDL 875, expert

20   deposition protocol, and instead -- I'll deny that and then

21   I'll put in place and it'll show up in these minutes the dates

22   that we just set for getting the invoices disclosed,

23   objections, and responses.  And then we'll see if there's

24   anything that needs to be hammered through at that point.  All

25   right, thank you all for that.  I'm sorry to -- I know that's a

1    -- it's an oldy.  But I figured as long as we're all here

2    together, if we could take care of a little bit of

3    housekeeping, that might be one bit of housekeeping that we

4    could take care of.

5              And the second bit of housekeeping that I was hoping

6    -- I think may to some extent already have taken care of

7    itself, but I wanted to double-check.  On September 21st, at

8    Docket Number 114, the Plaintiff filed a motion to strike and

9    limit untimely disclosed trial witnesses.  And it's filed as

10   part of a *Daubert* motion package.  But specifically, this one

11   has less to do with the notion of whether somebody should be

12   allowed to testify as an expert.  And the Plaintiff makes

13   reference to the fact that over the course of years in this

14   case, the Defendants have talked about all sorts of people who

15   may or may not be experts for this, that, or the other thing.

16   And as I read, the motion basically says, you know, if you

17   haven't timely filed reports for those people and you haven't

18   followed the rules of the particular judge that you were in

19   front of for those people, that those people should be

20   stricken.  The response, as far as I read it, was basically

21   that Pabst had already proposed that it was going to call Gary

22   Crawford and it had timely disclosed Gary Crawford's expert

23   witness report.  And Pabst basically said in his response

24   that's who we plan to call at trial, yeah, we've talked about

25   other people and we've kind of, you know, here and there, but

1   the -- who we plan to call at trial is Gary Crawford and so if

2   what they're asking is us to be limited to Gary Crawford, fine,

3   that -- we're fine with that.  And the same thing with

4   Sprinkmann and WEPCO with regard to Michael Hentgen -- am I

5   saying it correctly?

6           **MR. RHOADES:**  Correct.

7           **THE COURT:**  That his report was timely disclosed and

8   that they're perfectly -- that Sprinkmann and WEPCO are

9   perfectly happy to represent that that's who they're calling at

10  trial.  The only issue I think that sort of wasn't resolved or

11  conceded was one that perhaps is a little bit unclear, and that

12  is that WEPCO named Mr. Paulsen on the witness list and

13  actually identified him both as a lay witness, as an expert

14  witness.  He's an employee of WEPCO, at least he was at the

15  time.  I don't know if he still is, but was at the time.  And

16  he has historical knowledge not only about WEPCO procedures in

17  general but specific to the Oak Creek plant based on his years

18  of working there and his experience.  And so I read WEPCO's

19  response is kind of questioning a little bit, is there an issue

20  with regard -- is part of this motion an issue with regard to

21  calling Mr. Paulsen, given that he is as I understand it almost

22  mostly a fact witness, possibly there's some hybrid nature if

23  he's going to talk about, you know, specific knowledge as it

24  relates to asbestos, but more of a fact witness with regard to

25  what's been going on at the WEPCO plants, and particularly at

1  the Oak Creek plant.  And so I think that was the one sort of

2  unclear thing was WEPCO kind of wondering how Mr. Paulsen fits

3  in to the Plaintiffs' motion.  But other than that, it seemed

4  to me that this motion pretty much is moot.  So I guess first

5  I'll ask, Mr. McCoy, with regard to the two experts that have

6  been put forward as expert witnesses to testify at trial,

7  Mr. Crawford for Pabst, and Mr. Hentgen for WEPCO and

8  Sprinkmann, does that resolve your concerns with regard to

9  those experts?

10         **MR. MC COY:**  Yes, Your Honor.  Actually I think in

11  our motions we said that Crawford for Pabst and Hentgen for

12  Sprinkmann and WEPCO are fine.

13         **THE COURT:**  Right.

14         **MR. MC COY:**  We have no questions about them.

15  Paulsen, if I can jump ahead there, Judge, I -- just looking at

16  this, I see where at one point he was tendered for deposition.

17  I suppose we didn't know about the expert opinions he might

18  have.  But as far as I'm concerned, I mean, since the trial

19  date moved and there's more time here, if they want -- the way

20  I would propose to resolve it was if they want to provide an

21  expert report of Paulsen's opinions, then I won't object any

22  further as long as we can take his deposition.  That's how I

23  would propose to resolve it now with the additional time.

24         **THE COURT:**  And I guess to that suggestion from

25  Mr. McCoy, my question to you, Mr. Rhoades, was going to be, I

1    read the summary of what Mr. Paulsen was going to testify to,

2    and it's a little bit unclear as to what of it might be in an

3    expert category as opposed to what the guy just knows from his

4    years working there.  So I don't know if -- I don't know --

5         **MR. RHOADES:**  Right.  And I don't know if this

6    clarifies it for the -- I have no intention of offering Tom to

7    offer what would typically be considered expert opinion

8    testimony in a case like this.  But he is the chief safety

9    officer at WEPCO and he has some specialized knowledge with

10   respect to asbestos because he's worked there forever.  And so

11   I don't know, because we tendered him but he was never deposed,

12   what the Plaintiff might ask him about.  And I suppose we can

13   deal with those issues at trial.  If they open a door, then I

14   presume I'll be allowed to walk through it.  But, you know, in

15   terms of normal, typical expert opinion, I don't intend to have

16   him offer any.

17        **THE COURT:**  And let me try to see if I can't clarify

18   a little bit, because I -- this is the sort of situation as I'm

19   sure all of you have experienced where suddenly something

20   happens at trial and someone hops up and says, wait, wait,

21   that's an expert opinion and you said you weren't going to, and

22   then somebody else responds and says, oh, no, it's not, and I

23   didn't.  Obviously the issue here is causation.  I mean, that's

24   what I think the major battle has come down to.  And I could

25   imagine someone like Mr. Paulsen testifying about what his

1   experience was in terms of how asbestos ought to be handled,

2   how it ought to be treated, maybe what his understanding was of

3   what kind of training people ought to get if they're working

4   around asbestos, things of that nature, what training, if any,

5   was given.  But for him to provide testimony saying, I

6   understand that this is what causes mesothelioma or causes

7   someone to die of mesothelioma or any of the other causation

8   issues, that clearly would be wandering over a pretty black and

9   white line it seems to me; is that what you're thinking?

10          **MR. RHOADES:**  Yeah.  And our position is anybody with

11   an IH background shouldn't be testifying about medical

12   causation issues anyway.

13          **THE COURT:**  Right.

14          **MR. RHOADES:**  I mean, so I would never offer him or

15   Mr. Hentgen for that matter to argue medical causation issues.

16          **THE COURT:**  Okay.

17          **MR. MC COY:**  I would -- just looking at this

18   disclosure -- and, again, if you don't have something that the

19   witness themselves signed, you don't know what they're actually

20   going to testify to at trial.  If it's in their -- if it's got

21   their signature on it like a 26(a)(2) report, then you know

22   that's their opinion and that's the basis and that's the

23   ballpark that you're playing in.  I mean, here we have

24   references in this attorney-written summary which don't bind

25   Mr. Paulsen.  But it says things like "threshold limit values,"

1  which I'm assuming he's probably going to provide some opinions

2  that the threshold limit values were protecting the workers and

3  that's what the understanding was of himself or WEPCO.  I also

4  assume he's probably going to testify to situations in which

5  these permissible exposure limits are or are not exceeded, and

6  that's also opinion testimony.  It says, "Studies with respect

7  to power plants."  That seems to me almost inherently an expert

8  opinion type of basis that he's going to say, well, you know,

9  the studies didn't show that it was a dangerous conditions.  I

10  just can't imagine how a lot of his testimony isn't going to

11  take the form of some opinions based on these topics that he's

12  disclosed about.

13            **THE COURT:**  Well, let me -- again, I guess we need to

14  clarify language a little bit.  Lay witnesses can give opinions

15  but they're limited to personal experience.  They can't rely on

16  hearsay, they can't rely on, for example, studies with respect

17  to power plants.  So if he's not going to be called as an

18  expert, then he can't rely on hearsay.  That doesn't mean he

19  can't give an opinion.  It simply means that that opinion has

20  to be based on his own personal knowledge, just like any other

21  lay witness.

22            And I guess with regard to the issues on threshold

23  limit values, there's a difference in my mind, I would think

24  hopefully in other people's, between somebody saying in my job,

25  I understood that the threshold limit value was this, that's a

1  fact that I understood, and I understood that, you know, I

2  wasn't supposed to exceed -- our plant was not supposed to

3  exceed a particular threshold.  Whether that is a scientific

4  opinion or a hybrid opinion about whether that threshold is

5  right or wrong and whether that threshold, exceeding it could

6  cause this or could cause that or the other thing, that's an

7  expert witness opinion.  But to simply say, you know, I'm a

8  realtor and I was told that the house should be sold for

9  $50,000 and so that's what I listed it for.  That person's not

10  giving you an opinion on whether $50,000 is the right

11  valuation; they're simply telling you that's the fact they

12  understood and they were operating under.  So, I mean, I

13  understand that this -- a gentleman like this is the kind of

14  person who it might be easy to slip over into expert testimony.

15  But if he's not being put forward as an expert and he's not

16  being put forward to testify on giving expert opinions, then

17  Mr. Rhoades's suggestion that at trial if we -- if suddenly he

18  starts relying on hearsay, I assume Mr. McCoy will hop out of

19  his chair and I'll listen and I'll say, yeah, nuh-uh, and

20  that's where we go.

21        **MR. MC COY:**  And just other examples, Judge, I

22  understand what you're saying and I agree with that way you

23  characterized "lay" versus "expert" on those issues.  But we

24  also have things like "construction practices" and "scheduling

25  of work."  So, again, I don't know that Mr. Paulsen was an

1  employee that in the time period of Ahnert's work --

2           **THE COURT:**  Well, that's a different issue.

3  That's --

4           **MR. MC COY:**  And --

5           **THE COURT:**  -- whether or not he has personal

6  knowledge about a fact that he can testify to.

7           **MR. MC COY:**  Right.  And that's why I say when you

8  get down to construction practices, his opinion is, well, we

9  don't put the pipefitters like Mr. Ahnert next to the

10  insulators because the insulator's work is always done before

11  the pipefitters.  I mean, that's the kind of opinion that again

12  I typically see these type of corporate witnesses express.

13          **THE COURT:**  But that's not an expert witness opinion.

14  That's saying in our practice, in our company, we don't station

15  people at "X" place.  And if your response is, hey, you weren't

16  even there when we alleged that this exposure happened, then

17  that's an appropriate objection.  But it's not an expert

18  witness objection, it's a you don't have the factual background

19  to be able to testify this competent -- to this competently as

20  a lay witness, right?

21          **MR. MC COY:**  Well, it's lack of personal knowledge --

22          **THE COURT:**  Right.

23          **MR. MC COY:**  -- of what -- how it was done back then.

24          **THE COURT:**  That's it, and --

25          **MR. MC COY:**  So --

1          **THE COURT:**  -- that's a lay witness objection.

2          **MR. MC COY:**  Right.  So if his opinion is, well, it

3   had to be done that way because that's how we would do it, that

4   to me is an expert opinion because he doesn't have personal

5   knowledge that -- of what happened back then.

6          **THE COURT:**  Now you're conflating two concepts.

7   You're -- the issue of whether any witness has personal

8   knowledge is always relevant, and particularly with regard to

9   lay witnesses.  The fact that somebody doesn't have personal

10  knowledge to what they testify to doesn't automatically convert

11  them into an expert; it just means they're not a competent

12  witness for that topic.  And so I think, you know, with regard

13  to construction schedules, if somebody says, you know, we only

14  built on Tuesdays between what and what, --

15         **MR. MC COY:**  Right.

16         **THE COURT:**  -- that's a factual statement and it

17  certainly can be challenged in terms of, how do you know, you

18  weren't there or, you know, whatever.  But those things to me

19  don't sound like expert witness opinions.  Expert witness

20  opinion, we'll get into it more deeply when I talk about the

21  *Daubert* motions but, you know, an expert witness opinion is

22  some sort of specialized knowledge, whether it is scientific or

23  under *Kumho*, otherwise that a trier of fact needs a specialist

24  to tell them.  Somebody simply walking in and saying, here in

25  our court we start at 8:30 and we get done at 5:00 and that's

1  the way we've always done it as far as I know, that's me making

2  a statement of fact. And you have every right to say, well,

3  how long you worked here, lady, you don't know, maybe 15 years

4  ago maybe they weren't doing it that way. That's your cross.

5  But that's not an expert witness; that's just me telling you

6  the fact of what I understand. So it seems to me that the best

7  way to handle Mr. Paulsen is he has not been tendered as an

8  expert, he's not being proposed to give expert testimony. If

9  Mr. McCoy or anybody else hears something come out of his mouth

10 at trial that concerns them that they're headed in that

11 direction, you make the objection at trial. There is no expert

12 witness report for him and so if that objection arises and I

13 believe that he's wandered into expert witness territory, I'll

14 sustain the objection.

15        **MR. MC COY:** Okay.

16        **THE COURT:** Okay? So does that then take care of

17 Docket Number 114, I think? We've got Mr. Crawford, we've got

18 Mr. Hentgen. Mr. Paulsen's going to testify as a lay witness;

19 and if any problems arise with regard to Mr. Paulsen, deal with

20 them at trial.

21        **MR. MC COY:** That's fine, Judge.

22        **THE COURT:** Okay.

23        **MR. MC COY:** That resolves the motion, yes.

24        **THE COURT:** Okay, thank you. So that takes care of

25 that one as well. And I think that then takes us to the actual

1   what I would consider actual *Daubert* motions.  And those are:

2   Docket Number 15, which is the Plaintiffs' motion requesting

3   that I issue an order prohibiting any and all parties from

4   offering "any exposure" or "every exposure" testimony; Docket

5   Number 116, which is Pabst's motion to exclude Anderson, Brody,

6   and Staggs's testimony; Docket Number 118, Pabst's motion to

7   exclude Garza's reports, testimony, and so forth; Docket Number

8   120, Pabst's motion to join Sprinkmann's *Daubert* motions and

9   WEPCO's *Daubert* motions, and in particular that motion relates

10  to Dr. Ellis, Mr. Ahnert's personal physician; Docket Number

11  122, which is the motion of all of the Defendants to exclude

12  Mr. Garza's testimony to strike certain testimony of

13  Dr. Anderson, and then also to preclude testimony from

14  witnesses regarding asbestos content and some other issues.  So

15  as I understand it, those are what I feel like kind of fall

16  into traditional *Daubert* motions.  Any that I haven't listed

17  that you all think I should have?

18          **MR. MC COY:**  None others for -- that the Plaintiff

19  knows of, Judge.

20          **THE COURT:**  Okay, all right, thanks.  Mr. McCoy, can

21  I ask you a question?

22          **MR. MC COY:**  Sure.

23          **THE COURT:**  Are you using our Wi-Fi or are you hooked

24  up to something else some kind of way?

25          **MR. MC COY:**  I'm just using the Court Wi-Fi.

1          **THE COURT:** Yes, it works!

2          **MR. MC COY:** It does work.

3          **THE COURT:** I'm sorry, I'm on the IT committee and we

4   only got it up and running in the middle of December and I

5   haven't seen anybody use it yet.  I will be happy to march back

6   and report that it works, thank you.

7          **MR. MC COY:** I don't --

8          **THE COURT:** I should have asked Mr. Rhoades but I

9   just saw Mr. McCoy looking at it so --

10          **MR. MC COY:** Didn't remember it from before but when

11  I opened up, I --

12          **THE COURT:** We didn't have it --

13          **MR. MC COY:** Yeah.

14          **THE COURT:** -- before, that's why you didn't

15  remember.  We didn't have it.  So, I'm sorry, that was a frolic

16  and detour but I'm --

17          **MR. MC COY:** State Court has had it for a while here.

18          **THE COURT:** Yes, we know.  That's one of the reasons

19  we were somewhat mortified.  But we were told that because of

20  the age of this building and the way it's set up, that it would

21  be difficult.  And it was difficult, but we have it, it works.

22  Okay, --

23          **MR. MC COY:** I don't think the Northern District of

24  Illinois has it yet.

25          **THE COURT:** Oh, good, we beat Chicago.

1          **MR. MC COY:**  Pretty frustrating.

2          **THE COURT:**  And I can say that as a former Chicagoan.

3    Okay, Mr. Rhoades, anything that you think I've missed in terms

4    of the list of *Daubert* motions?

5          **MR. RHOADES:**  No, I don't think so, Your Honor.

6          **THE COURT:**  Okay, and Mr. Schumacher?

7          **MR. SCHUMACHER:**  No, ma'am.

8          **THE COURT:**  Okay.  So I want to assure you all that I

9    have read and gone through the motions I think fairly

10   thoroughly.  But if -- I wanted to give each of you an

11   opportunity if you wanted to address any last thoughts with

12   regard to the motions, then I'm happy to hear those now, and

13   then I'll -- assuming that those don't change my opinions very

14   much, I'll let you know what conclusions I've come to.

15   Mr. McCoy, any additional argument, either on your own motion

16   with regard to prohibiting the -- any or every exposure or with

17   regard to the Defendants' motions?

18         **MR. MC COY:**  I've got some notes here.

19         **THE COURT:**  Sure.

20         **MR. MC COY:**  I think most of these are touched on in

21   the brief.

22         **THE COURT:**  Okay.

23         **MR. MC COY:**  But there's a couple here maybe that are

24   not.  I know on this Garza, there was some reference to an

25   opinion of Judge Yamahiro's about Garza's partner who --

1    Garza's a certified industrial hygienist.  The -- his partner

2    was not but his partner was found qualified.  But the comment

3    that I had was that the publications in the report of Garza, he

4    has that general report that's about 50 pages or something, the

5    publications in there are all peer-reviewed publications.

6    There might be one or two exceptions but, I mean, otherwise

7    those are all peer-reviewed publications.  And somehow that

8    wasn't picked up by Judge Yamahiro.  But they are.

9              And the other thing is from a foundation standpoint,

10   if there's questions about an expert, I -- that Your Honor has,

11   I would like to address any specific questions about that

12   because you may have some very specific things.  The -- as a

13   general matter here, I would say, first off, you know, that the

14   primary dispute is over dose and exposure, and that as we

15   pointed out in the affidavit, especially of Dr. Anderson that

16   was done specifically for *Daubert*, because the depositions were

17   not *Daubert* depositions.  In a *Daubert* deposition, you lay out

18   all the foundation for witnesses' testimony.  But these were

19   not *Daubert* depositions and so they weren't done in that manner

20   where we laid out the expert's testimony and foundation.  So

21   basically you just get soundbites of defense cross.  But the

22   primary basis for knowing that you have sufficient dose and

23   causation -- I apologize if I look up and down here, Judge, --

24             **THE COURT:**  That's okay.

25             **MR. MC COY:**  -- because I've got these -- I couldn't

1   wear my contact lenses today because I've got an eye infection

2   so --

3           THE COURT:  No worries.

4           MR. MC COY:  -- but I -- so I keep having to lift up

5   and down from the bifocals to see you and down here to see my

6   paper so --

7           THE COURT:  You can feel free to just --

8           MR. MC COY:  Right.

9           THE COURT:  -- look at your papers.

10          MR. MC COY:  I'm used to --

11          THE COURT:  I'm not that interesting.

12          MR. MC COY:  Right, I'm used to being able to make

13  better eye contact.  But the basis is that the literature that

14  produces the information that creates the ability to draw

15  causation inferences in the experts, that literature is about

16  activities and jobs and how long the people had these things.

17  And there's not literature that says, okay, if -- or that here

18  is the measurement of asbestos in the air that this worker

19  breathed and, therefore, this -- that makes a causal opinion.

20  That literature, I mean, I have trouble even thinking of any

21  situation like that in the literature.  I couldn't come up with

22  one.  But that's in essence what the defense is asking to do;

23  whereas the literature bases the causation connections on the

24  activities, like being a pipefitter or working at WEPCO or

25  working with thermal insulation where -- or working with

1  gaskets.  That's how these things are determined.  Now -- in

2  terms of the experts and their drawing connections.  Because

3  there are separate publications that do measure like the

4  release of asbestos fibers from gasket removal activities or

5  from thermal insulation, but that's a separate publication

6  where you don't even draw a causation to a particular

7  individual, it just reports here's the numbers from these

8  activities.  And there's a few of those studies out there that

9  the experts all utilize.  I mean, for the most part, it --

10 there weren't measurements taken back in the days when these --

11 work took place like Ahnert's work in the fifties and sixties

12 and seventies, there wasn't any measurements.  But there was a

13 couple studies that did pick up some measurements, so those are

14 what the experts know about.  So, I mean -- but, again, knowing

15 that there is a particular measurement and therefore you have

16 causation isn't something that's published in the literature.

17 It's based on these activities and these types of products and

18 the time periods, which for mesothelioma are very short.  I

19 think Dr. Anderson says the reports are a day of exposure can

20 cause mesothelioma in his affidavit on dose and causation.  And

21 so you have very short periods of duration to cause

22 mesothelioma.  But that's -- that I think is an important

23 concept, and that's in part also important because when you get

24 down to the question of the dose, what reaches the target organ

25 in asbestos, as Dr. Anderson again explains in his affidavit,

no one will ever know that because in each individual it's so
variable. When the fibers enter the breathing zone and they're
inhaled, that's not what goes to the target organ because the
body has so many defense mechanisms that only a small portion
of those fibers, unknown portion in each individual, will
actually reach the target area of like mesothelioma, which
would be the lung lining and the -- for asbestosis, which
Ahnert also was diagnosed with that. That would be pretty much
any place in the lower part of the lung usually. But how many
fibers that are inhaled actually penetrate into those areas,
you can never know. We do know, though, that in each of these
situations where you have that kind of activity like Ahnert did
where there's removal of thermal insulation -- "thermal
insulation" meaning the block or the pipe covering that goes on
the surfaces that are the heated steam piping or equipment that
gets very hot -- that those situations generate millions of
fibers being released if if you just, you know, cut it, hit it
with a hammer, whatever. Gasket removal generates essentially
the same very high level of fibers, "gaskets" being the seals
that are on the pipes when they're put together or when they're
connected to equipment. So what you have is very typical
activities by Ahnert that create his exposure or his dose that
is dealt with in the literature as being the types of
activities that will cause mesothelioma. And for his trade,
some of the -- there are some studies even of pipefitters.

1           But more importantly really is that it's these types

2    of products, and you have the bystander situations and you have

3    situations where he's directly involved because he's actually

4    having to -- typically when a pipefitter removes a gasket from

5    the pipe, they'll have to take off -- I mean, I'm sorry, a

6    valve from a pipe, because these valves are pretty big valves,

7    some of them can be a foot or more in size.  But they'll have

8    to take off insulation on either side of the pipe that connects

9    to the valve to get into that valve and be able to work on it.

10   So they're removing some insulation.  And those exposures are

11   very, very high, and that's, as I say, reported in the

12   literature that that's a lot of asbestos.  But, again, the

13   studies that are creating causation are based on these

14   activities and participating in them, and that's how the

15   literature reports on this.  And as I say, that's explained in

16   Dr. Anderson's dose affidavit.  That was written specifically

17   really for the *Daubert* scenario here, so that one does really

18   get right into the questions on *Daubert*.

19           But these -- the knowledge of these types of

20   scenarios is something that essentially all the experts, Ken

21   Garza, who's the industrial hygienist, Henry Anderson,

22   Dr. Anderson, who's the occupational and environmental medical

23   doctor from Madison, used to be the State's chief medical

24   officer for 30 years but he just retired last year, and also

25   Dr. Staggs, who's a pathologist, they all are working off of

1   this same body of literature that I'm talking about.  And I

2   suppose the other component to the dose analysis -- well, it's

3   one of several because Dr. Anderson's affidavit really talks

4   about multiple components for dose and causation that they look

5   at, but a big -- another component of that is the

6   epidemiological literature which says, you know, in this group

7   of people doing these types of activities, there's a much

8   higher incidence of asbestos-related disease or mesothelioma.

9   So that's another basis for drawing these causal connections.

10  But I don't know how much -- I don't think Your Honor had had a

11  lot of asbestos experience before, and that's one of the

12  reasons why we laid this out.

13          See what else I had here.  So originally there was

14  opinions essentially that, you know, all these exposures are

15  significant from an industrial hygiene standpoint or that each

16  exposure is a -- considered a cause.  And, again, we're not

17  talking about one fiber in their thinking.  But then we had

18  that series of cases that came out in the last few years that

19  said, well, that's not a sufficient enough basis to opine on

20  dose and causation.  So instead we've now just taken the

21  exposures that we know now today are left in this case for

22  these Defendants and taken each of those exposures.  So if

23  every exposure's a cause, now we're -- now we just created a

24  hypothetical with the specific facts that looks like what we're

25  going to essentially prove at trial.  And that's the basis for

1    the -- those assumptions, or the basis for the opinions, those

2    hypothetical assumptions.  And that's how the experts testify

3    at trial.  And we've -- we presented that in the depositions,

4    again taking what we all knew as the facts because essentially

5    it's the same thing we had for summary judgment in these cases,

6    and applying -- instead of saying, oh, each of these exposures,

7    we said, now, okay, let's assume these specific ones that we're

8    talking about and narrow the opinions down to those.  And

9    that's what we did.

10           See if there's anything else I should add.  Again,

11   Your Honor, if you have specific questions, please ask me;

12   because as I say, we didn't specifically take *Daubert*

13   depositions in this case so I think we've got enough

14   information from other testimony, we can answer any

15   foundational questions.

16           **THE COURT:**  Okay, thank you, Mr. McCoy.  Mr. Rhoades?

17           **MR. RHOADES:**  Your Honor, I think the way we decided

18   to deal with this is that I would kind of take the point on the

19   Garza IH-type motions.

20           **THE COURT:**  Right.

21           **MR. RHOADES:**  And so I will talk briefly about those.

22   I don't want to add to a record that you don't need added to.

23   But, you know, part of the challenge with this motion was that

24   Mr. Garza was deposed and it wasn't titled "*Daubert*

25   deposition," or whatever we think it should have been titled,

but he had produced a report, we deposed him essentially on the
report. I think that's typically how it goes and I'm not sure
we need an extra deposition to deal with *Daubert* issues. The
report is essentially a cut-and-paste report that has been
submitted in hundreds of asbestos cases. In fact, I apologize
for having -- for sending you the *Moan* (phonetic) materials. I
thought it might be instructive to you. I always go back and
forth about whether to dump one court's work on another that's
not directly controlling. But given the fact that we have
wrestled with these issues, that it was essentially an
identical report from the same folks, and the challenge was
essentially the same, I thought it might be instructive. And
when I say an "identical report," I mean even to the opinions
being a word-for-word identical, other than the name change.
And so, you know, the issue that we have is typically, and what
we've kind of argued about in the other case, is that these
gentlemen have gotten together and put together what they deem
a comprehensive literature review that deals with as many
aspects that they could think of as these cases as they could,
and then they kind of take whatever they glean from each
individual case and they apply it to the report and they come
out with their conclusions. Our problem with their methodology
is that they, both of them, have cited to this De Nardi
(phonetic) text as the kind of blueprint for how to do these
things. And I have the four chapters, I've read them as many

1    times as a layperson can read this stuff, and I think I

2    understand the procedure, but it essentially involves

3    collecting data and then analyzing the data.  And, you know, in

4    particular, what seems to be important to Mr. Garza is, "A,"

5    there are some witnesses that saw visible dust and so there are

6    a group of publications that tell me visible test equals "X"

7    million particles per cubic centimeter.  And so what I did was

8    I looked a little bit more closely at the report about those

9    studies, and that's section five of their report which is your

10   doc. number 178-2 of your -- and so what the discussion and the

11   citations about visible dust refer essentially to what section

12   five of that report, which is on page eight.  And to

13   Mr. McCoy's comment earlier about the peer-reviewed nature of

14   these articles, the first article cited there for the

15   proposition that dust contains a certain number of million

16   fibers per cubic centimeter is a deposition of a plaintiff's

17   expert in another asbestos case, Demet (phonetic) deposition,

18   February, 1998; hardly peer-reviewed.  The second article is

19   entitled "Calidria 1968."  It is a marketing publication put

20   out by Union Carbide, which I have a copy of.  It contains a

21   reference to what general dust looks like in terms of numbers

22   of particles.  It doesn't say anything about asbestos or non-

23   asbestos or what the content was or anything else, and it

24   certainly doesn't have any citation to any methodology used to

25   reach those numbers.  And, you know, there are several other

1   citations in this as well that cite to different articles for

2   particular propositions.  There's a citation to a Dodson study,

3   which is a peer-reviewed study.  It's entitled "Asbestos Risk

4   Assessment Epidemiology and Health Effects."  But if you look

5   at the actual proposition that this article is cited for, it --

6   to another article, which I wasn't able to find unfortunately,

7   authored by someone named Hemeon (phonetic) that contains

8   Mr. Hemeon's conclusions about what dust looks like in terms of

9   the number of particles in different lighting conditions, but

10  also doesn't contain any reference to a methodology that I

11  assume somebody who was in the business of quantifying these

12  things might be interested in before formulating an opinion.

13          We asked Mr. Garza which of these articles did you

14  use to reach your numbers.  And his response essentially was,

15  boy, it'd be really hard for me to pick one out, pretty much

16  all of them.  It makes it difficult for us to challenge that

17  because there are, as you know, several hundred articles that

18  are cited in his report.  Now, I've highlighted a few for you

19  that don't appear to be the type of information that a

20  scientist might rely on if he were doing work for somebody and

21  getting paid for his scientific work, which I think is the

22  standard we'd like to hold these experts to.  And so, you know,

23  there -- the other big area, and I don't want to -- I'll shut

24  up in a second.

25          The other big area is the thermal systems insulation,

1 which obviously my client is concerned about and both of us are

2 in these cases.  You know, one of the big articles is the Brown

3 article that's cited to.  You know, the Brown article, and

4 there was an argument in the other court that it was peer-

5 reviewed.  It's actually a speech that was given by someone

6 that was transcribed and put down in a journal.  It's not a

7 peer-reviewed article.  And so, you know, to the extent that we

8 are able to try to defend these claims, what we want is some

9 connection between what the evidence is in the case and what

10 the peer review, the process is that you're using to make the

11 connection to formulate your opinion.  And that's absent in

12 this case because Mr. Garza wasn't able to make that connection

13 for us.

14        There are other issues with the methodology, you

15 know, that I think we briefed but, I mean, he didn't really do

16 anything other than read deposition testimony and try and use

17 his basic knowledge that he collected over the years to

18 scribble down some numbers about what exposures he thought were

19 important.  But one thing I did want to point out is one of his

20 conclusions, and perhaps the most important one with respect to

21 this case and these cases, is opinion "B."  This is Document 71

22 in the '13 case, I apologize.

23        **THE COURT:**  Yeah, unfortunately I've been looking at

24 the '10 docket.  But that's okay, I can go back and find

25 something if I need.

1              **MR. RHOADES:**  I'm sorry, 178-2 in the '10 case.

2              **THE COURT:**  Hold on a second.  Really?  Because the

3       last docket entry I have in the '10 case is 145 so --

4              **MR. RHOADES:**  I'm looking at a file-stamped copy and

5       I have one on the computer that we submitted as an exhibit.  It

6       has a 2-10-cv-67443 (indisc.) stamp on it filed 8/13/12.  In

7       any event, it's the same report we've been looking at.

8              **THE COURT:**  Yeah, there's nothing filed on that date

9       in the 2010 case so I don't know if somehow we -- I just -- I

10      may have the '10 docket open, but it's okay.  It's --

11             **MR. RHOADES:**  It's page -- it's the -- it's opinion

12      "B" of the opinion section, which is section four.  And the

13      opinion is:  "Significant exposure to asbestos includes" and

14      then a series of activities "in such a manner that airborne

15      asbestos fiber concentration is released above background

16      concentration."  That's an opinion that they've offered.  But

17      there's nothing in their work that supports that opinion or

18      tells us how much over.  Is it anything over background?  Is it

19      -- and this is what industrial hygienists are supposed to do is

20      categorize these things.  And so this is the challenge here

21      that we have, right?  We have all these historical studies that

22      say, you know, this activity does this and that activity does

23      that.  And then we have current practitioners who opine that

24      anything over what some governing body has determined is a

25      background level is a significant exposure and should become or

1    be able to become the foundation for a viable claim in these

2    cases.  And there's no real connective tissue between those

3    propositions.  And so I guess that's kind of a nutshell of the

4    challenge to Mr. Garza offering his opinions in this cases.

5         **THE COURT:**  Thank you, Mr. Rhoades.  And then

6    Mr. Schumacher's going to take the rest of it; is that right?

7    Am I understanding --

8         **MR. SCHUMACHER:**  Well, I'm going to piggyback just a

9    little bit --

10        **THE COURT:**  Okay.

11        **MR. SCHUMACHER:**  -- on what Mr. Rhoades had to say,

12   and I'll just stick with Mr. Garza since we started there.  And

13   then I'm going to talk a little bit --

14        **THE COURT:**  About the doctors.

15        **MR. SCHUMACHER:**  -- about the other -- the doctors,

16   yes.  So in addition to I think Mr. Rhoades referred to it as

17   the connective tissue that's lacking in this particular

18   instance with Mr. Garza's proposed testimony or in response to

19   hypotheticals, is in specific regard to Pabst, the fact that

20   Mr. Garza candidly acknowledges that at no time has he received

21   any information tying anything that he might talk about to

22   Pabst, other than simply a bullet point that says Plaintiff

23   worked at some unknown time at Pabst Milwaukee, unknown

24   location, unknown time, unknown place in the plant, unknown

25   what Plaintiff did, what Plaintiff encountered; and, as a

1  result of that, suddenly relied on testimony from just a

2  complete different case with a complete different plaintiff and

3  a complete different set of facts and is now extrapolating that

4  to Pabst.  I think, you know, again, to borrow Mr. Rhoades's

5  phrase, if we're talking about connective tissue, you know,

6  we're so far afield of any possible connection to Pabst with

7  any then-industrial hygiene opinions of exposure of the type

8  that Mr. Rhoades just discussed with regard to Pabst that I

9  don't know how we defend against that fundamentally, because

10  we're asked to simply imagine that a different plaintiff in a

11  different lawsuit with a different set of facts and experiences

12  should just be grafted on to this one.  That's all I'm going to

13  say about Mr. Garza.  I don't think there's any reason to move

14  forward.

15          With regard to the doctors, what I'm hearing Your

16  Honor say is, you know, take the handwritten, single-spaced,

17  you know, sort of outline of presentation and sort of just put

18  that aside, Your Honor's read the papers.  So I want to --

19          **THE COURT:**  You can read me the single-spaced if you

20  want to.

21          **MR. SCHUMACHER:**  No, no, no.  I'm not dying to do it.

22          **THE COURT:**  Okay, all right.

23          **MR. SCHUMACHER:**  I think there's a couple of

24  particular issues though that I'd like to bring up to highlight

25  sort of some issues that we brought forward in our papers.  One

1    of them is sort of an aside.  It's an argument that was made in

2    Plaintiffs' opposition that -- just because I don't want it to

3    -- I'm not sure where it comes from, but just the notion that

4    somehow a *Daubert* motion is a dispositive motion.  We noted in

5    the opposition, our papers, that a *Daubert* motion fundamentally

6    by definition is not a dispositive motion.  But since the

7    filing of our paper, I actually found a couple of cases that

8    point blank note that a *Daubert* motion is not a dispositive

9    motion.  And I'll quote for instance from Government Employee's

10   Insurance Company, which I think that's the fancy name for

11   GEICO, v. KJ Chiropractic Center out of the Middle District of

12   Florida where the court -- I guess this particular argument was

13   advanced and the court specifically noted, and I quote:  "A

14   *Daubert* motion is not a summary judgment motion, motion to

15   dismiss, or other motion that purports to resolve a claim.  It

16   is a motion to exclude expert evidence pursuant to Federal Rule

17   of Evidence 702.  As such, it is not a dispositive motion."  I

18   just think that should be made clear that, you know, a motion

19   to limit or strike an expert's testimony is not a motion on the

20   ruling of the merits of the case, which is what a dispositive

21   motion does.

22          If we move specifically to the doctor experts, and I

23   guess I'm going to concentrate -- I think we have agreement.

24   I'm not going to say that I'm a hundred percent sure that we

25   have agreement with regard to Dr. Brody, that he is not

1 offering -- or he's not being proffered to offer a specific

2 causation opinion.

3          **THE COURT:**  That -- I actually have that in my notes.

4          **MR. SCHUMACHER:**  Okay.

5          **MR. MC COY:**  That's correct.

6          **MR. SCHUMACHER:**  And that's fine, because what we are

7 challenging is not general causation.  We're challenging

8 specific causation; because what doctors Brody, Dr. Staggs,

9 Dr. Anderson, what they have all offered are general causation

10 reports that the Plaintiff then seeks to graft into a specific

11 causation opinion.  And we can use whatever nomenclature we'd

12 like to use for this.  We can call it "each and every" or

13 "single fiber" or "cumulative exposure" or, you know, I'm sure

14 if I started going through various opinions of various courts

15 and various expert reports, I would find half a dozen more, you

16 know, versions of phraseology for what we're going to call

17 this.  But fundamentally, almost every Federal Court that has

18 looked at opinions like these, including specifically some of

19 Dr. Anderson's opinions, have found that they're all

20 functionally the same thing; and that the issue is not simply

21 one of dose and exposure, although those are part of it, it's

22 really every single factor of the *Daubert* rubric of the Court's

23 gatekeeping function.  It's a methodology that can't be tested.

24 It has no error rate.  It -- I mean, fundamentally, this

25 methodology will always -- if you plug in a couple of key

1  factors, which is a sick plaintiff with alleged asbestos

2  exposure with this methodology, you will always get equals

3  specific causation to whatever the product or the premises is

4  that you're going to talk about. And I think the -- I mean, I

5  think it's fairly obvious that the most seminal case we've got

6  to look at based on where we're sitting today is the Seventh

7  Circuit's recent *Krik* (phonetic) opinion. You know, it was

8  interesting because in the *Krik* opinion at page 676,

9  plaintiff's counsel specifically noted -- and this is actually

10  quoted, this is a transcript from the argument before the

11  Northern District of Illinois that the Seventh Circuit is

12  quoting -- where the plaintiff's counsel specifically notes:

13  "That's right. That's how" in this case "Dr. Frank would say

14  any exposure. All exposures contribute." This is functionally

15  what Mr. McCoy just said 25 minutes ago when he was referring I

16  think at the time to Dr. Anderson. And if we look to, you

17  know, the *Krik* opinion and where the court sort of laid out a

18  variety of bullets that are specifically referenced in Pabst's

19  papers -- I'm sorry I don't have it. It's always I have too

20  many papers in front of me at once. Several direct quotes from

21  the Seventh Circuit's opinion, most of them are at page 675.

22  One of them's at page 677. I'm not going to read them to Your

23  Honor because they're already in our papers. And I don't think

24  Your Honor would want me to do this, but with each one of these

25  quotes, and I'll just take the first one, *Krik*'s experts

1  "readily admitted in in their depositions that they had not

2  considered any information about the amount of exposure in

3  their analysis."  With each one of these bullet points, I can,

4  right in front of me if Your Honor wants to, pull out each one

5  of, in this case Dr. Staggs's and Dr. Anderson's, deposition

6  testimony and match up almost as though they read this and

7  said, well, that's what I need to say, except that that's what

8  I don't want to say, where they are explicitly matching each

9  one of these bullets that the Seventh Circuit -- that the

10 Northern District of Illinois found objectionable that the

11 Seventh Circuit heartily agreed with.  I'm not going to do that

12 unless Your Honor actually wants me to pull them out.  I didn't

13 think so.

14          **THE COURT:**  Okay.

15          **MR. SCHUMACHER:**  So, you know, moving beyond that,

16 the -- each one of these reports with Dr. Staggs and

17 Dr. Anderson, and each part of their testimony -- and once

18 again, I'm not really -- I'll confess, I'm not really quite

19 sure the notion of a *Daubert* deposition versus a non-*Daubert*

20 deposition.  The purpose of the depositions was to explore the

21 experts' opinions with -- and what they are.  That's what we

22 did.  We explored the experts' opinions and they were -- they -

23 - we assume they testified so to what their opinions are,

24 except that there's this notion that, well, we're going to have

25 different opinions that you don't get to know about right now

1  in the form of all these, you know, convoluted hypotheticals

2  that we're going to create.  But fundamentally, at the end of

3  the day, the hypothetical is still going to come down to was

4  there asbestos exposure, is it represented to me that it's

5  something above background, whatever that means because the

6  experts can't defined it -- define it, and if so, ergo equals

7  specific causation.  That's simply not -- that's not a

8  scientific methodology.  It doesn't pass muster under *Daubert*,

9  under *Kumho*, under its progeny, and certainly not under just,

10  you know, whatever it was three months ago, the *Krik* decision.

11         And then finally -- and I'm going to shut up real

12  soon, too.  Every lawyer's famous last words.

13         **THE COURT:**  No, "I'll be brief, Your Honor," is every

14  lawyer's famous --

15         **MR. SCHUMACHER:**  I suppose that's the more gentile

16  way to say it.

17         **THE COURT:**  I've said it myself plenty of times so

18  it's okay.

19         **MR. SCHUMACHER:**  So I think there's another notion,

20  and that is that because Dr. Staggs and Dr. Anderson's reports

21  are general in nature, the fact that they're suddenly going to

22  talk about specific causation when they didn't issue a report

23  on specific causation, couldn't particularly discuss specific

24  causation except to say, well, if you tell me there was

25  asbestos there, then I'm going to say there's specific

1    causation, I would argue the reports also don't pass muster

2    under, you know, Rules 37 and 26.  And interestingly enough,

3    this is sort of what Mr. McCoy was just talking about with --

4    I'm sorry, I'm blank.

5            **THE COURT:**  Mr. Paulsen.

6            **MR. SCHUMACHER:**  Yes, thank you.  And, you know, with

7    regard to Dr. Anderson, Dr. Staggs, they don't provide any

8    information for which to bind them to their opinions with

9    regard to specific causation because their opinions by

10   definition are totally and wholly general in nature.  And it's

11   too late on litigation that's been around since 2010 and 2013

12   to suddenly try to cure that now, as I think Plaintiff is

13   trying to do with this affidavit, but which I would still argue

14   does not pass any muster.  It's really not changing any of the

15   opinions, it's just using different nomenclature in 2017 and --

16   or 2018 now.  Sorry, we're still at that point where my mind

17   hasn't caught up.

18           **THE COURT:**  Mine will sometime in June.

19           **MR. SCHUMACHER:**  So with that being said, I have one

20   other point.  And it has escaped me.  Probably wasn't that

21   important anyway.

22           **THE COURT:**  Three o'clock in the morning it'll come

23   to you.  Okay, thank you, Mr. Schumacher.  Mr. McCoy, I'll turn

24   back to you just for the -- if you have any last words with

25   regards to these arguments, not last words period.

1          **MR. MC COY:** Right.  Yeah, the *Krik* opinion was one

2     of judicial discretion.  It said based on whatever record they

3     had in that case.  So the record here is far more fleshed out

4     about the basis for expert causation opinions and it's not just

5     this -- it's not the statement that every exposure is a cause.

6     That's not the basis for the opinions.  It's the factors listed

7     in Dr. Anderson's testimony and in his affidavit that was

8     submitted specifically for *Daubert*.  And, of course, when you

9     get down to *Daubert*, you're talking about not necessarily what

10    the jury's going to hear but about the proper foundation.  So

11    to provide additional information for a *Daubert* hearing, under

12    Rule -- I believe it's 104, that wouldn't necessarily be

13    submitted to the jury is proper to provide additional

14    foundation.  And that's what's been done with Dr. Anderson's

15    affidavit.  So there's all these different factors in there

16    that aren't anything about what was discussed in the *Krik* case,

17    which only had to do with this one conclusory issue about every

18    exposure or being a part of the cumulative and that being the

19    only basis for the opinions.  All these basises (sic) are laid

20    out here in Your Honor's record that aren't discussed in the

21    *Krik* opinion and weren't in that record.

22          The other thing is Ken Garza's report essentially

23    lays out exactly the same thing in his general report where he

24    talks about all these different factors that go into evaluating

25    the significance of the exposures.  He's not saying that

1   there's any certain amount of exposure because, again, that

2   couldn't be said for the very reasons that we talked about,

3   that you don't know day-by-day what exactly Ahnert's work was

4   and what the measurements were.  There were none taken.  And

5   all you know is that he had this job, and in the literature

6   these types of jobs were reported as having these types of

7   exposures when you're using these types of products.  So,

8   again, you're just talking about very common situations that

9   come up over and over and over again.  And that's one of the

10  reasons why his opinion is just based on the fact that there's

11  so much literature about studying thermal insulation and

12  studying gaskets.  So it's a very different record that *Krik*.

13          And, again, we specifically have said in our

14  briefing, we're not going to offer this every exposure opinion,

15  and that the reason for it was, again, because we don't want

16  Your Honor to have to be bothered with that argument.  It's

17  just -- it's not worth it because we have all of these other

18  bases and reasons that have been laid out as to why these

19  particular exposures, scenarios that we've known since the

20  summary judgment motions and the depositions for Ahnert, are

21  ones that would be causes of his condition or would be

22  significant exposures.

23          He's not offering a specific -- none of our witnesses

24  are offering a specific opinion about Pabst.  I heard some

25  comment about that.  And that's very true.  They're only

1  offering opinions about the conditions that will be testified

2  to about Pabst, but they're not witnesses to the Pabst brewery

3  itself.  They're only taking the facts that are being provided

4  through these hypotheticals and opining based on those.  So

5  there's no specific opinion that Pabst -- the conditions at

6  Pabst were dangerous and a cause of his disease.  Nobody's

7  going to say that.  I think we laid out the opinions in the

8  hypotheticals.  But they will say that a period of two weeks

9  doing these activities with gaskets or thermal insulation,

10 whatever it is, specific that other witnesses say about WEPCO

11 and about Pabst, that those are either significant from an

12 industrial hygiene standpoint, meaning above background, or

13 from a medical standpoint, they're a cause.  So they're limited

14 in that way.  Nobody's giving an opinion about WEPCO, nobody's

15 giving an opinion about Pabst; just about the activities that

16 occurred at those places.

17         There was also some mention about industrial hygiene

18 methodology, but I don't -- there's nothing unique here about

19 any of the procedures that Garza's following or methods that

20 he's following in assessing asbestos exposures.  I think we

21 made it clear in our brief that he's using exactly the same

22 basis in assessing these exposures and that that exposure

23 methodology that he uses repeatedly, and he said so in his

24 deposition.  But he doesn't go out there and have somebody at a

25 job site disturb the asbestos and go out there and measure it.

1   That's not how -- that's not how it works.  You probably -- you

2   couldn't even do that.  And so instead you have to rely on the

3   reports and the literature about these activities and the

4   conduct and the fact that there is visible dust is one element,

5   but it's not necessary because most all of the asbestos is

6   invisible.  So instead you deal with these situations where you

7   have the activity of disturbing this thermal insulation or

8   removing this gasket and then that activity is known to produce

9   significant amounts of fibers.  So he's -- he's assessing it in

10  that way, the way he would do it in any place.

11          And these -- again these are very common types of

12  products, there's nothing unique about this, you know, when you

13  talk about the gaskets and thermal insulation.  In his report

14  he's got whole big sections of those, and that's coupled with

15  the basic industrial hygiene concepts of asbestos, or

16  principles of asbestos, I should say, those principles being

17  that these fibers, once they get up into the air they become

18  invisible and they travel for great distances, they can travel

19  for miles.  And they -- and even when they settle out then

20  they'll stay in the air for days.  But when they settle out,

21  importantly, they're very easily kicked back up in the air.

22  So, again, those are factors that he's considering in his

23  assessment of these types of products and these types of

24  activities.  But there's no one unique methodology that -- that

25  you have that says you have to have a measurement to make an

1   industrial hygiene assessment, you have to have a measured

2   amount of exposure or you have to do something, sort of those

3   reconstruction that -- that's, as I say, basically not possible

4   for a particular individual because you can't -- you don't have

5   any data, you don't have a video of what happened on that day

6   or each day that he was exposed at WEPCO, we don't have that,

7   that kind of data to make that kind of reconstruction.  Instead

8   you have knowledge of these activities based on what the co-

9   workers remember and WEPCO didn't document any of this so we're

10  stuck with what the co-workers remember which is, you know,

11  back 40 years ago they weren't thinking about asbestos

12  exposures, it wasn't a concern to them, obviously.  They were

13  out there doing their jobs so when they testify now they have

14  only limited recall of these situations, but that recall is

15  sufficient to fit into the pattern of the literature that these

16  activities performed in these normal and customary ways are

17  going to create significant exposures or are going to be the

18  source of medical causation.

19          So I think that, again, these are spelled out in our

20  briefing that these are all the different bases and I won't go

21  into it any further, I think I've covered it, unless Your Honor

22  has a question.

23          **THE COURT:**  Thank you, Mr. McCoy.

24          And thank you all for your arguments.

25          **MR. SCHUMACHER:**  Your Honor, if I may before we go

1 any further?

2        **THE COURT:** Sure.

3        **MR. SCHUMACHER:** What I wanted to -- not responding

4 to Mr. McCoy, tell you that I remembered my thought --

5        **THE COURT:** Oh, good.

6        **MR. SCHUMACHER:** -- if I could get it out.

7        **THE COURT:** That's quicker than I would have

8 remembered it.

9        **MR. SCHUMACHER:** I knew as soon as he started talking

10 that it was going to come to me.

11        I actually just wanted to address -- I don't want to

12 address them all, but I also think it's important to address

13 some of the case law that the Plaintiffs cited in opposition to

14 our Briefs and how inapposite it really is. And I'll call out

15 a couple in particular.

16        The Plaintiff relied on the *Milward* case from the

17 First Circuit in arguing that his expert's methodology was

18 appropriate and met the *Daubert* standard, but once again

19 *Milward* actually fits perfectly within the framework of what

20 we're referring to. Specifically *Milward* is a First Circuit

21 case where the First Circuit reversed the District Court which

22 had excluded expert testimony.

23        The expert in the District Court was making a general

24 causation opinion overall that exposure to benzene could cause

25 a form of leukemia, that's all the expert was saying, and the

1   District Court excluded that.  And the First Circuit determined

2   that based what had occurred that the record that the experts

3   methodologies, you know, all of the factors for *Daubert* had

4   been met to issue that general causation opinion.

5          Once again the First Circuit explicitly noted they

6   weren't touching specific causation; they were not saying that

7   Company A's allegedly benzene-containing product caused

8   Plaintiff's alleged leukemia, those -- they're just

9   fundamentally different things.

10          And another one that Plaintiff cites is the *Ross* case

11  which is a Pennsylvania Supreme Court case.  I'm probably safe

12  in saying I'm the only person in the room who's actually a

13  Pennsylvania lawyer and I'm very familiar with this case --

14          **THE COURT:**  Speaking for myself you're right.

15          **MR. SCHUMACHER:**  -- and I'm very familiar with this

16  case and the Pennsylvania Supreme Court explicitly noted in the

17  Opinion that they were rejecting the every exposure opinion.

18          Now Pennsylvania operates on a *Frye* standard, it's a

19  little bit different, but while they upheld or while they noted

20  that the expert's testimony met the muster of *Frye* in a case

21  where there was well-documented fiber exposure years of between

22  45 to 100 fiber per cc exposure years, which we don't have any

23  of that in this case, they determined that there was -- there

24  was sufficient data, the data that doesn't exist in this case,

25  to determine that the expert met the *Frye* standard.  Again,

1   it's just a -- it's a very different thing than what we're

2   talking about here.

3          That's all I was going to say with regard to my --

4          **THE COURT:**  Escaped thoughts.

5          **MR. SCHUMACHER:**  -- missing my escaped thoughts.  I

6   could certainly respond to Mr. McCoy, but I don't think that's

7   what Your Honor wants so I will stop there.

8          **THE COURT:**  Okay.

9          **MR. MC COY:**  And there is no minimum fiber year level

10  for mesothelioma.

11         **THE COURT:**  Okay, but I don't think that's what the

12  argument was, but --

13         **MR. MC COY:**  That doesn't exist.

14         **THE COURT:**  All right, thank you all.

15         So let me -- I'll take these a bit at a time and I'm

16  going to start with Docket Number 114 which is the Plaintiff's

17  Motion, and that's a Motion for an Order excluding any exposure

18  or every exposure testimony.

19         This was filed as a *Daubert* Motion.  It is not what I

20  consider to be a traditional *Daubert* Motion because -- and,

21  again, I guess my opinion doesn't really matter, but a *Daubert*

22  motion usually is a motion that says:

23         "This particular person is either not qualified to be

24          an expert or isn't qualified to be an expert on a

25          topic that would be of assistance to the trier of

1          fact or does not use the methodology that is reliable

2          and repeatable," if you will.

3          And I'll go over that standard in a minute.

4          What this Motion, as I read it, Docket 114, seeks is

5   an Order from me instructing all parties that no one can put a

6   witness on the stand and then elicit from that expert witness

7   testimony about the any exposure theory or the testimony about

8   the every exposure theory.  And basically what the Motion

9   really seems to be is a stipulation from Mrs. Ahnert where she

10  says "I'm telling you I won't do that, guys, and since I'm

11  telling you I won't do that you should agree that you won't do

12  it either, and if we're all in agreement then -- then we're

13  good."

14          I -- I appreciate the thought, I think, but the

15  reality is as Mr. Schumacher said that what's being proposed

16  here is that I issue an Order telling people to abide by

17  Seventh Circuit law, and I'm not sure that I need to tell

18  anybody to do that, the Seventh Circuit has already done it.

19          The -- I suspect that this Motion was, in some

20  respect, in anticipation of or a response to Krik, and I'll

21  just briefly go over *Krik*.  As you all know it's *Krik versus*

22  *Exxon Mobil Corporation*, 870 F3d 668, it was decided last year

23  by the Seventh Circuit.

24          In that case the Plaintiff in *Krik* was trying to

25  argue what it called a "cumulative" -- or what he called,

1    sorry, "a cumulative exposure theory," and kept hitting over

2    and over again on cumulare exposure.  And the reason that the

3    Plaintiff, I think, probably emphasized so heavily that -- that

4    label was because the Plaintiff was aware that the any exposure

5    theory or the each and every exposure theory was not tenable in

6    the Seventh Circuit, and so that Plaintiff, and I don't mean in

7    any way to be dismissive, but creatively said "We're not

8    arguing those, we're arguing cumulative exposure."

9         The District Court in the Northern District decided,

10   first of all, that any exposure was not reliable enough for

11   specific causation and that each and every exposure was not

12   reliable enough for specific causation, and so in response to

13   that the Plaintiff said "Okay, we're going to call a cumulative

14   exposure expert."

15        The District Court said I don't see the difference,

16   it's another label for basically the any exposure or the each

17   and every exposure theory and suffers from the same flaws as

18   those theories do, which is that there is not, and I'm quoting

19   here:

20             "Cumulative exposure, any exposure, each and every

21             exposure, whatever you want to call it, is not tied

22             to the specific quantum of exposure attributable to

23             the Defendants, but instead was based on his medical"

24             -- the expert's "medical and scientific opinion that

25             every exposure is a substantial and contributing

1          factor to the cumulative exposure that causes

2          cancer."

3          That is a quote from *Krik* at Page 673.

4          And, of course, at the end of that case the jury

5    found that it was something other than exposure that caused

6    Mr. Krik's cancer.

7          On appeal in front of the Seventh Circuit Mr. Krik

8    argued that that was narrow on the District Court's part, that

9    they weren't the same thing.

10         The Seventh Circuit didn't agree.  The Seventh

11   Circuit said that the cumulative exposure theory was "more of

12   the same," that *Krik* decision at Page 675.  And I'll state

13   directly what *Krik* says:

14         "To summarize, the principle behind the each and

15          every exposure theory and the cumulative exposure

16          theory is the same, that it is impossible to

17          determine which particular exposure to carcinogens,

18          if any, called an illness -- caused an illness."

19         In other words, just like each and every exposure the

20   cumulative exposure theory does not rely on any particular dose

21   or exposure to asbestos, but rather to all exposures, that all

22   exposures contribute to a cumulative dose.

23         "The ultimate burden of proof on the element of

24          causation, however, remains on the Plaintiff

25          requiring a Defendant to exclude a potential cause of

1          illness, therefore, improperly shifts the burden to

2          the Defendants to disprove causation and nullifies

3          the requirements of the substantial factor test."

4          That is at Page 677 of *Krik*.

5          So I appreciate the fact that the Plaintiff is saying

6     "I promise that I won't elicit any testimony about any exposure

7     and I promise that I won't elicit any testimony about each and

8     every exposure."

9          I, under *Krik*, think that there should also be a

10    promise not to elicit any testimony about cumulative exposure

11    because the Seventh Circuit has said same difference, and the

12    Defense shouldn't be doing it either because *Krik* is Seventh

13    Circuit law and *Krik* says that those theories are not reliable

14    under *Daubert* and, therefore, can't form the basis for

15    causation.

16         So to the extent that I have to rule on the Motion

17    I'll grant it, but I think it's a little bit almost in the

18    sense of a -- of a nonevent because I'm simply saying by

19    granting that Motion that what the Seventh Circuit has said is

20    the law is the law and everyone should abide by what the

21    Seventh Circuit has said the law is.

22         When I was in Bankruptcy Court I once had a

23    bankruptcy attorney who asked me, he said "You know, this

24    particular Order doesn't say anything about Section 1114," and

25    the Plaintiff's lawyer looked at me and said "Judge, if you

1   want me to put a provision in the Order that says the

2   Bankruptcy Code says what the Bankruptcy Code says, I'm happy

3   to do that, it will save a lot of typing and we won't have to

4   retype the whole Code into the Order."  And I don't mean to be

5   flip but that's a little bit what this feels like to me, I'm

6   issuing an Order saying there's a case that says this and the

7   Seventh Circuit has said you have to do it and so that's what

8   we're going to do.  So I'll grant the Motion, but I think it's

9   in the for what it's worth category.

10          That comment, however, then I think takes us to the

11  more specific Motions, and I should emphasize again in granting

12  Docket 114 I'm also affirming that the burden still remains on

13  the Plaintiff to prove that it was exposure to either of these

14  Defendants' asbestos in either of these Defendants' locations

15  that caused the actual disease.

16          And that takes us to the second Motion, which is

17  Papst's Motion and employees in Sprinkmann and WEPCO's Motions

18  to strike certain of the expert's testimony.

19          I'm looking now at Docket Number 116 in the 2010

20  case, which is the Papst Motion, and at Docket Number 122 in

21  the 2010 case which is the Motion of the other Defendants.

22          And the starting place for that discussion now that

23  we're actually into the weeds of *Daubert* is to go over the

24  weeds of *Daubert*.

25          So what I understand that the Plaintiff has done is

1    to identify Dr. Anderson who as, as Mr. McCoy has indicated, is

2    a medical doctor and he formerly was the Chief Medical Officer

3    and State Epidemiologist for our version of OSHA, the State

4    version of OSHA in Wisconsin and is also a professor at UW;

5    Mr. Brody -- or Dr. Brody, who's not giving a specific

6    causation testimony and then Dr. Staggs.

7            And the purpose for calling, as I understand it, all

8    three of those individuals -- in fact, let me exclude

9    Dr. Brody, I don't think we really need to have a discussion

10   because we're going to be coming to a conclusion that will

11   apply to him, but will not serve to just -- to exclude his

12   testimony.

13           But the purpose for calling Anderson and Staggs is to

14   establish a causal link between exposure to asbestos from

15   either one of these Defendants or any one of these Defendants,

16   and the mesothelioma and the asbestosis that the coroner found

17   caused Mr. Ahnert's death.

18           By -- by its very terms, by the very definition of

19   the purpose for calling those experts the purpose for calling

20   them is to prove specific causation.  And as to many of

21   Mr. McCoy's comments today and many of the things that he said

22   in his briefs I'm not entirely sure that anybody in this room

23   would disagree with many of them.  Everyone knows and science

24   has proven that asbestos is a dangerous substance; that if it

25   gets into people's lungs it can cause all sorts of damage that

1    if you start off, it stays in the air and floats around and it

2    can stay there for a long time that -- as Mr. McCoy said we

3    don't have any idea how many of those fibers may actually make

4    their way from your nose down to your lungs to the portions of

5    your lungs where it can cause damage.  I don't disagree with

6    any of that, I'm guessing probably most people don't disagree

7    with any of that.  That's not the point of this lawsuit.

8           The point of this lawsuit is not to convince a jury

9    that asbestos is not a good thing.  It's not to convince a jury

10   that exposure to asbestos is a bad thing.  It's not to convince

11   a jury that people can get sick or die from exposure to

12   asbestos.  The point of this lawsuit is to explain to a jury

13   how Papst or Sprinkmann or WEPCO provided exposure that

14   specifically caused Mr. Ahnert's illness that caused his death.

15   Because, otherwise, all we're doing is proving a general

16   principle.  So in making the ruling that I am about to make I

17   am not disagreeing with any of the general propositions that

18   Mr. McCoy and the Plaintiff has made about generally the

19   science around asbestos and the science around the problems

20   that it can cause medically.

21          Now let me turn to the *Daubert* standard for a second.

22          The first question that I have to determine, I think,

23   is whether or not expert testimony is even necessary for a

24   Plaintiff to establish a prima facie case, because if it's not,

25   if one does not need expert testimony, then this whole

1    discussion is a little bit of a red herring.

2              Wisconsin Courts don't require expert testimony as

3    long as the case involves issues within the common knowledge of

4    a lay jury, that is *Peplinski v Fobe's Roofing, Inc.,* 531 NW 2d

5    597 at 601, a 1995 case from Wisconsin.  There are several

6    other cases, though, that make that same statement.

7              Products liability cases are not treated any

8    differently although this really technically isn't one, so you

9    don't necessarily have to have an expert witness if you've got

10   lay witnesses who can testify to the particular issue.

11             But here, as I indicated, the question is causation,

12   that's the whole bottom line discussion.  And the question of

13   causation and I'm quoting here:

14             "Like the issue of negligence involves technical,

15             scientific or medical matters which are beyond the

16             common knowledge or experience of jurors and without

17             the aid of expert testimony the jury can only

18             speculate as to what inferences to draw if the jury

19             were left to its own devices to determine the issue."

20             That's the *City of Cedarburg* case, and the full cite

21   for that is at -- where did I put it?  There, 149 NW 2d 661 at

22   662, a 1967 case from the Supreme Court of Wisconsin.

23             So it's pretty clear here as I just stated the issue

24   that I believe is going to be before a jury that the only way

25   for the Plaintiff to be able to prove the kind of causation

1    that we've just been talking about is through expert witnesses.

2           So that then takes us to the next question.  Rule

3    702, of course, is the governing rule.  The attorneys have

4    already said that, as well as Daubert versus Merrell Dow

5    Pharmaceuticals, 509 US 579 from 1923 -- 1993.

6           Rule 702 says that:

7           "A witness may testify as an expert and it is

8           discretionary with the Court if the witness is an

9           expert by knowledge, skill, experience, training or

10          education.  The expert's knowledge will help the

11          trier of fact to understand the evidence or determine

12          a fact at issue.  The expert's testimony is based on

13          sufficient facts or data and is the product of

14          reliable principles and methods, and the expert has

15          reliably applied those principles and methods to the

16          facts of the case."

17          The Supreme Court has held that:

18          "The Federal Rules of Evidence assigned to the trial

19          Judge the task of ensuring that an expert's testimony

20          both rests on a reliable foundation and is relevant

21          to the task at hand."

22          That's a quote from Daubert at Page 597.

23          The Daubert Court concluded that:

24          "Under Rule 702 a District Court must engage in a

25          three-step inquiry before allowing a witness to

1          testify as an expert:

2          First, the Court has to determine whether the expert

3          is proposing to testify to scientific knowledge that

4          will assist the trier of fact to understand or

5          determine a fact in issue.

6          Second, the Court must determine whether the

7          reasoning or methodology underlying that testimony is

8          scientifically valid.

9          And, third, the Court must determine whether that

10          reasoning or methodology properly can be applied to

11          the facts at issue at the case."

12          *Daubert* interpreted an earlier version of Rule 702,

13 but it remains as the Seventh Circuit has said:

14          "The gold standard for evaluating the reliability of

15          expert testimony and is basically codified in the

16          current Rule 702."

17          That's *Manpower Inc. versus the Insurance Company of*

18 *Pennsylvania*, 732 F3d 796 at 806 from the Seventh Circuit in

19 2013.

20          702 says that "An expert witness can be qualified as

21 an expert by knowledge or by skill or by training or by

22 education," any of those will work, and it also includes

23 experience so you don't even necessarily need to have those

24 things.

25          "An expert need not have a particular academic

1          credential to be qualified.  Anyone with relevant

2          expertise enabling him to offer a responsible opinion

3          testimony helpful to the Judge or jury may qualify as

4          an expert witness."

5          That's *Tough Racing Products, Inc. versus American*

6  *Suzuki Motor Corporation*, 223 F3d 585 at 591, a 2000 case from

7  the Seventh Circuit.

8          "In order to be relevant for the purposes of Rule 702

9          the testimony must assist the trier of facts to

10         understand the evidence or to determine a fact in

11         issue."

12         "Relevant evidence is evidence that has a tendency to

13         make the existence of any fact that is of consequence

14         to the determination of the action more probable or

15         less probable than it would be without the evidence."

16         That's from *Daubert* at Page 587 and of course it's

17  quoting 401 -- Rule 401:

18         "Where an expert's hypothetical explanation of the

19         possible and probable causes and would aid the jury

20         in its deliberation that testimony satisfies

21         *Daubert*'s relevancy requirement."

22         That's *Smith versus Ford Motor Company*, 215 F3d 713

23  at 718 and 19, again, a 2000 case from the Seventh Circuit.

24         "If an expert uses hypothetical explanations for

25         causes of an event those hypotheticals must have

1          analytically sound bases rendering them more than

2          mere speculation by the expert.

3          Again, *Daubert* at Page -- I'm sorry, *Smith Motor*

4     *Company* at Page 719.

5          "The question of whether the expert's theory is

6          correct given the circumstances of a particular case

7          is a fact question that's for the jury."

8          Again from *Smith*.

9          "The factors that the trial Court must consider when

10         determining reliability of an expert's testimony are:

11         Number 1, of whether the expert's theory or technique

12         can be and has been tested.

13         Number 2, whether the theory or technique has been

14         subjected to peer review and publication.

15         Number three, the known or potential rate of error.

16         And, Number four, general acceptance in the relevant

17         scientific community."

18         That's from *Daubert* at Pages 593 through '94.

19         So that is the standard that I have to employ in

20    looking at the proposed testimony of each of these experts.

21         The first one is Dr. Anderson and there's been a good

22    deal of discussion today about Dr. Anderson.

23         Papst argues that Dr. Anderson's opinion isn't based

24    on sufficient facts or data because, as -- as Mr. Schumacher

25    also argued with regard to Mr. Garza, Dr. Anderson never

1    mentions Papst in his opinion.  He admits that he doesn't have

2    any specific knowledge relating to Papst or exposure on the

3    Papst premises except I think that he might have gone there one

4    time and had a brewery tour, but other than that no -- no

5    exposure to the premises.  Did not estimate Mr. Ahnert's

6    specific exposure to asbestos-containing products at the Papst

7    facility.

8         And Mr. McCoy just indicated today in the hearing

9    that he has never said that Dr. Anderson is going to say

10   specifically that Papst had this particular exposure that

11   caused this or caused that.

12        Dr. Anderson's testimony -- sorry, Dr. Anderson's

13   report, I've got too much paper, too, at Page 8 of his report,

14   and I have that as Docket Number 67 in the -- in the 2010 case,

15   at the bottom of that page Dr. Anderson indicates what his

16   opinions are within the bounds of medical certainty that he's

17   going to give.  And those are:

18        "Number 1, and Mr. Daniel Ahnert developed a

19        malignant pleural mesothelioma on the left (spindle

20        and epithelial type) which was the primary cause of

21        his death.

22        Number two, Mr. Ahnert suffered from asbestosis and

23        bilateral calcified and noncalcified pleural plaques.

24        Asbestosis was a substantial contributing cause of

25        his death.

1          And, Number three, the malignant left pleural

2          mesothelioma, asbestosis and bilateral calcified and

3          noncalcified pleural plaques were caused by his

4          combined occupational and bystander exposure to

5          asbestosis."

6          That is a specific causation opinion.  That is not

7    this is what happens when people are exposed to asbestos;

8    that's not this is what can cause mesothelioma, that is a

9    specific opinion.

10         It isn't specific in the sense that it doesn't refer

11   to Papst, it doesn't say that it was exposure to Papst, or

12   exposure, quite frankly, on this particular page of the report

13   Sprinkmann or WEPCO either, but it is a specific conclusion as

14   to what caused the diseases from which Mr. Ahnert died.

15         Dr. Anderson then goes through in more detail and

16   says and I quote -- I'm actually quoting from my own notes, so

17   don't say I quote, I don't consider it a quote, but that all

18   exposures to asbestos fibers are considered to contribute to

19   the disease process.

20         He was actually asked whether he'd give an opinion as

21   to the actual dose that Mr. Ahnert may have received during his

22   working activities, and he replied "The only thing I would say

23   is the dose was sufficient to cause asbestosis, pleural plaques

24   and mesothelioma.  So -- and that's based on medical

25   literature, my training, professional judgment."

1        Dr. Anderson admitted in the deposition, and as an

2   aside let me say nor am I familiar with the concept of a

3   "*Daubert* deposition." I guess I always consider an expert

4   witness's deposition to be in some way related to *Daubert*

5   because the whole point of deposing an expert witness is to

6   find out whether they have the kinds of opinions that would be

7   admissible under *Daubert* and what those opinions are, so

8   forgive me, but I'm not familiar with that either. But in

9   whatever kind of deposition this was Dr. Anderson admitted that

10  he didn't have any knowledge specific to the facilities in this

11  case, whether these facilities used asbestos fibers, any

12  specifics of that nature at all.

13       There is this affidavit to which Mr. McCoy has

14  referred, and the -- it was presented in connection with the

15  Motion to Exclude Mr. Anderson -- or Dr. Anderson. It's dated

16  October 15th of 2017.

17       Now there is an argument made and I think some hint

18  that what that affidavit really is is a supplemental expert

19  report and as such given the fact that it was filed seven years

20  after this lawsuit started and without leave of Court and

21  without seeking leave of Court, that it could be considered a

22  supplemental and untimely supplemental expert report under

23  26(a)(2)(B).

24       Mr. McCoy has argued today that all it is is evidence

25  of foundation or supporting evidence of foundation. Quite

1    frankly I'm not entire sure that I agree with that, but whether

2    that is true or not I don't think makes a difference to the

3    decision.  The October 15th, 2017 Declaration says that the

4    asbestos fibers become invisible as they break down and they

5    can float for hours and I don't have any reason to dispute

6    that.

7          Then it talks about inhalation and how they're

8    retained by the body and they don't decompose.

9          He says that he's familiar with Mr. Ahnert's work as

10   a pipefitter although as I read it basically what he's saying

11   is I understand that Mr. Ahnert worked as a pipefitter.

12          And then he talks about his knowledge of work

13   practices that can lead to asbestos -- to asbestosis.

14          This is the first time that he ever mentions

15   something about a "dose-response relationship, i.e., inhaling

16   more fibers increases the risk of developing mesothelioma."

17   That I don't think was mentioned in the prior report.

18          And he makes some more specific references to

19   Mr. Ahnert that he did not make in the prior report.  So to the

20   extent that one might consider this a supplemental report I

21   think that new information might support that theory, but still

22   even in this affidavit Dr. Anderson doesn't address the fact

23   that he doesn't have any knowledge specific to any of the

24   particular Defendants; he doesn't have any knowledge specific

25   to Mr. Ahnert's exposure on any particular job site and

1    particularly Papst because there's no mention of Papst at all.

2         He testified at one of his prior -- at his prior

3    deposition that he didn't need to do fiber burden calculations

4    in order to make his opinion with regard to cumulative exposure

5    which, by the way, he can't testify to under *Krik,* but in the

6    same deposition then he said that there has to be more than one

7    single brief exposure to the asbestos.  So I guess you probably

8    figure out where I'm going with this, which is that there is

9    nothing in Dr. Anderson's original report, there is nothing in

10   the October 15th report, which whether you consider it to be

11   buf -- supporting foundation, I don't really -- or consider it

12   to be a supplemental expert report, there is nothing in any of

13   those reports anywhere that provides any information with

14   regard to specific causation or that supports any information

15   with regard to specific causation.

16        Now, I think, and I don't necessarily hear the

17   Defendants disagreeing, that he certainly seems to have some

18   knowledge about mesothelioma, causes of mesothelioma, and

19   things of that nature.  But as Mr. Schumacher argued in the

20   Pabst section of his argument, that is general causation

21   testimony.  That is educating a jury about what mesothelioma

22   is, what asbestosis is, and what can cause those diseases.  It

23   is in no way specific to Mr. Ahnert.

24        I understand the Plaintiffs expression of concern

25   that under cases like *Krik* and places in other Federal Courts

1   that have come to the same conclusion that the Seventh Circuit

2   has come to, that this creates a very difficult world for a

3   plaintiff in a case like this.  Most of his exposures happened

4   years and years and years ago, as we're all aware.  It is very

5   hard if you don't have people who can stand there and say,

6   yeah, I stood next to him every single solitary day and he

7   worked for this many minutes with this much stuff floating

8   around.  It is very hard to figure out how many of those little

9   fibers settled down in the bottom of one's lungs.  I understand

10  that.

11          I'm not sure, though, that under Seventh Circuit law

12  I can provide any solution to that issue.  The Seventh Circuit

13  has made clear that as to specific causation cumulative won't

14  do it, any and every won't do it, whatever, whatever you call

15  it won't do it.  There has to be a specific -- the expert has

16  to be able to use facts that specifically draw a line of

17  causation between a particular defendant and a particular

18  plaintiff and the disease that the particular plaintiff

19  suffers.

20          I also understand that Dr. Anderson, forgive my

21  saying, made a statement that he doesn't subscribe to the any

22  exposure or the each and every exposure theories.  I know

23  that's what he said, but every other word of his reports

24  indicates that that's exactly what he does.  And perhaps that

25  is the only way in a case like this that one can get close to

1    describing causation, but under the existing law it's not

2    enough.

3            Now, to Mr. Schumacher's point that deciding a

4    *Daubert* motion is not the same as deciding a dispositive

5    motion.  Certainly I agree and I'm surprised that there's a

6    case out there that actually says it, because it seems like a

7    given.  It can prove dispositive in some cases.  I have had

8    cases in which once the expert has been excluded a party says,

9    well, that's it for me.  But that's different than a

10   dispositive motion in which a Court says I'm deciding this

11   motion and the case goes away.

12           So I don't believe it is appropriate to exclude

13   Dr. Anderson's testimony entirely and I'm not sure that that's

14   necessarily what either -- any of the Defendants have been

15   asking for.  What I believe is prohibited and what there is no

16   evidence here to support is for Mr. Anderson to give -- or

17   Dr. Anderson, sorry, to give testimony as to specific

18   causation.  And as I indicated, at Page 8 of the report at

19   Docket Number 67 that's exactly what he proposes to do.

20           You know, I suppose we can talk about, you know,

21   because he appears to qualify as an expert on mesothelioma and

22   on asbestosis we can rely on hearsay and so if he wants to look

23   at the medical -- at the coroner's report and say this seems to

24   be what Mr. Ahnert died of, I suppose he can do that.  And he

25   can look at it and say -- he could look at the doctors' perhaps

1 and say this is what he suffered from.  But the third point

2 that he proposes to testify to, the causation point, is exactly

3 the kind of testimony that is barred under *Krik* based on what

4 we have here.

5 And I appreciate Mr. McCoy's argument that this is a

6 more developed record than the record was in *Krik*.  I reckon

7 maybe it is.  But the bottom line is regardless of how

8 developed this record is, it is void in Dr. Anderson's case of

9 anything that would support a specific causation opinion.

10 And so I am going to grant Pabst's motion and as well

11 as Sprinkmann, Employers, and WEPCO's motion to the extent that

12 they are seeking an order prohibiting Dr. Anderson from

13 testifying as to specific causation for Mr. Ahnert's

14 mesothelioma and Mr. Ahnert's asbestosis.  If the Plaintiff

15 wants to call Dr. Anderson to testify generally about what

16 those two diseases are and the sorts of things that cause them,

17 that's certainly the Plaintiff's prerogative and from what I

18 can tell Dr. Anderson seems to have the qualifications under

19 *Daubert* to be able to testify to that.  But there is nothing in

20 any record that would put him in a position to be able to

21 qualify as to specific causation with regard to Mr. Ahnert.

22 In addition, on top of that in Sprinkmann, Employers,

23 and WEPCO's motion they also asked that I preclude Dr. Anderson

24 from testifying about the costs of Mr. Ahnert's treatment, how

25 reasonable those costs were and the necessity of those costs.

1 They argue that Dr. Anderson never met or spoke with

2 Mr. Ahnert, never examined him, never had any interaction with

3 him in any way about that. And so while certainly

4 reasonableness is an issue, the fees as an issue or the costs

5 as an issue, that's not something Dr. Anderson should testify

6 to. I think the Plaintiff has conceded that it's not -- that

7 was not -- she was not planning to ask Dr. Anderson that

8 information.

9       **MR. MC COY:** That's correct, Your Honor.

10       **THE COURT:** All right.

11       **MR. MC COY:** And it wasn't even an issue for us.

12       **THE COURT:** Okay. All right. Well, I just -- I

13 wanted to go ahead and hit it anyway.

14       And so, again, the Plaintiff indicated that in that

15 particular response that Mr. McCoy wanted to ask Dr. Anderson

16 about the nature of mesothelioma, the symptoms, the causes, the

17 treatments given to the persons who contract it, and how he

18 sees death in those afflicted with it. Again, that seems to me

19 to be a general testimony; to a general extent that will be

20 allowed. But nothing with regard to cost of medical bills and

21 nothing with regard to specific causation.

22       Okay, then we move on to Dr. Brody, the biologist --

23       **MR. MC COY:** May I just ask one question, Your Honor?

24       **THE COURT:** Certainly.

25       **MR. MC COY:** So he can't testify that what went on at

1    Pabst was a cause, meaning -- does that mean that he cannot

2    answer like a hypothetical?  The hypothetical question was

3    simply about the removal of gaskets or pipe thermal insulation.

4            **THE COURT:**  No, I certainly think that you can ask

5    him, you know, if the removal of a gasket or the removal of a

6    pipe or thermal -- (indisc.) released the asbestos fibers and

7    somebody was exposed to that for a certain, you know, a long

8    time, or whatever, I don't know how you'd phrase your question,

9    would you think that that might be something that could cause

10   or contribute to these diseases.  Yes, you can ask a question

11   like that.  But, again, with regard to Mr. Ahnert and with

12   regard to Pabst, or frankly with regard to Sprinkmann and with

13   regard to WEPCO, no specifics because it's not there.

14           **MR. MC COY:**  Okay.  I understand what your line is.

15           **THE COURT:**  All right.  With regard to Dr. Brody, I

16   think maybe that discussion just answers Dr. Brody in terms of

17   what I had indicated, that they were not going to be -- she was

18   not going to be asking Dr. Brody any kind of medical causation

19   opinion.  I don't know --

20           **MR. MC COY:**  That's correct.

21           **THE COURT:**  -- I assume that Dr. Brody again is

22   background about the impact of asbestos on the human body.

23           **MR. MC COY:**  Right.

24           **THE COURT:**  And that takes us to Dr. Staggs and I

25   think that Dr. Staggs' opinion actually has even more concerns

1  for me than Dr. Anderson's.  And in this respect Pabst argued

2  that there are not sufficient facts and data again that

3  Dr. Staggs was relying on and he doesn't really mention Pabst,

4  other than to note that somebody had told him that at one point

5  at sometime Mr. Ahnert worked at Pabst.  That was it in terms

6  of any specific knowledge that he might have had.

7       There's even less information in Dr. Staggs' report

8  about Mr. Ahnert's work history or about his medical records,

9  about -- and there is only one paragraph in the opinion that

10  talks about those particular issues.  He specifically said,

11  Dr. Staggs did, in his deposition that he didn't have any

12  information sufficient to attribute any asbestos exposure to a

13  specific Defendant, to a specific product, to a specific

14  location.  He testified that he didn't have any knowledge

15  regarding dose that might have been encountered.  And very much

16  like Dr. Anderson, Dr. Staggs' testimony in his deposition was

17  that no asbestos fibers can ever be excluded as an agent in

18  causing mesothelioma or any of the data relevant to this

19  individual and specific matter and that everyone in the United

20  States is exposed to background levels of asbestos.

21       This is again the general testimony that we were

22  talking about earlier and it is also the cumulative testimony.

23  You know, you can't say that just because somebody sucked in

24  one fiber that wouldn't cause their disease.  That is exactly

25  the any exposure or the each and every exposure or the cumulate

1    exposure issue that the Seventh Circuit has said, nope, can't

2    go there.

3         The Plaintiff responded to this motion by arguing

4    again that Dr. Staggs had said I don't subscribe to the each

5    and every or the any.  I realize he says that, but then he

6    follows up by saying that the exposures do have to

7    mathematically contribute to the cumulative dose and overall

8    that increases your risk.  It's the same thing.  It's exactly

9    what the Seventh Circuit said in *Krik*.

10        He then followed that up by saying I only assess it

11   on a case-by-case basis by trying to make a, quote,

12   quantitative comparison with any given case about whether a

13   given exposure, because we're talking about specific instead of

14   general causation, specific causation or specific exposure,

15   however it's classified, contributes to the causation.  It's

16   clear to me that Dr. Staggs knows and understands that there is

17   an issue with any exposure or each and every exposure.

18        But they then follow, I wrote down in my notes

19   somewhere, four pages, I think, or maybe it's eight pages, of

20   deposition testimony in which someone, I can't remember who,

21   asks Dr. Skaggs and said, okay, so tell us what this

22   quantitative analysis is and walk us through what exactly it is

23   that you do.  And he did, but it was basically I rely on the

24   literature, I kind of take a look at what's given me, and I

25   make a determination based on what I know from my reading the

1    literature.

2         So because, again, there's no -- there's nothing from

3    Dr. Staggs that produces or supports any specific causation

4    analysis, I grant the motion with regard to Dr. Skaggs, again

5    to the same extent that I did to Dr. Anderson, which is that he

6    can testify about what he understands causes -- caused these

7    diseases and what he understands the relationship to -- between

8    asbestos and these diseases may be, but not any specific

9    testimony with regard either to Mr. Anderson -- I mean to

10   Mr. Ahnert or to these particular Defendants.

11        With regard to Mr. Garza, I'm looking at Pabst's

12   motion to exclude at Docket 18 -- 118, excuse me, and

13   Sprinkmann, Employers, and WEPCO's motion to exclude, that was

14   combined in Docket Number 121.  And everyone asks me to bar

15   Mr. Garza's testimony and they make that request on several

16   bases.

17        The first, I think, is there's an argument that he's

18   not actually qualified to testify as an expert.  He's not

19   licensed in Wisconsin, he's licensed in Texas.  He doesn't have

20   a Ph.D., he has a Master's in environmental science and

21   management.  He is licensed in Texas, I guess, for asbestos

22   consulting, but not in Wisconsin.  Somebody recalls, I can't --

23   somebody says, I can't recall who, that he failed his first

24   certified industrial hygienist exam.  Okay, I think the Seventh

25   Circuit, unfortunately, or fortunately, depending on how you

1  look at it, is indicating that -- has indicated that there are

2  no particular credentials that are required for someone to

3  qualify as an expert and, in point of fact, experience can

4  qualify someone as an expert. The Rule says that. The Seventh

5  Circuit has says that. The old joke about the one guy who

6  lives in Dallas County who valued every single farm that ever

7  got sowed there, he'd never been trained for anything but he

8  valued every single solitary farm there and he got qualified as

9  an expert because he had the experience.

10        I think Mr. Garza appears to certainly have

11  experience in asbestos -- in assessing asbestos in industrial

12  settings. He's done a lot of inspections. His information

13  talks about that. So in terms of whether or not he's qualified

14  to testify on that topic generally, I think he is qualified.

15  Maybe not to the extent that some other people would be, but I

16  think he's qualified.

17        The next issue that the parties raise is that he

18  doesn't base his decision, his testimony on any specific

19  sufficient facts or data. And here I think we have a bigger

20  concern. Again, Mr. Garza's opinions are generic, they don't

21  relate to any of the Defendants specifically in this case, they

22  don't really relate to Mr. Ahnert. Someone apparently gave him

23  a list of "X" number of job sites where Mr. Ahnert had worked,

24  but there were no dates there, there was no indication of when

25  Mr. Ahnert worked at any of those places, how long he worked at

1   any of those places, what he was doing at those places when he

2   was working there.  And so basically what seems to have

3   happened, as one counsel argued today, it may have been

4   Mr. Rhoades or both, argued that he basically just looked at

5   the literature and regurgitated or recited some of what the

6   literature says about these issues.  There was an allegation

7   made by the Defendants that he didn't do any air sampling, he

8   didn't do any testing, and the Plaintiff responded and said,

9   well, he doesn't have to, as long as he reads the literature,

10  that's fine and that's what he's done here.  And then

11  Mr. Rhoades raised in some detail concerns about the literature

12  and whether or not it actually is peer reviewed literature and

13  whether it is reliable literature.

14          But I think to me the bigger concern is that

15  Mr. Garza's testimony is far more attenuated than even that of

16  the doctors.  There is just simply no link, meaning that

17  there's no discussion either of any of the premises, there's no

18  discussion of any of the specific products, there's no

19  discussion of anything really that particularly directly

20  relates to this case.  It is, as the Defendants have argued, a

21  very general report.  And let me be clear, by it being a

22  general report, I mean the August 10th, 2012 report.  That is

23  the original report that was turned over and there's simply

24  nothing in there that I can identify that in any way, shape, or

25  form has any specific connection to this case.

1          At least in the doctors' opinions the doctors knew

2     what Mr. Ahnert suffered from and factored that in to some of

3     their discussions.  I think Mr. Garza's is even more attenuated

4     than that.  There's just no underlying data here.

5          Now, I understand the Plaintiff's argument again

6     that, you know, what are you going to do, you're going to go

7     out there, you're going to take a hammer, you're going to whack

8     down on a pipe and see if stuff floats up; well, you can't even

9     do that now because time has passed and stuffs been removed and

10    that's the whole point here.  I get it.  But *Daubert* talks

11    about a reliable methodology upon which someone can rely and

12    that can be repeated and that can be described.  That implies

13    that there has to be some sort of methodology.  And as far as I

14    can tell from reviewing Dr. Garza's 2012 report, the

15    methodology is read the literature.  I don't think that's a

16    methodology.  Certainly experts should do that, experts do do

17    that, they're entitled to rely on it in their testimony and in

18    forming their opinions.  But if that is all there is, and that

19    appears to be all there was for Garza, that's not a

20    methodology.  That's reading the literature.

21         And so I couldn't really identify any specific

22    methodology that somebody could walk through and say so you've

23    done this 15 times and each time you've come to this conclusion

24    or that conclusion.  I don't see it here from Mr. Garza.

25         In addition, there are two additional reports.  One

1   was disclosed on August 7th of last year, although it was

2   written October 19th of 2015, 55 pages long.  And then there

3   was an August 10th, 2017 report that was 45 pages long.  As the

4   parties are aware, the experts reports in the MDL case, in the

5   2010 case, were due on August 13th of 2012.  That's the

6   deadline that Judge Strawbridge had set.  And then

7   Judge Clevert had set a deadline in 2014, I think it was

8   September 15th, 2014.  And the Defendants argue that both of

9   these reports should be barred as untimely.  The 2015 report

10  should be barred because Judge Strawbridge found it untimely in

11  the 2010 case.  And I don't know if there was much comment on

12  the August 10, 2017 report.  There's no question that the

13  August 10th, 2017 report is untimely.  And so even I were

14  allowing any testimony from Mr. Garza, I certainly wouldn't

15  allow that report.

16          I suppose we could quibble over whether or not, even

17  though it was late by the MDL standards, it was timely by

18  Judge Clevert's standards and might impact the October 19th,

19  2015 report.  However, again, I think that's a rehashing pretty

20  much of the general report that was provided back in 2012.

21          But, quite frankly, I think it's irrelevant.  I don't

22  think that there's any information in any of these reports that

23  I have been able to find that indicate in any way that

24  Mr. Garza's testimony would even be helpful to the trier of

25  fact necessarily, given the lack of methodology that I could

1   identify.

2          I do note, just as an aside because Mr. McCoy may

3   raise it, that Ms. Ahnert did say that she would agree not to

4   use anything in the 2015 report in the event that that would

5   make things run a little more smoothly.  But I think it's a

6   moot point given the determination on Mr. Garza's testimony.

7          **MR. MC COY:**  May I comment on that for a moment,

8   Judge?

9          **THE COURT:**  Sure.

10         **MR. MC COY:**  Mr. Garza does cite in his report the

11  testimony about the WEPCO's Oak Creek Powerhouse.

12         **THE COURT:**  He does mention that.  That is correct.

13         **MR. MC COY:**  And he -- so he had knowledge of the

14  specific activities at the Oak Creek Powerhouse.  I mean that

15  to me is the thrust of the concern, which is because then he

16  has the opinion that each of the exposures are significant and

17  he describes the exposures at Oak Creek.  So it's within those

18  exposures that it's one of the significant exposures.  That's

19  laid out in his report, is that he read the testimony.

20         **THE COURT:**  And you're correct.  I apologize.

21         **MR. MC COY:**  It's -- and I think his testimony is

22  backed up by the knowledge of what went on at these work sites

23  from the coworkers, in addition to what's in the general

24  literature.  So when you put the two together, I think that's

25  sufficient basis to testify in this case about these

1   activities.

2        Now again, he's not giving an opinion that everything

3   and anything that went on at WEPCO is wrong and this is

4   significant exposure, but he is describing and relating these

5   particular activities that he's got information on from the

6   coworkers and he's saying those are significant exposures.  I

7   think that that -- I believe that testimony is properly

8   disclosed and laid out and tied into his review of the general

9   literature.

10        I mean there is no -- as you say, there is no

11  measurements back in that period of time.  These cases don't

12  necessarily even exist.  So he's dealing with the best

13  available evidence that we have and relating that through the

14  general literature to what's a significant exposure.  And

15  that's his opinion in his 2012 report, that this would be one

16  of the significant exposures.

17        I just think he's properly disclosed on the basis of

18  this and he's got sufficient information, I believe he's

19  qualified under the *Daubert* standards.

20        **THE COURT:**  Thank you for correcting that error.

21  And, Mr. McCoy, you are right, he does talk about the Oak Creek

22  plant in there.

23        **MR. MC COY:**  He doesn't talk about Pabst.  I agree

24  with that.

25        **THE COURT:**  Right.  Right.  But he does talk about

1    the Oak Creek plant.  And so I was a little bit overly broad

2    with my brush in saying that he doesn't mention any of these

3    Defendants.

4          That still doesn't address the concern, however,

5    about a lack of reliable methodology.  And again, I go back to

6    the fact that I realize that because many years have passed he

7    no longer has the ability to say here's what I do, I go in

8    there and I take an air sample and then after I test it I look

9    for certain rates above this amount or below that amount or

10   whatever it may be.  I completely understand that he can't do

11   that.  I'm not sure how to address that general fact within the

12   confines of *Daubert* and within the confines of what the Seventh

13   Circuit has said we need to rely on in terms of someone

14   testifying as an expert.

15         So while you are correct that I spoke overly broadly

16   in indicating that he made no mention of any of the Defendants,

17   he did talk about the WEPCO plant and the information that he

18   saw in the testimony of the employees, that still doesn't

19   address the reliable methodology issue.  And even with the

20   passage of time *Daubert* still requires that in order for

21   someone to testify as an expert that person must have some sort

22   of reliable methodology.  And as I indicated, that's missing

23   here.

24         **MR. MC COY:**  Well, I would again --

25         **THE COURT:**  Mr. McCoy, if you want to file a motion

1    to reconsider, I'd be happy to entertain it.

2              **MR. MC COY:**  I will, Judge.

3              **THE COURT:**  Okay.

4              **MR. MC COY:**  Thank you.

5              **THE COURT:**  Sure.

6              With regard to Docket Number 122, Sprinkmann and

7    WEPCO also filed a motion asking to preclude any lay witnesses

8    from offering opinion as to asbestosis and the cause of

9    asbestosis and so forth.  This strikes me as a motion in

10   limine.  I think it's a premature motion for me to rule on at

11   this point in time.  I don't know of any lay witnesses that are

12   going to try to testify as to this.  If they do, I would

13   certainly expect an objection, because a lay witness certainly,

14   as I found earlier, is not in a position to give expert witness

15   testimony or opinion on medical causation.  And so I'm going to

16   leave that for a motion in limine or if someone wants to file

17   one, although I don't even think that I could decide it then.

18   I think it really is a wait if it comes up at trial, then I'll

19   deal with it when it comes up at trial.

20             The last issue that came up in the *Daubert* motions is

21   at Docket Number 120 and again included in Docket Number 122.

22   Pabst is at 120 and the other Defendants are at Docket Number

23   122.  And that's with regard to Dr. Ellis, who was Mr. Ahnert's

24   personal doctor.  The Defendants ask that I prohibit Dr. Ellis

25   from testifying about causation of the mesothelioma and the

1   asbestosis and specifics around the treatment of those two

2   diseases and they argue that Dr. Ellis is basically a general

3   practitioner doctor, that he was not a pulmonologist or an

4   oncologist, toxicologist, any of those sorts of roles, and that

5   he didn't have the expertise to testify as a witness, an expert

6   witness on those topics.  I agree with that.  I'm not sure that

7   the Plaintiff necessarily disagreed.  The Plaintiff indicated

8   that Dr. Ellis admitted that Dr. Ellis wasn't an eyewitness to

9   anything that happened to Mr. Ahnert at any of the work sites

10  or with any of the Defendants and agreed that he wouldn't

11  testify as to anything Mr. Ahnert told him, which he couldn't

12  do anyway, or it would be hard to do.

13          I do think, of course, that because Dr. Ellis was

14  Mr. Ahnert's personal physician if there's any relevance to

15  what the condition of Mr. Ahnert's health was at any particular

16  time, he could make general observations as to that.  He knows

17  that.  The question of law on that, of course, is going to be

18  whether or not it's relevant.  And that's a 403 issue that I'll

19  determine when and if he's called as a witness and we know what

20  he's going to testify to.  So he could certainly testify as a

21  fact witness, a kind of hybrid witness as to what he saw in

22  Mr. Ahnert's health condition and what kind of condition

23  Mr. Ahnert was in, but not to the causes of asbestosis or

24  mesothelioma or what may have caused Mr. Ahnert's particular

25  asbestosis and mesothelioma, because there's nothing to

1    indicate that he has any expertise in that area.

2         **MR. MC COY:**  You're talking about general causation

3    of mesothelioma, that he can't testify to that?  Is that --

4         **THE COURT:**  No, I don't have any information that he

5    has any expertise in that.

6         **MR. MC COY:**  Well, I mean again I understand the

7    ruling, I just want to make sure if that's the ruling that the

8    Defense can't go out there and argue, well, no treating

9    physician says it's related to asbestos, because if he doesn't

10   have the ability to they can't make that argument either.

11        **THE COURT:**  I think -- well, I'm not sure that the

12   two are related.  I mean he doesn't have the expertise.  I mean

13   there may be somebody out there who can say.  The coroner

14   apparently has made a determination he died because of

15   mesothelioma or asbestosis.  But that wasn't Dr. Ellis that

16   made that determination.  And again, I don't see that

17   Dr. Ellis -- I have nothing in front of me with regard to

18   Dr. Ellis being able to say what caused the mesothelioma or

19   what caused the asbestosis.  And in point of fact, you've named

20   two experts who you think have much more expertise in what

21   causes those two diseases than, as far as I could tell,

22   Dr. Ellis.

23        **MR. MC COY:**  Right.  And again, I'm -- I don't agree

24   with Your Honor's ruling, but I'm accepting it --

25        **THE COURT:**  I know.

1          **MR. MC COY:**  -- when I make this -- when I express

2    the concern that I am, which is that the Defense not be allowed

3    to say, well, no treating physician has said it's related to

4    asbestos.  Because I hear that argument often at these trials.

5          **THE COURT:**  I'm sure you do, but that's also a true

6    fact.

7          **MR. MC COY:**  Well, you said he's not -- but he did

8    express that opinion and if they say that then I think we can

9    open the door to allow the opinion.

10          **THE COURT:**  Well, if you brought evidence to me that

11    he's got some basis for expressing that opinion, some knowledge

12    expressing that opinion that would allow him to testify to it

13    as an expert, then we should talk about that.  Because I'm not

14    aware of it.

15          **MR. MC COY:**  Well, like I say, I'm accepting in my --

16    the concern I'm expressing your ruling, but I'm just saying

17    that the trade-off has to be to prevent the Defense from

18    arguing that, well, no treating physician said it's related to

19    asbestos.

20          **THE COURT:**  No, the trade-off doesn't have to be that

21    and I'm not going to make that ruling right now.  Because,

22    first of all, I don't even know if they're going to make that

23    argument; and second of all, if they do, I think there's a

24    difference between saying that nobody's gotten up here, no

25    treating physician has gotten up here and said that and the

1   question of whether or not Dr. Ellis is qualified to say that.

2   And the motion here was that he's not qualified to say that, as

3   I understand it.

4        **MR. MC COY:**  Okay.  I won't say anymore today.

5        **THE COURT:**  Now, what I have thought possibly of

6   doing is also giving you some rulings on the motions in limine.

7   But, number one, I expect there are folks who might need to use

8   the facilities; and, number two, you might not have anticipated

9   being here all afternoon.  I have no idea.  So I will leave it

10  to you all.  We can take a bathroom break and I can come back

11  and give you some rulings on motions in limine or we can all

12  gather our wits about us and then come back and talk about

13  motions in limine on a different date.

14       **MR. SPEAKER:**  I'll jump in here, Your Honor.

15       **THE COURT:**  Okay.

16       **MR. SPEAKER:**  I'm perfectly fine to sit here as long

17  as Your Honor would like and hear Your Honor's thoughts.  My

18  office is in St. Louis --

19       **THE COURT:**  Boy, you are a bored person, aren't you.

20       **MR. SPEAKER:**  No, my office is in --

21       **THE COURT:**  Yeah.

22       **MR. SPEAKER:**  -- is in St. Louis, so I'm here.

23       **THE COURT:**  Right.  Right.  Okay.  So you're free to

24  go back to your hotel and watch the football game, but anyway.

25  So I'll leave it up to the other two of you.

 1          **MR. SPEAKER:** If there's going to be separate hearing

 2   on some of the motions in limine, I'd kind of prefer that they

 3   all be done at the same time, because I think they often

 4   overlap in part.

 5          **THE COURT:** No, I'm sorry, I perhaps didn't clearly

 6   state what I was proposing. I was proposing either that I give

 7   you the rulings on the motions in limine in toto this afternoon

 8   or that we set a different date for giving those rulings. I

 9   wasn't proposing to break it up. They all do overlap, in fact,

10   many of them are repetitive.

11          Have a druther?

12          **MR. SPEAKER:** That's fine. I'm ready to press on if

13   you are.

14          **THE COURT:** Okay, well, let's --

15          **MR. SPEAKER:** If that's the case, then yes.

16          **THE COURT:** Okay. Then let's take a few minutes at

17   least and let me give Ms. Wrobel a break and I need to go potty

18   if nobody else does. I'll excise that from the record later.

19   So just when everybody gets back, we'll --

20          **THE MARSHAL:** All rise.

21      **(A recess was taken from 4:02 p.m. to 4:16 p.m.; parties**

22   **present)**

23          **THE COURT:** I'm sorry. I thought I had left my

24   glasses back there but I left them in here.

25          **MR. SCHUMACHER:** Your Honor?

1          **THE COURT:**  Yes.

2          **MR. SCHUMACHER:**  Before you move on to the motions in

3    limine, do you mind if I ask just a few clarification questions

4    before we walk out just to make sure that we understand your

5    rulings?

6          **THE COURT:**  Sure.  That's assuming that I do.

7          **MR. SCHUMACHER:**  Okay.  We'll muddle through

8    together.

9          **THE COURT:**  Okay.

10          **MR. SCHUMACHER:**  So it's my understanding that

11    Mr. Garza is struck in his entirety?

12          **THE COURT:**  Yes.

13          **MR. SCHUMACHER:**  Okay.  And Drs. Anderson and Staggs

14    are able to give only general causation opinions?

15          **THE COURT:**  Yes.

16          **MR. SCHUMACHER:**  Okay.  And what I was confused or

17    concerned about was when -- and I'm not even sure if it was the

18    Court or if it was Mr. McCoy started giving a hypothetical

19    example that seemed to veer back into specific causation as

20    being potentially acceptable.

21          **THE COURT:**  So as I recall it -- and I'm glad you

22    asked about it because we should probably be clear about it --

23    Mr. McCoy asked whether or not -- and he was referring to a

24    hypothetical that he had proposed in one of the moving papers,

25    I think, and I didn't have it open in front of me and maybe I

1   should have had it open in front of me.  And I said something

2   along the lines of -- I can't quote my own self but, you know,

3   if you want to ask whether or not if somebody is removing the

4   gasket and it throws up asbestos fibers and, you know, they're

5   working on that for a long time and, you know, that could

6   somehow or another contribute to or cause somebody to perhaps

7   contract these diseases, you can certainly ask that.

8          **MR. SCHUMACHER:**  But if I may, doesn't that

9   hypothetical start to veer into some of the same problems that

10  we've discussed with regard to methodology, dose, exposure,

11  time period, error rate?

12         **THE COURT:**  And, you know, I -- to me, that's the

13  sort of issue that -- there's obviously a spectrum, right?  And

14  so there are medical doctors who are capable of saying,

15  inhaling asbestos fibers -- if you inhale enough of them -- can

16  cause mesothelioma and so if somebody was in a situation where

17  they inhaled a lot of the fibers, they could contract

18  mesothelioma and mesothelioma is the kind of disease that can

19  kill somebody.  I'm being very broad.

20         On the other end of the spectrum is someone who can

21  say, Daniel Ahnert contracted mesothelioma from the time that

22  he spent extracting gaskets at wherever and fitting pipes at

23  wherever and that's what caused him to contract it and then

24  that's what caused him to die.  That's about as specific as I

25  can imagine that you can get.  Or maybe more specific would be,

1    you know, on January 17th, 1972 while he was there for two

2    hours, he absorbed enough that I believe he would -- that's

3    specific.

4          There is a continuum between those two extremes and

5    so as I understood the question that Mr. McCoy was asking -- if

6    he's asking a question that relates to -- you know, let's say

7    that somebody is working on a job that throws up -- or is

8    capable of throwing up mesothelioma -- asbestos fibers and they

9    breathe that in, could that cause them theoretically to

10   contract mesothelioma or could it contribute to mesothelioma?

11         Does that fall on the one side of the line of the

12   spectrum or on the other side of the line of the spectrum?

13   It's getting closer, yeah.  Is it specific testimony as to

14   Mr. Ahnert?  Not yet, I don't think.  Where the hypothetical

15   gets to that it gets to a point where it crosses the line

16   depends on the specific orient of the hypothetical, I think.

17   And so if we need to go back and look at the actual

18   hypotheticals that he proposed in his moving papers, we can do

19   that.  I mean, I think the Seventh Circuit is clear that

20   experts can rely on hypotheticals but --

21         **MR. SCHUMACHER:**  And I certainly don't disagree with

22   Your Honor.  I guess obviously my concern on behalf of Pabst is

23   a concern about sort of back-dooring --

24         **THE COURT:**  Right.

25         **MR. SCHUMACHER:**  -- the specific causation testimony

1   that Your Honor has just excluded, you know, through some very

2   artfully worded hypotheticals.

3          THE COURT:  And that's why I say, I don't -- where

4   you fall on that spectrum is going to depend on how the

5   hypothetical is worded and I can see that you can cross the

6   line.  I don't know that I ever let Mr. McCoy get specifically

7   out word for word what he was going to say and then I

8   summarized something in a different way.  So I don't have a

9   specific question in front of me.

10          I don't know -- you know, other than requiring

11  Mr. McCoy right here today to tell us exactly what questions

12  he's going to ask, I don't know if I can necessarily draw that

13  line today other than to say that if hypotheticals are

14  presented that do start getting closer to the testimony that I

15  prohibited, I'll sustain objections to those.  I won't allow

16  those to be asked or, you know, we can handle it some other way

17  but there are hypotheticals I could imagine that he would ask

18  that would not run afoul of the ruling that I issued today.

19          There are others that he could ask that I could

20  imagine would clearly run afoul of the ruling that I've issued

21  today.  That's not helpful, I know.  I'm always glad to be

22  unhelpful.

23          MR. SCHUMACHER:  It sounds that we're going to have

24  to potentially deal with this a little closer to --

25          THE COURT:  To trial.

1      **MR. SCHUMACHER:**  -- trial and it may require some

2   in-camera testimony or something like that because obviously,

3   again, my concern is once a hypothetical is out of the box, you

4   know, the limiting -- obviously, the concern a lot of us have

5   is the limiting instruction to the jury can only go so far once

6   the -- you know, the genie is out of the bottle.

7           **THE COURT:**  Yeah.  And I understand that and I

8   realize that the solution that I initially proposed which is if

9   he asks a question that's inappropriate, you can object and

10  I'll sustain it isn't the ideal solution and so if there's

11  another way to handle that, we can certainly think about it.

12  I'll think about it and you-all can think about it as well but

13  I just think -- number one, I don't think you want me sitting

14  down here and trying to suggest what hypotheticals would or

15  wouldn't work because that ain't my job.

16          And, number two, the condition that my brain is in

17  right now probably wouldn't result in anything of any use to

18  anybody, as you can already tell.  And then beyond that, you

19  know, I think perhaps the better way to do this, for all of us

20  to think about it a little bit and then write an order and see

21  how we can handle it in such a way that bells don't get rung

22  that can't be un-rung but at the same time, we have a path.

23          **MR. SCHUMACHER:**  Sure.  And certainly, you know, our

24  concern is, as we've discussed, and all of us here have been

25  doing toxic tort litigation for quite a while.  So it's --

1          **THE COURT:**  No, I know I'm the Junior Joe on the

2    totem pole.

3          **MR. SCHUMACHER:**  -- it's very easy for us to split

4    those hairs very finely.  So, you know, when we start talking

5    general versus specific causation where that line gets drawn.

6    But we'll deal with it at a later point.  So I understand the

7    ruling is Drs. Anderson and Staggs may testify about general

8    causation and not specific.

9          **THE COURT:**  That's the ruling for today and I am more

10   than happy to accept any and all suggestions that you-all think

11   of and when you're a little less tired of listening to me about

12   how we might deal with the issue.

13         **MR. SCHUMACHER:**  Thank you, Your Honor.

14         **MR. MC COY:**  Judge, on the Garza motion to

15   reconsider --

16         **THE COURT:**  Yes, sir.

17         **MR. MC COY:**  -- I've got a lot of commitments in

18   January on all kinds of things.

19         **THE COURT:**  Okay.

20         **MR. MC COY:**  Can I have 30 days to file that?

21         **THE COURT:**  I'm sorry.  I'm hesitating because I've

22   forgotten what day of the week it is now or what day it is.

23         **MR. MC COY:**  It's the 4th.

24         **THE COURT:**  Yeah, it's the 4th, right.  Yeah, so like

25   February 5th?

1          **MR. MC COY:**  Yes.

2          **THE COURT:**  Yes.

3          **MR. MC COY:**  Thank you.

4          **THE COURT:**  That's fine.  And then I'm assuming the

5    Defendants will want to respond to it?

6          **MR. SPEAKER:**  Certainly.

7          **THE COURT:**  You think two weeks will be --

8          **MR. SPEAKER:**  That's sufficient.

9          **THE COURT:**  Okay, February 16th.  Thank you for that

10   reminder, Mr. McCoy.

11         Okay.  Anything else that you think we ought to

12   address or that you think I'm capable of addressing before we

13   move to motions in limine?  No?  Okay.

14         All right.  So let's change tacks a little --

15         Joan, do you need water?

16         **MS. SPEAKER:**  I'm sorry.

17         **THE COURT:**  I'll get you -- the bubbler -- thank you,

18   guys.  I appreciate that.

19         **MS. SPEAKER:**  Okay, thank you.

20         **THE COURT:**  I'm finding my place anyway.  So --

21       **(Discussion off the record)**

22         **THE COURT:**  So let's start with Sprinkmann and

23   Wisconsin Electric and Employers' motions in limine which are

24   at Docket Number 125 of the 2010 docket.  There are several

25   motions that -- it's a combined set of motions in limine.  So

1     I'm going to use the numbers that are in the motion itself.

2              Motion Number 1 asks that I order that the Plaintiff

3     not be allowed to make any reference to liability insurance.

4     The Plaintiff responded that the Plaintiff does not oppose that

5     motion.  So I will grant that motion.

6              The second one -- the second motion within Docket

7     Number 125 is a motion asking to exclude references to other

8     actions against Sprinkmann and against WEPCO.  Basically, the

9     Defendants argue that Ms. Ahnert may try to introduce evidence

10    regarding other personal injury lawsuits that have been brought

11    against Sprinkmann and WEPCO and they argue that under 403, the

12    evidence is relevant -- irrelevant -- excuse me -- and also

13    that the -- any probative value it might have would be

14    outweighed by the prejudice.

15             Ms. Ahnert responded, no objection as long as we can

16    still -- and I think I'm understanding this correctly,

17    Mr. McCoy -- as long as this doesn't limit any impeachment that

18    we may want to do based on prior testimony.  For example, if a

19    witness climbs up on the stand and says something that's

20    directly opposite to what they said in a prior testimony --

21    deposition under oath or a prior evidentiary-type hearing under

22    oath, the Plaintiff would want to reserve the ability to use

23    that for impeachment.  Am I understanding that correctly,

24    Mr. McCoy?

25             **MR. MC COY:**  I think that's correct, Judge.  Sorry,

1  I've got more than one thought on that one going in but that's

2  correct, yes, on this one.

3          **THE COURT:**  Okay.  Any disagreement that people can

4  use prior inconsistent testimony for impeachment but otherwise

5  no reference?

6          **MR. MC COY:**  No.

7          **THE COURT:**  Okay.  I'll grant that motion and I'll

8  also note that even in an impeachment context, I think it's

9  important at trial that if a party wants to use testimony from

10 another case that that impeachment be framed in terms of, do

11 you recall giving your deposition or do you recall testifying

12 on thus and such a date.  I don't think anybody needs to go

13 into any details about, you know, when you guys got sued in

14 thus and such State court for this and that.  It simply can be

15 a reference to the date of the testimony and the fact that it

16 was under oath and then ask the questions.

17          The third motion in that packet is a request to

18 preclude the Plaintiff from referring to other Sprinkmann

19 companies that may be outside of the state of Wisconsin and I

20 think, as I understand it, there's Sprinkmann Sons in Minnesota

21 and then there's in Illinois.

22          **MR. SPEAKER:**  There were, yes.

23          **THE COURT:**  There were?

24          **MR. SPEAKER:**  Yes.

25          **THE COURT:**  Okay.  No longer, so I apologize.  And

```
 1   neither of those have been named in party in this court and in

 2   this lawsuit and Sprinkmann and WEPCO argue that there were

 3   different boards of directors, there were different entities in

 4   place.  The Plaintiff responds and says that back in 1962,

 5   there was a claim filed by somebody in the Sprinkmann Minnesota

 6   entity, a workers' compensation for asbestos and the

 7   Plaintiffs' argument basically is that that should have given

 8   Sprinkmann some notice as far as long ago as 1962 that asbestos

 9   was a problem, that it had asbestos issues.

10             So anything to add to your objection, Mr. McCoy?

11             MR. MC COY:  No, that's the objection.  It's

12   relevant.

13             THE COURT:  Okay.  Mr. Rhoades, do you want to

14   respond?

15             MR. RHOADES:  Other than the claim made against a

16   separate corporation unless there's some evidence connecting

17   the two shouldn't --

18             THE COURT:  And so -- I mean, what is the connection

19   between the Minnesota entity and the Sprinkmann here?

20             MR. RHOADES:  Oh, I mean, the -- it's a hundred-and-

21   fifty-year-old story at this time, Your Honor.

22             THE COURT:  Oh, sorry.

23             MR. RHOADES:  It's a company that was started in 1888

24   by members of the family and the family grew and they expanded

25   and moved.  They had operations in some different states and so
```

1  they incorporated some entities in different states and those

2  entities were managed sometimes by members of the Sprinkmann

3  family and sometimes by other folks and at different points in

4  time, those entities were sold to the other folks.

5          **THE COURT:** Okay. And so I know that we're going

6  back a ways but isn't the time of the events to the extent that

7  we can pinpoint a time period with regard to Mr. Ahnert -- or

8  have these already been sold to other owners?

9          **MR. RHOADES:** Well, with respect to the claims for

10  exposure in the 60s, no.

11         **THE COURT:** Okay.

12         **MR. RHOADES:** With respect for the claims for

13  exposure in 1989, yes. We have two different -- you may recall

14  we have the two different sets of evidence --

15         **THE COURT:** Right, right.

16         **MR. RHOADES:** -- in these cases.

17         **MR. MC COY:** The relevant timeframe though is the

18  early 60s when they had knowledge.

19         **THE COURT:** But that's irrelevant if by the time

20  Mr. Ahnert arguably was exposed, the owner of that -- there was

21  a different owner of the Wisconsin Sprinkmann who had no

22  relationship to the owner of the Minnesota Sprinkmann who would

23  have gotten notice in the 60s.

24         **MR. MC COY:** Well, the knowledge and the notice they

25  got in the 60s carried forward for Ahnert's exposures caused by

1  a Sprinkmann product.

2          **THE COURT:**  Not -- I get --

3          **MR. MC COY:**  No --

4          **THE COURT:**  -- if it was the same -- if the same

5  entity or human got notice in 1962 and still was the owner of

6  Sprinkmann Wisconsin in 1989, then, yes, I would agree with

7  you --

8          **MR. MC COY:**  Yeah --

9          **THE COURT:**  -- but that's what I'm asking.

10         **MR. MC COY:**  -- the family was still the owner, the

11  same Sprinkmann family.

12         **THE COURT:**  Okay.  Well, you're both saying two

13  different things.  So I think we'll table this one and I'll be

14  asking you-all for information about ownership in the 80s.

15         Oops, I put my note in the wrong place, sorry.

16         The fourth motion in this packet is to preclude

17  introduction of any worker compensation records.  The

18  Defendants are asking that I not allow the Plaintiff to put in

19  any records to show that Sprinkmann had notice of the alleged

20  danger of insulation products.  The argument here is that

21  because asbestos are dose-response diseases, it's different for

22  an employee handling the asbestos and a bystander and the

23  information that somebody filed a workers' compensation claim

24  doesn't have any relevance to the question of whether or not

25  the company had any notice of potential hazards of asbestos

1   products.

2          There are not any records, as far as I understand,

3   relating to WEPCO.  So it's moot as to WEPCO.  I think the only

4   issue is with regard to Sprinkmann and in that regard, the

5   Plaintiff indicates that there's six worker compensation claims

6   that were filed against "Sprinkmann entities."  I think this

7   raises the same issue as the last one because the question is

8   whether or not it's the same people or group of people who had

9   this notice.

10         I think there is some tangential relevance.  I don't

11  think there's a lot but arguably under 403, there's some

12  tangential relevance but I think the first issue, again, is

13  whether or not whoever got notice of these workers' comp claims

14  against Sprinkmann was the same person who would have had

15  reason to know that there was asbestos or there were problems

16  with asbestos at the time Mr. Ahnert arguably was exposed.  So

17  I'll put that in the same category as the previous one.

18         **MR. MC COY:**  And, Judge, just one other point and I

19  understand that's being referred to but the Sprinkmann

20  exposures for Ahnert -- I believe the evidence is -- began at

21  least in the 60s, if not earlier.

22         **THE COURT:**  Okay.  Well, I mean, I'll give you-all an

23  opportunity to tell me that, too.  I'll be totally frank with

24  you.  At this point in time, I don't recall exactly.  When I

25  was working on summary judgment motions, I remembered which

1  dates and which.

2          **MR. MC COY:**  Yeah, this --

3          **THE COURT:**  Now I can't remember quite what I had for

4  breakfast.

5          **MR. MC COY:**  Right.  And you --

6          **THE COURT:**  So I'll give you-all a chance to share

7  that if that's the case because I think that's relevant.

8          The fifth motion in that packet is a motion to

9  preclude the Plaintiff from presenting evidence of disease in

10  individuals other than Mr. Ahnert and it seems like they're --

11  in the response -- both the argument and the response, it seems

12  like there are two possible different issues here.  The first

13  issue is whether or not they can -- the Plaintiff can introduce

14  evidence that other people who may have worked with Mr. Ahnert

15  on any of these projects had asbestosis and then --

16          **MR. MC COY:**  We're not doing that.

17          **THE COURT:**  Okay.  Then that's what I wanted to make

18  sure.  That's -- because that's number one.  I was going to

19  say, I think that is irrelevant and shouldn't come in.  But

20  then what I was going to say, the other side of the coin is the

21  one that the Plaintiff raises which is, but, you know, wait a

22  minute.  If I want to say that there are studies out there that

23  show that asbestos causes mesothelioma, then by virtue of

24  saying that, I have to say that other people suffered from this

25  disease.  I can't even refer to a study if I can't refer to the

1    fact that people had diseases.  I didn't understand that to be

2    the target of the motion.  Am I correct?

3           **MR. MC COY:**  That's correct.

4           **THE COURT:**  Okay.  All right.  So what we're talking

5    about here is referring to specific human beings who might have

6    worked with or around Mr. Ahnert at the same time that

7    Mr. Ahnert allegedly was exposed.  There's also -- and I think

8    that's absolutely correct.  The Plaintiff says the Plaintiff is

9    not going to be raising that or introducing evidence about that

10   and I wouldn't allow it if they were.

11          There's also -- the Plaintiff makes a comment that

12   Ernest Sprinkmann, who was formerly the president of

13   Sprinkmann, died of mesothelioma in 1968 and that a Sprinkmann

14   employee testified that company employees heard somewhere in

15   the 1960s that the owners had spots on their lungs -- no, no.

16   No, no, neither one of those am I going to allow testimony

17   about.  That is, as to the second point, complete and utter

18   hearsay and hearsay that does -- isn't even attributed to an

19   identifiable person.  And with regard to Ernest Sprinkmann, the

20   fact that he's president of Sprinkmann is not enough to make it

21   relevant.  So I'm not going to allow that.

22          Number six in the packet is a request that I exclude

23   invoices, material registers, sales documents or purchase

24   orders, in particular, any of those types of documents that

25   would show that either Sprinkmann or WEPCO had purchased

1  products, I think, that might have fibers in them and the

2  argument here is that this is pure speculation, that if there

3  were purchase orders and things like that that were put in to

4  show that they bought items that had asbestos in them that the

5  jury were being asked -- would be asked to speculate that,

6  okay, so that must establish cause.

7         I'm -- to be honest, I'm a little bit confused about

8  this one.  I didn't know that there was a dispute that there

9  was asbestos at any of these sites.  Is that a disputed fact?

10         **MR. SPEAKER:**  You mean -- no, we're not going to

11  dispute that there was asbestos containing insulation at the

12  Oak Creek power plant.  I think the concern is that there may

13  be, you know, an ocean of invoices over a period of years that

14  might present a picture to the jury that, you know, he must --

15         **THE COURT:**  The place was crawling with it?

16         **MR. SPEAKER:**  -- he must have been, you know, despite

17  the fact that there's no direct evidence that links the man to

18  any of those products.

19         **THE COURT:**  So --

20         **MR. SPEAKER:**  So that's the concern.

21         **THE COURT:**  Okay.  So what -- Mr. McCoy, what are --

22  what's the purpose of -- if you are planning on it?  I mean,

23  you objected to this.  So --

24         **MR. MC COY:**  Yeah, that the sales records were being

25  offered to show just how much asbestos that there was at WEPCO.

1    I'm not clear about this -- this stipulation.  I mean, if
2    they're saying that it's all asbestos on all the piping, we
3    still have the question of what portion of that was
4    Sprinkmann's.  And basically, that the sales records establish
5    that it was all Sprinkmann's.  I mean, there's no -- there's
6    really no other records that we have to show anybody else's
7    asbestos.
8            So -- so it's not just that there's asbestos at the
9    WEPCO facility, it's that it's Sprinkmann's asbestos.
10           **THE COURT:**  Well, I mean, I -- on the one hand, I
11   think you have -- the Plaintiff has a right to try to prove
12   that the Defendant is somebody who was involved in the alleged
13   behavior.  On the other hand, I -- I don't want this to turn
14   into a trial about how many purchases were made and -- I mean,
15   what are we talking about in numbers here, Mr. McCoy?  What
16   kind -- how many documents have you got?
17           **MR. MC COY:**  Normally we'd just introduce a summary,
18   but -- but there's certainly thousands of these records.  I
19   mean, for WEPCO, for Pabst, there's -- it's just -- that's --
20   Sprinkmann had all the work.  I mean, that's the whole point of
21   these invoices is to establish that it's all Sprinkmann's
22   asbestos.
23           **THE COURT:**  Well --
24           **MR. MC COY:**  That's -- that's the only way we can do
25   it, by showing this is what they sold and delivered to -- to

1  these places.  I could say, depending on what the stipulation

2  might be, you wouldn't have to use it, but certainly you'd

3  just -- you know, you'd only introduce the summary of what's in

4  those records.

5           **THE COURT:**  And I defer --

6           **MR. MC COY:**  Like -- like at Oak Creek, there's seven

7  football fields of asbestos.  I mean, it's from Sprinkmann.

8           **THE COURT:**  I'm going to defer ruling on it until

9  such time as the Plaintiff provides the Defendants with

10  information about certainly the summary and what -- what

11  exactly it is that's going to be presented to the jury.  As

12  Mr. McCoy hints, there may be some stipulation that the parties

13  reach.  I am guessing that Sprinkmann is not going to agree

14  about football fields, but there may be some agreement that the

15  parties can come to.  If not, then I'll look at the summary and

16  I'll see whether or not I'm going to allow it.  So I'll defer

17  ruling on that one.

18           Number 7, the Defendants asked to prohibit the

19  Plaintiff from using, in front of the jury, the terms "asbestos

20  industry" or "members of the asbestos industry," arguing

21  basically that Sprinkmann, in particular, and -- was not an

22  asbestos manufacturer, was not an asbestos installer, or

23  whatever else.  And WEPCO, of course, is an electric company.

24  And so, using that terminology would be inappropriate.

25           The Plaintiff responds, Sprinkmann's business

1    involved a high percentage of asbestos-containing materials and

2    it employed members of an asbestos workers' union.  I -- I

3    don't -- I don't think that makes Sprinkmann a member of the

4    asbestos industry.  That phrase or that terminology refers to

5    people who manufacture it, people who install it, companies who

6    install it, and companies who manufacture it -- maybe companies

7    who remove it.  I don't know whatever else, but I -- I don't

8    think it's appropriate to refer to Sprinkmann.

9            It doesn't apply as to WEPCO.  I don't think the

10   Plaintiff is proposing it as to WEPCO.  But as to Sprinkmann, I

11   don't -- I'm not going to allow reference to Sprinkmann as a

12   member of the asbestos industry or as an asbestos company.  I

13   think that's misleading, if -- among other things.

14           Was there asbestos on the premises?  Certainly that's

15   going to be argued, and I understand that, but that's not the

16   same thing as being a member of the asbestos industry, even if

17   you employ people who are part of a union.

18           Number 8 in that packet is -- is a motion and it's

19   entitled, "Wisconsin law dictates that all potentially

20   responsible parties be included on the special verdict form."

21   I think this is a premature motion.  Until I know what the

22   evidence is that comes in, I don't know what parties are going

23   to need to be included on the special verdict form.  And so, I

24   think we should take that out.

25           Once we hear how the evidence comes in, who the

parties are that the evidence related to, and then we can determine that. And believe you me, we'll spend some time talking about the verdict form, probably even before we talk about jury instructions.

So that takes care, I believe, of all the motions in Docket Number 125.

And Pabst filed some consolidated motions in limine in Docket Number 126. Again, I'll go through and use the numbers, because it's a number of motions.

Number 1, the Plaintiffs make a standard -- I mean the Defendants, sorry, makes a standard exclusion request that any witness who's not a party representative be outside the courtroom until it's his or her time to testify. Plaintiff doesn't seem to object, as long as everybody follows that same rule. And so, that's fine. We've got witness rooms out there. We always have them open. So people can cool their heels out there and then wait to be called. So I'll grant that motion.

The second motion in the Pabst package as -- as Mr. McCoy indicated, a number of these overlapped, and Pabst also asked that I exclude any reference to "insurance." And as I indicated earlier with regard to the other Defendants, the Plaintiff doesn't oppose that, so I'll grant that motion.

The third motion is a motion that I preclude any reference to Ms. Ahnert's health situations, particularly her breast cancer and her overall health. And again, the

1    Plaintiffs said, "Fine with us, as long as you abide by the

2    same rule," and I'm sure the Defendants don't have any intent

3    on raising those issues.  And so I'll grant that motion as

4    well -- I mean, that's with regard to everybody, obviously.

5           The fourth motion is the one that we talked about

6    earlier which is the request that I exclude any references to

7    lawsuits -- other lawsuits against Pabst.  I think that falls

8    into the same category as the request to exclude reference to

9    other lawsuits against the other two Defendants.  And I think

10   we've already resolved that, which is that prior inconsistent

11   testimony can be used to impeach, but otherwise no reference to

12   prior -- to other lawsuits with regard to Pabst or WEPCO or

13   Sprinkmann.

14          The fifth motion is, again, similar to the ones that

15   the other Defendants brought.  "Motion to preclude the

16   Plaintiff from presenting evidence of disease in individuals,

17   other than Mr. Ahnert."  I think we resolved that.  And no

18   evidence of disease in other co-workers, members of the

19   Sprinkmann family, anything of that nature.  But, again, if any

20   party wants to refer to studies which obviously involve other

21   human beings who have these diseases, then they can certainly

22   do that.

23          Number 6 -- the sixth one is the same as the one that

24   I just ruled on with regard to Sprinkmann and WEPCO, and that's

25   to prohibit any reference to Pabst as either a member of the

asbestos industry or as an asbestos company.  And the Plaintiff
didn't oppose that one as to Pabst, and I've already ruled on
it as to the other Defendants.

The seventh motion that Pabst brings is asking me to
exclude any reference or comments along the lines of something
like, "Pabst profits at the expenses of others," or, you know,
it -- "It's on the backs of other people's injuries."
Plaintiff does not propose to do that, and so I'll grant that
motion.

The eighth motion is asking that I exclude reference
to and comments regarding any attempts to settle that have
taken place over the course of years.  I think that's already
pretty clear from the rules of evidence that it's not allowed.
And the Plaintiff doesn't oppose it, so I will grant that
motion.  And, of course, that applies to everybody, no
references to settlement attempts or settlement discussions.

Number 9, the ninth motion asks that the Plaintiff
not make any reference to the fact that Pabst may not have a
corporate representative present at the trial.  And the
Plaintiff doesn't oppose that, so I will grant that motion.

Number 10 asks that I exclude reference to the number
of asbestos-related Workers' Compensation claims filed against
Pabst.  The Plaintiff says that's moot.  I don't know if that
means there haven't been any Workers' Compensation claims or --
but it doesn't seem to be opposed, so I'll grant the motion --

1    oh, no, just says "not opposed."  I apologize.

2              **MR. MC COY:**  We don't have any comp claims we know of

3    against Pabst.

4              **THE COURT:**  Okay.  Well, then, I'll grant that

5    motion.

6              Motion Number 11 -- yes.  Motion Number 11 asks that

7    I exclude reference to the use of -- or allow the use -- not

8    allow the use of any prior deposition testimony, unless Pabst

9    was present and had the opportunity to object or cross examine

10   the witnesses, and the Plaintiffs show the relevance of the

11   deposition testimony and the materiality.

12             Right now nobody's designated any deposition

13   testimony, so if -- let's wait and see what gets designated.

14   And if anything like that gets designated, then I will rule on

15   it at that point in time.

16             The twelfth motion asks that I exclude demonstrative

17   evidence involving asbestos-containing products that the

18   Plaintiff didn't use -- Mr. Ahnert didn't use or that he didn't

19   have any contact with.  The Plaintiff opposes this saying that

20   it's relevant because it could have to do with bystander

21   exposure from co-workers, removal exposure, exposures through

22   drifts, suspension.  There are other ways that he could have

23   been exposed to this; and that the Plaintiffs' experts provide

24   the foundation for that evidence.  And

25   Dr. Anderson discusses bystander exposure.

1          I've already made a ruling on the experts, and none

2  of them are going to be going specifically into a causal link

3  between what happened to Mr. Ahnert and the condition of the

4  premises.  So I'm not sure -- I'm not sure how this is relevant

5  anymore.

6          Mr. McCoy?

7          **MR. MC COY:**  Demonstrative evidence -- I guess we

8  wouldn't.  We don't have any demonstrative evidence on that.

9          **THE COURT:**  So you're not going to bring in a chunk

10  of pipe and go, "This is what this looks like," or --

11          **MR. MC COY:**  Right.

12          **THE COURT:**  Okay.  Then --

13          **MR. MC COY:**  I mean, actually that probably should

14  have been -- I'm reading some shorthand summary of this, but

15  probably should not have been opposed.

16          **THE COURT:**  Okay.  Then I will grant that motion as

17  well.

18          Number 13 asks me to exclude any reference or comment

19  by lay witnesses as to the cause of Mr. Ahnert's injury.  I've

20  already ruled on that with regard to the other Defendants.

21  I'll grant that motion.  And the Plaintiff didn't oppose it.

22          Number 14 asks me to exclude any evidence of co-

23  workers' injuries or deaths related to asbestos exposure.  I

24  think we've already covered that, and the Plaintiff is not

25  proposing to introduce any evidence as to co-workers.  And so

1    I'll grant that motion.

2           Number 15 asks me to exclude references to or

3    comments on the knowledge or information or documents possessed

4    by trade organizations and industry groups that Pabst is not a

5    part of, which has the effect of imputing knowledge of the

6    purported hazardous asbestos exposure to Pabst.

7           At this point in time, I don't have any idea whether

8    or not the Plaintiffs plan to introduce any of that kind of

9    evidence, but particularly as it relates to "Safe Place,"

10   there's a knew or should have known element to that.  And

11   information that is out there that could be available to Pabst,

12   I think would be relevant.

13          Now, trade organizations that it wasn't a member of

14   or didn't have any way of knowing anything about, I guess that

15   wouldn't be relevant, and I won't know until we know whether

16   the Plaintiffs are planning on -- or Plaintiff is planning on

17   putting anything into that regard.  But just as a general

18   motion -- a general notion, I would say that since "Safe Place"

19   is in here, there is some requirement that the Plaintiff has to

20   prove that the Defendants knew or should have known that

21   asbestos was dangerous.  And so, I can anticipate that there

22   may be evidence about what the status of information was at

23   that time.

24          So I'll reserve ruling on any specific documents.  We

25   can look at those once the Plaintiff has made a proposal as to

1    what -- or, submitted an exhibit list, I suppose.

2            Sixteen asks me to exclude any reference or comment

3    concerning the amount of money or time spent by the Defendant

4    in -- in defending the matter.  And the Plaintiff doesn't

5    oppose that, so I will grant that motion.

6            Seventeen asks me to exclude reference to or comments

7    that label defense counsel as asbestos lawyers or -- oh, I'm

8    sorry.  Am I on 17?  Yes.

9            **MR. SCHUMACHER:**  Yes.

10           **THE COURT:**  Asbestos -- thank you -- asbestos lawyers

11   or asbestos defense lawyers and label the Plaintiffs as

12   asbestos victims.  And the response to that from the Plaintiff

13   is that we don't have any problem not calling you asbestos

14   defense attorneys.  They want to call Mr. Ahnert an asbestos

15   victim because he died of mesothelioma.  I -- I think calling

16   him an asbestos victim draws a conclusion that is the very

17   point of what we're talking about here.  I mean, there won't be

18   any dispute, I would guess, that he died of mesothelioma,

19   because that's what the coroner concluded, but to draw that

20   link between asbestos and, in particular, be drawing a link I

21   think between these Defendants, and any asbestos that may have

22   been on their premises and Mr. Ahnert is inappropriate.  And I

23   also think it's, in some respects, unduly inflammatory.  So I

24   will grant that motion and I will not allow reference to

25   Mr. Ahnert as an asbestos victim.  There are all sorts of other

ways that he can be referred to, but not as an asbestos victim.

Number 18 asks me to exclude mentioning reference or introducing evidence of any prior action and/or omission on the part of Pabst that isn't directly related to the incident at issue.  I -- I don't know how to even rule on that right now.  It's a 403 issue.  And I think the best thing to do with that is if Pabst knows of any specific incidents that the Plaintiff might be referring to, certainly it can raise those with me before trial and we can talk about them before trial.  And if something comes up during trial, I can do a 403 analysis at that point.  But I -- I'm kind of in a vacuum on this one at this point.  So I'm going to defer ruling on that until something specific comes up at trial.

The next two, 19 and 20, are kind of related to each other.  Nineteen asks me to exclude mentioning, referencing, or introducing evidence of any subsequent remedial measures or actions.  I think the rules already kind of talk about that.  Those are -- that is not allowed, and so I will grant that motion.

And then with regard to Number 20 --

**MR. MC COY:**  There's a Wisconsin statute where Wisconsin has a rule on the Safe Place Act scenario.

**THE COURT:**  Okay.

**MR. MC COY:**  I mean, I -- I don't --

**THE COURT:**  I'm sorry, I missed that.

1      **MR. MC COY:** -- know how that plays out in Federal

2  Court, but it seems like it ought to be followed in the same

3  way that the same information can come in.  I mean, there's a

4  general recognition that it's allowed for Safe Place Act claims

5  subsequent remedial evidence, like an exception.

6      **THE COURT:** All right.  Then let me look at that.  I

7  didn't -- I somehow missed that.

8      **MR. MC COY:** You know, if we didn't put it in our

9  briefing -- I thought we did, but --

10      **THE COURT:** Well, you may have done.  I mean, I --

11  it's been a little stack of paper.

12      **MR. MC COY:** Yeah.

13      **MR. SCHUMACHER:** So is it safe to say you're

14  deferring 19 at the moment?

15      **THE COURT:** Yes, that is safe.

16      Twenty, to exclude evidence of conditions at the

17  Defendant's premises, other than where the Defendant worked.

18  That's where my notes are.  Oh, okay.  So I think what we're

19  talking about here is Federal Rule 407.  And in Federal

20  Court -- and let's set aside the Safe Place Act for a second --

21  in Federal Court, "Subsequent remedial measures may be offered

22  for other purposes" -- in other words, to show who owns the

23  property, to show who controls the property, things of that

24  nature can be used for impeachment.

25      And then it says, "Approving a violation of the

1  Wisconsin Statute 101.11, the <u>Safe Place Act</u>."  So I think the

2  subsequent remedial measures issue with regard to the <u>Safe</u>

3  <u>Place Act</u>, Mr. McCoy is right -- and you did put it in your

4  brief, and I apologize.

5           And then with regard to the other claims, it is not

6  relevant.  And I think we're probably going to need to come up

7  with some sort of language to make clear to the jury that it is

8  relevant only as to "Safe Place."  And that's something that we

9  can talk about as we get closer to it.

10          Do you have a question, Mr. Schumacher?

11          **MR. SCHUMACHER:**  Yeah, I just want to -- sorry to be

12  all schoolboy back here.

13          **THE COURT:**  No.  That's okay.

14          **MR. SCHUMACHER:**  But I just want to make sure I

15  understand.  So it sounds like we went back to 19 --

16          **THE COURT:**  We did go back to 19 because I didn't

17  realize that I had put my notes --

18          **MR. SCHUMACHER:**  -- and we're granting it, but only

19  insofar as it relates to --

20          **THE COURT:**  "Safe Place."

21          **MR. SCHUMACHER:**  -- the Safe Place Statute.

22          **THE COURT:**  Right.  Because otherwise under Rule 407,

23  with regard to the other claims, it can only come in for other

24  purposes, such as to prove ownership, which I am guessing is

25  not an issue; to prove control, which I am guessing is not an

1    issue for impeachment. It's only allowed for very limited

2    purposes under Federal Rule of Evidence 407. So, unless any of

3    those circumstances exist, it's not relevant to anything other

4    than "Safe Place."

5          **MR. SCHUMACHER:** And is that -- is that the same

6    ruling with regard to 20 or --

7          **THE COURT:** Well, I mean, I understood the motion

8    about conditions of the Defendant's premises, other than where

9    the Plaintiff allegedly worked -- oh, sorry, no. No. Twenty

10    is places other than where the Plaintiff worked, and that

11    motion I'm granting. Yeah. Sorry.

12          **MR. SCHUMACHER:** Okay. That's why I got confused,

13    because you started talking about "Safe Place," we talked about

14    20, and I was going to start to say, I'm not seeing the --

15          **THE COURT:** And it's just because --

16          **MR. SCHUMACHER:** Yeah.

17          **THE COURT:** There isn't, and it's because I laid out

18    my notes badly. I'm sorry.

19          **MR. SCHUMACHER:** No. That's fine.

20          **THE COURT:** All right. Twenty-one asks me to exclude

21    any mention or reference to post-exposure evidence on direct

22    examination. I don't know -- I'm not sure whether that's

23    anything that the Plaintiff is planning on doing or not. I

24    don't see how post-exposure evidence would be relevant. If

25    there's any particular document or something that Pabst is

1    aware of that the Plaintiff's going to try to use, certainly

2    I'll consider that.  But at this point, I don't see any reason

3    that post-exposure evidence should be relevant.

4           Were you planning to submit evidence of that,

5    Mr. McCoy?

6           **MR. MC COY:**  At the moment, I can't think of any

7    evidence.

8           **THE COURT:**  Okay.  Then I'll grant that motion as

9    well.

10          Twenty-two asks me to exclude any reference to or

11   comment on the financial condition of Pabst in the Plaintiffs'

12   case in chief or any -- any other time.  And the only way, as I

13   think the Plaintiff concedes that that could be relevant, I

14   think, is with regard to punitive damages, if we even get

15   there.  And we're way too far out to know whether we even get

16   there.

17          So I will grant the motion to that extent, and then

18   reserve discussion of whether or not we get to punitive

19   damages -- and if we do, Pabst's financial condition at that

20   point.

21          Twenty-three asks me to exclude -- this is the

22   purchase orders and receipts motion that Sprinkmann and WEPCO

23   have already filed.  And as I indicated, I need more

24   information on -- on what the summary will be.  So I will defer

25   ruling on that until I know what exactly we're talking about

1  here.

2       Twenty-four asks me to exclude all anecdotal

3  testimony or documents concerning product use, bodily injury,

4  death, causation, or other condition related to asbestos-

5  related injuries.  I don't think anecdotal evidence has much of

6  a place at all.  I don't know if the Plaintiff was planning to

7  put any in, but I -- I will generally grant that motion.  If

8  something specific comes up at trial and there's an argument

9  about whether it's anecdotal or otherwise, I'll take that up

10 when we get to it.

11      And then 25 asks me to exclude imputed knowledge of

12 the purported hazards of asbestos exposure to this Defendant.

13 And the Defendant indicates -- Pabst indicates here that --

14 thinks that the Plaintiff might be planning to submit some kind

15 of evidence or introduce evidence that other companies, other

16 kinds of industries had extensive knowledge about asbestos

17 hazard in the years that led up to Mr. Ahnert's exposure; and

18 that they might try to say somehow or another that Pabst should

19 have known about that information from these other industries.

20      I think this is similar to the "trade association

21 that I'm not a member of" motion, that -- that Sprinkmann and

22 WEPCO filed.  And as I indicated earlier, I think certainly,

23 and with regard to "Safe Place," it is going to have some

24 relevance as to whether or not there was information out there

25 that Pabst knew or should have known as to any specific trade

1   organization or industry or that Pabst may argue, "Well, we

2   didn't have any contact with them," or, "We didn't know

3   anything," or, "Have no way to know anything."  I'll take that

4   up when we get closer to trial.

5           Twenty-six asks to exclude any testimony by

6   Mr. William LaPointe.  He hasn't offered any opinions with

7   regard to Pabst, and I haven't been provided any information

8   and -- and the Plaintiff says not -- we -- we agree.  It

9   doesn't have any opinions about Mr. Ahnert's work at Pabst.

10  And so, it's a moot point and I'll grant that motion.

11          And then finally, the last motion, 27, asks to

12  exclude deposition testimony of Mr. Ahnert.  And the basis for

13  it is that it isn't a dying declaration.  The Plaintiff

14  responded that the Plaintiff was fine with that, but wanted to

15  clarify that what we were talking about was Mr. Ahnert's

16  December 11th, 2010, deposition.

17          Is that -- or do you know off the top of your head,

18  Mr. Schumacher?

19          **MR. MC COY:**  Just a statement.

20          **MR. SCHUMACHER:**  It's a statement; it's not a

21  deposition.  He was never --

22          **THE COURT:**  Okay.

23          **MR. SCHUMACHER:**  -- he was never put under oath.

24          **THE COURT:**  Well, right.  I guess you -- he wouldn't

25  have been, right?

1          **MR. SCHUMACHER:**  I -- I -- I'm sorry, that's really

2    close.  I think that's correct.

3          **THE COURT:**  Well, the motion says "deposition

4    testimony."

5          **MR. SCHUMACHER:**  Does it really?

6          **MR. RHOADES:**  He was put under oath.

7          **THE COURT:**  December 11th --

8          **MR. RHOADES:**  Mr. McCoy's partner --

9          **MR. MC COY:**  It's a -- it's a statement in the sense

10    it's not -- no defense counsel were there.  That's why I call

11    it a statement.

12          **MR. SCHUMACHER:**  Okay.

13          **MR. MC COY:**  It's a statement under oath, but it's

14    not a deposition.

15          **THE COURT:**  Oh, so it wasn't subject to questioning?

16          **MR. SCHUMACHER:**  Yes, I'm sorry.  It's been so long,

17    I'm trying to keep it straight.

18          **THE COURT:**  No, no.  I know.

19          **MR. SCHUMACHER:**  Yeah.  It's not an affidavit.  He

20    was put under oath, but there was no one there to cross

21    examine.

22          **THE COURT:**  Right.

23          **MR. RHOADES:**  There was no cross; there were direct

24    questions by the defense counsel.

25          **THE COURT:**  Okay.  And so, regardless of that fact,

1    is that the statement we're talking about?

2              **MR. SCHUMACHER:**  Yes.  Yes.  That's the statement I'm

3    talking about.  I think we probably didn't know what to call

4    it.

5              **THE COURT:**  Yeah.  And it sounds like to that end,

6    the Plaintiff doesn't have any objection to not putting that

7    in.  So I'll grant that motion.

8              **MR. SCHUMACHER:**  And there is -- actually, you said

9    "the last one."  There is actually one more motion.  We just

10   filed it separately because it was longer.

11             **THE COURT:**  Oh, no, I'm taking this by docket number.

12   So I -- I think that --

13             **MR. SCHUMACHER:**  I see.

14             **THE COURT:**  That's the only one in this Docket Number

15   126.

16             **MR. SCHUMACHER:**  Yes.  I understand.

17             **THE COURT:**  That's the way I have them organized.

18   I'm sorry.

19             **MR. SCHUMACHER:**  My apologies.

20             **THE COURT:**  No, I'm sorry.  Mr. Rhoades?

21             **MR. RHOADES:**  Your Honor, and I didn't file a

22   response to that motion, and I don't know sitting here today

23   whether I can completely agree with it or not, but it is a

24   statement by Mr. Ahnert taken under oath.  So, I don't believe

25   it's hearsay.  I'm not sure what the --

1          **THE COURT:**  Well, and -- and, so you'll note that I

2   didn't -- I made a comment that the basis for it was it's not a

3   dying declaration.  And I didn't make an evidentiary ruling in

4   that regard.  And a dying declaration, pretending that we're in

5   law school again, is obviously a statement that someone makes

6   knowing that they're about to die, and it's an exception to the

7   hearsay rule which imputes credibility or reliability of the

8   statement because it assumes that nobody would lie if they knew

9   that they were on the verge of death.  And this isn't that; I

10  get it.  But there's also Rule 804.  And Rule 804 may be the

11  issue that deals with the hearsay problem.  And so, if we need

12  to go there, then we can consider 804.

13          **MR. SCHUMACHER:**  And just to clarify, that's all

14  Pabst is asking for, really, is just a ruling that this is not

15  a dying declaration.

16          **THE COURT:**  As far as I can tell, it's not a dying

17  declaration.

18          Okay.  Now, to Mr. Schumacher's point, Docket Number

19  127 is their Motion in Limine, Pabst's Motion in Limine Number

20  28.  It's just filed in a separate document.  And that motion

21  asks me to exclude the testimony of Ralph Van Beck and Jack

22  Wetzel as to Pabst, and to limit the exposure period at issue

23  as to Pabst to two months between 1955 and 1959.

24          The Plaintiff indicates that nobody's designated Beck

25  or Wetzel's testimony, they're dead, so they're not going to be

1    showing up.  And so with respect to excluding it until it's

2    designated, it may not end up being an issue.

3            With regard to the restriction of the time period,

4    the Plaintiff argues -- asks what's the basis for making that

5    restriction?  So I guess, you know …

6            **MR. SCHUMACHER:**  The basis, Your Honor, is the actual

7    testimony of Mr. Robert Wolter who testified that at some point

8    between 1955 and 1959 he recalled working with the decedent,

9    Mr. Ahnert, for, and I quote, "a couple of months," at the

10   Pabst Brewery.  That's the only evidence in the record with

11   regard to Mr. Ahnert's presence at Pabst.

12           **THE COURT:**  And so --

13           **MR. MC COY:**  There was more than that.  We have a --

14   a footnote that indicates where the additional testimony was,

15   and it talks about it being in the '60s in the testimony of

16   Wolter's deposition.  So we have both.

17           **THE COURT:**  Are you talking to me or are you talking

18   to Mr. Schumacher, Mr. McCoy?

19           **MR. MC COY:**  I'm addressing Your Honor, but I'm

20   addressing his -- his statement that there's no other evidence,

21   other than the '50s.  That's just not the case.

22           **THE COURT:**  All right.  Well, then I will defer

23   ruling on this one and we'll take a look at that, first of all,

24   to find out whether or not even the Plaintiff plans to try to

25   designate Mr. Van Beck or Mr. Wetzel's deposition testimony,

1    but second of all, with regard to the time period.  I'm willing

2    to restrict the time period, if that's all the evidence is, but

3    if that's all the evidence is, then I don't know why I need to

4    restrict the time period because there's only evidence as to a

5    short time period.  But we can cross that -- that motion in a

6    minute -- cross that -- that motion -- that bridge later.

7         And then the Plaintiff has filed Motions in Limine,

8    this is Docket 129.  And I'm going to try to move through these

9    relatively quickly so we can get on with our -- the rest of our

10   evening.  Docket Number 29 again is broken up into numbers, and

11   I'll use the same numbers that are in the motion.

12        The first asks me to exclude reference to any

13   affirmative defenses or other legal arguments which are

14   dispositive motions that should have pursued -- that should

15   have been pursued at the summary judgment stage.  I'm not

16   entirely sure I understand what that motion is.  And the

17   Defendants basically say, "We object because we don't know what

18   defenses -- what motion -- what is it you're seeking to bar."

19   I'm a little confused on that one, Mr. McCoy.

20        **MR. MC COY:**  I don't -- I don't know -- I mean, I

21   guess that can just be deferred because I don't know what

22   they're planning to present.  But I typically see on the eve of

23   trial what I call dispositive motions about -- about these

24   cases.  And, again, whether they're dispositive or not, I guess

25   that -- you don't know until you see it.  So right now I don't

1  see any of those.

2      **THE COURT:**  Okay.  Well, I'm going to deny it.  I

3  guess if what I'm hearing you say is sometimes people file

4  something and they stick the words "in limine" after the

5  motion, and then what they file is their summary judgment

6  brief --

7      **MR. MC COY:**  Right.

8      **THE COURT:**  -- I've seen that once or twice myself

9  and I've looked at people and said, "Huh-huh, that deadline

10  came and went."  Right now the motions that I have in front of

11  me don't fit that description.  So if something gets filed five

12  minutes before we call in the jury or a day before we call in

13  the jury, I'll cross that bridge when we get to it.  But I'll

14  deny the motion in general for now.

15      The second motion is that the -- that I preclude any

16  evidence that the Plaintiff made claims against the Defendants

17  who were granted summary judgment in this case.  The Defendants

18  oppose that motion unless the reason that the summary judgment

19  was granted was on the merits basically -- an argument that

20  there could be no exposure to asbestos attributable to that

21  Defendant.  And the Defendants note that there have been a

22  number of folks in this case who were dismissed either because

23  they agreed to be dismissed and there was a stipulation, or

24  because there was an unopposed Motion for Summary Judgment,

25  which really didn't get any treatment, in terms of the merits

1    or anything of that nature.

2            And so, the -- the Defendants say, you know, "Fine.

3    If the determination of summary judgment was based on the

4    actual merits.  But if it wasn't, then that's not relevant."

5    And I -- I agree with that.  I don't -- I will deny that

6    motion, unless the particular Defendant in question was awarded

7    summary judgment on the basis there couldn't have been any

8    exposure attributable to that Defendant.

9            The third motion asks that I preclude all asbestos

10   exposure evidence or -- well, what it says is, "All exposure

11   evidence is admissible to prove the cause of any of Daniel

12   Ahnert's asbestos-related conditions."  The way that's phrased

13   I was a little confused about, but then there's an explanation

14   which says, "The Defendants likely will move or argue to

15   exclude certain events or seek a limiting instruction from one

16   of the consolidated cases, because disclosure of evidence by

17   the Plaintiff was allegedly improper or untimely."  And I guess

18   this relates to the fact that there's a consolidation and there

19   were two different schedules, two different timelines, I think.

20           **MR. MC COY:**  Two -- yeah, more specifically, two

21   different judges -- well, that you were preceded by other

22   judges, but different judges ruling on the 2010 case and the

23   2013 case.  So that -- that created some -- that created this

24   situation here.

25           **THE COURT:**  So, is what you're saying, Mr. McCoy,

1 that they ought not be able to object to admission of evidence

2 because, for example, the evidence wasn't turned over under the

3 2010 scheduling order, but it was turned in under the 2013 case

4 scheduling order?  So it was timely under one, but not under

5 the other?

6       **MR. MC COY:**  That -- that's correct.  And, let's see

7 this.

8       **(Pause)**

9       **MR. MC COY:**  Yeah, that's an accurate statement, I

10 think, Judge.  But I would also add that not every witness has

11 to be deposed in the case.  So if somebody wasn't deposed, that

12 was listed as a witness in the 2010 case, but was not deposed

13 until the 2013 case, there's still that -- that's a disclosed

14 witness for both cases.

15       **THE COURT:**  Well, I'm going to defer ruling on this

16 one.  I can't -- I mean, there are a million different

17 permutations of how this could and couldn't come up.  And the

18 answer to that particular question would depend entirely on

19 what the evidence is and when it came in.  And there -- I

20 guess, there could be evidence it was turned over untimely

21 under either schedule; there could be evidence it was turned in

22 timely under both.  There was, I mean, I don't see any way to

23 make a blanket ruling on this.  Mr. Rhoades?

24       **MR. RHOADES:**  Your Honor, this is a specific issue

25 and I'm happy to spend time talking about it now or if you'd

1   like us to just kind of clarify it in a supplemental brief on

2   this.  It really relates to Charles Lewitzke's testimony.

3           **THE COURT:**  Okay.

4           **MR. RHOADES:**  He was barred from testimony --

5           **THE COURT:**  Okay.

6           **MR. RHOADES:** -- from testifying or offering evidence

7   in the 2010 case.  His testimony was considered by Judge

8   Clevert in ruling on the summary judgment motion.

9           **THE COURT:**  Okay.

10          **MR. RHOADES:**  And so, the issue is whether the body

11  of evidence that existed in the 2010 case is the one that ought

12  to be carried forward to trial or whether that ought to be

13  expanded --

14          **THE COURT:**  I see.

15          **MR. RHOADES:**  -- and include Mr. Lewitzke's

16  testimony.

17          **MR. MC COY:**  And that's my point, Judge, that

18  Lewitzke was a disclosed witness in the 2010 case, as well as

19  the 2013 case.  He only gave testimony in the 2013 case.

20          **THE COURT:**  Okay.

21          **MR. MC COY:**  So when you get out to summary judgment,

22  there -- there was some question about it, but when you get to

23  trial, it doesn't matter because he's a disclosed witness for

24  trial.

25          **THE COURT:**  All right.  Well, as to that, I think I'd

1   prefer to have you-all give me a separate discussion of that

2   because I didn't -- I wasn't entirely clear that that was what

3   the main issue was.  And as I'm going back looking at the

4   motion, I see that he's mentioned, but I was looking at the

5   broader -- in a broader context.  So, we'll come back to that

6   in just a second in terms of dates for you-all getting me

7   something on that.

8           The fourth motion that the plaintiff filed asked me

9   to preclude any reference to the fact that any other court may

10  have barred or limited the testimony of either, I guess brought

11  it down to Dr. Anderson or Dr. Staggs, and the arguments of a

12  402, 403 relevance argument.  And it basically says that I'm

13  the person who is supposed to make a decision as to

14  admissibility of expert testimony.  That's absolutely true, but

15  this isn't a question with regard to admissibility of

16  testimony.  This a question with regard to weight and

17  reliability and credibility.  And that's a determination that's

18  entirely for the jury.  So, I wouldn't necessarily exclude a

19  witness unless I had evidence that a number of other courts

20  perhaps had barred that person from testifying.  But, I'm not

21  sure why that doesn't make it grounds for cross-examination if

22  you're attacking the credibility of a witness.  I mean expert

23  witnesses are subject to attacks on their credibility just like

24  any other witness.

25          **MR. RHOADES:**  And, Your Honor, I would also note that

1  even though Dr. Brody wasn't at issue with regard to the

2  Daubert motions of specific versus general causation, it would

3  apply to Dr. Brody because he has been excluded many times.

4       **MR. SCHUMACHER:**  The admission of testimony is a

5  legal judgment, discretionary with each judge.  I don't see how

6  that can be a factor with the jury unless there's some specific

7  piece of concrete evidence that goes to bias or unreliability.

8  I mean, I don't see how those legal rulings can have any effect

9  other than to confuse the jury because they're not trained in

10  the legal aspects, but that's a judge decision.  But if there's

11  something specific that creates bias or whatever, then I think

12  that that certainly comes out but it's not because some other

13  judge made a ruling that the jury should make any decisions on

14  the credibility of a particular witness.

15       **THE COURT:**  Well, I suppose to your point that a

16  judge may exclude an expert witness because the witness is an

17  expert but not on this particular topic, that doesn't

18  necessarily to credibility.  Or a judge may exclude an expert

19  because they gave their opinion 15 years ago and now it's stale

20  and it's too old.  I mean, I suppose there could be some that

21  don't relate to credibility.

22       **MR. SCHUMACHER:**  Or he didn't have facts in the case.

23  I mean even some of the rulings I heard here where you're

24  limiting their testimony are based on specifics of this case

25  and what they had in this case.  So, I just -- I mean, that's

1    the whole -- I just don't see -- I mean he can establish the

2    relevance of it because it's something that's the same -- like

3    you say some concrete piece of evidence about the witness that

4    is carrying forward to the current case and was also in the

5    past case.  I mean I guess that would be appropriate, but

6    that's not what we're talking about here with Daubert-type

7    rulings.  Those are very -- those are very different from court

8    to court.  I mean --

9         **THE COURT:**  All right, then I'm willing to -- to at

10   least say that if any of the defendants have information

11   showing that Brody -- and apparently, he's the one person to

12   whom this would apply --

13        **MR. RHOADES:**  No, no, no.  It would apply to all

14   three.

15        **THE COURT:**  Oh, really?

16        **MR. RHOADES:**  I was just noting you -- you had

17   mentioned, I suppose this only applies to Dr. Anderson and

18   Dr. Staggs.

19        **THE COURT:**  Oh, I see.

20        **MR. RHOADES:**  And I was saying, no, it would still

21   apply to Dr. Brody even if we did have a Daubert issue --

22        **THE COURT:**  I see.

23        **MR. RHOADES:**  -- because he's not offering specific

24   causation testimony.

25        **THE COURT:**  I see, thank you.  I'm sorry.  I

1   misconstrued what I heard.  Thank you.

2          But again, to the extent that any of these experts

3   were excluded for reasons other than -- I mean I don't think

4   it's relevant if somebody got excluded, for example, because

5   their expertise was in a different area then what that

6   particular court was dealing with.  So --

7          **MR. RHOADES:**  But then conversely, I mean, I can see

8   that, but conversely to say -- just to go back to our

9   discussions of an hour and a half ago, to say that

10  fundamentally their underlying methodology is so lacking that

11  they don't meet the --

12         **THE COURT:**  If that's the reason.

13         **MR. RHOADES:**  -- reliability standard of Daubert or

14  the general acceptance standard of Frye.

15         **THE COURT:**  But that's what I'm saying.

16         **MR. RHOADES:**  Yes.

17         **THE COURT:**  If that's the reason that they were

18  excluded, then yes, I do think that that's relevant.  Now, if

19  there's not been a motion -- yes, I do think that's relevant

20  for that basis.  So, if there are people who have been excluded

21  for that reason, that I think that is a -- again, I think

22  that's an appropriate topic of cross-examination.

23         Mr. McCoy, you said several times that admissibility

24  is up to a court.  And that's absolutely right.  It's the

25  court's decision as to whether allow the witness to testify.

1          **MR. MC COY:**  So even --

2          **THE COURT:**  The credibility is a jury issue

3     determination.

4          **MR. MC COY:**  But if the methodology is bad in this

5     case, then the witness is out.  We wouldn't even have that

6     point.  So -- so that example of bad methodology doesn't -- I

7     mean the witness wouldn't even be testifying in the first

8     place.

9          **THE COURT:**  Okay.  Well, then you-all can add this to

10    your list of things that you can provide me additional

11    information on.

12         **MR. MC COY:**  I mean many witnesses have had certain

13    times --

14         **THE COURT:**  I think I've --

15         **MR. MC COY:**  -- when they've been excluded and a

16    million times where they testified.  I mean, that's pretty much

17    the way it is.  But --

18         **THE COURT:**  I think we'll move on from this one for

19    now and then we'll come back to it.

20         Number five is the plaintiff asks that I exclude any

21    testimony or I assume -- that's not what it says -- but any

22    testimony or evidence that any medical condition other than

23    mesothelioma and asbestosis could've been the causes of

24    Mr. Ahnert's death.  They argued -- Ms. Ahnert argues that the

25    death certificate from Texas says that he died by mesothelioma

1    and asbestosis and that that's controlling under Texas law.

2    And there's a long discussion about Texas law and the Texas

3    health code, and Texas cases and Texas information.

4         The defendants respond opposing the motion because

5    under Wisconsin law, the facts that are set forth in a death

6    certificate can be rebutted by evidence and they cite to

7    Eannelli's Estate, 269 Wisconsin 2d 192 at 212.  It's an old

8    case, but every case from Wisconsin Supreme Court is old just

9    about.  And -- okay, there have been a few recent ones.  I'm

10   sorry.  Don't repeat that.  And the plaint -- the defendants

11   note that Mr. Ahnert -- I think it's uncontroverted -- had a

12   number of other physical issues and we've already talked about

13   the fact that Dr. Ellis may be on the plaintiff's witness list

14   in terms of testifying about his health condition and his

15   physical condition.

16        The defendants also point out that the death

17   certificate is not worded in such a way that it says these are

18   the only two causes of death.  I don't -- I've never seen a

19   death certificate that's worded that way.  There's a cause of

20   death and there's a word there.  And so, there are all sorts of

21   other issues that could have impacted such as the defendants

22   indicate sarcoidosis, pulmonary fibrosis, CKD, obesity, throat

23   cancer, various things.

24        At any rate, I'm going to deny this motion.  I think,

25   again, this gets kind of down to what we're talking about here.

1 And this whole discussion of Texas law and what Texas holds as

2 to the death certificate, Texas law doesn't control here.  And

3 I know in Wisconsin law, the death certificate inclusion is

4 rebuttable.

5          So, did you want to question that ruling

6 Mr. Schumacher or were you just --

7          **MR. SCHUMACHER:**  No.

8          **THE COURT:**  Okay.  I saw you open your mouth.  I

9 thought you're going to say something --

10          **MR. SCHUMACHER:**  Oh.

11          **THE COURT:** -- I was surprised.

12          **MR. SCHUMACHER:**  Goodness no, no.  I'm fine with that

13 ruling, Your Honor.

14          **THE COURT:**  Okay.  All right.

15          Number six, similar, to exclude any evidence that

16 Mr. Ahnert sustained or suffered any medical condition,

17 accident, toxic exposure, injury other than malignant or

18 nonmalignant asbestosis disease.  It is -- it is absolutely, I

19 think, the same issue that that testimony certainly is relevant

20 because the whole issue here is causation.

21          And so, I'm going to deny that motion as well.

22          Motion number seven is --

23          **MR. MC COY:**  There has to be -- there has to be a

24 medical witness to say that.

25          **THE COURT:**  To say what?

1      **MR. MC COY:**  To say that there's some other medical

2  condition that contributes to the --

3      **THE COURT:**  Well, if they don't call a witness to

4  testify about that, then I guess we're having a discussion that

5  we don't need to have.  I don't know who they're going to call

6  as a witness or not, but I'm not ruling that they can't

7  introduce evidence of that.

8      **MR. MC COY:**  Our basis was nobody's been disclosed as

9  a witness.

10      **THE COURT:**  Okay.  Well --

11      **MR. MC COY:**  I understand, Judge.

12      **THE COURT:**  -- if someone doesn't get disclosed as a

13  witness, then I guess we just wasted those three minutes.

14         Number seven, and I assume that your same comment is

15  going to apply here, Mr. McCoy, but you asked that I exclude

16  any evidence or any testimony that cigarette smoking caused the

17  mesothelioma.  I would be surprised, I suppose, if the

18  defendants were going to put on testimony that cigarette

19  smoking caused mesothelioma, but they might very well want to

20  put on some sort of evidence indicating that Mr. Ahnert was a

21  smoker and that could have impacted his health and could've

22  been a contributing factor to his passing.  So --

23      **MR. MC COY:**  The motion's limited to this causation

24  point and that's all it's limited to.  It doesn't apply to what

25  Your Honor just said about that.

1          **THE COURT:**  Okay.  So, were you-all planning to put

2    on any evidence that Mr. Ahnert's mesothelioma was caused by

3    the fact that he smoked cigarettes?

4          **MR. SCHUMACHER:**  I'll respond for Pabst.

5          **THE COURT:**  Go ahead.

6          **MR. SCHUMACHER:**  Certainly Pabst, as we acknowledged

7    in our motion, is not intending to argue that cigarette smoking

8    causes mesothelioma.

9          **THE COURT:**  Right.

10          **MR. SCHUMACHER:**  But there's certainly an issue --

11    and in fact, one of the plaintiff's experts opined on this --

12    that smoking does reduce the mucociliary response --

13          **THE COURT:**  Yeah.

14          **MR. SCHUMACHER:** -- of the lungs, which could

15    potentially make one more susceptible to a variety of diseases,

16    including mesothelioma.

17          **THE COURT:**  And that's why I was dividing it out.

18    Saying that smoking causes mesothelioma, I guess I've never

19    heard anybody say that ever, so if you-all were going to put on

20    testimony in that regard, I would be surprised.  But --

21          **MR. SCHUMACHER:**  No, we just -- I'm sorry.  I didn't

22    mean to interrupt you, Your Honor.

23          **THE COURT:**  But, no, but putting on evidence that

24    cigarette smoking affects one's overall health, including in

25    that way, and could have been a contributing factor is, I

1    think, an appropriate area for testimony and I think I just

2    heard Mr. McCoy say that that's -- he's not disputing it.

3         **MR. MC COY:** Right. That's not part of this motion.

4    The motion is just cigarette smoking causes mesothelioma.

5         **THE COURT:** Right. And I'll grant the motion as to

6    that specific statement.

7         Number eight asked that I exclude, I think, evidence

8    or information that the work history of "claimed" locations of

9    suspected exposure submitted in discovery. And again, I didn't

10    entirely understand it until I read it -- and then basically

11    what the text following that says is in responding to standard

12    interrogatories about claimed sites of asbestos exposure, the

13    plaintiff identified a group of locations. The list is sites

14    for which exposure is claimed. Evidence about claims made is

15    only admissible with the proper foundation of exposure and

16    causation, yeah, I guess I still don't. I'm not, I'm still a

17    little bit confused about what I'm being asked to exclude.

18    Mr. McCoy?

19         **MR. MC COY:** The list that's submitted because of the

20    interrogatories about claimed location exposure. That's --

21    that's what we want out. That doesn't exclude locations where

22    there's evidence of actual exposure. It just takes away the

23    list of claimed ones where there's not yet been any evidence.

24         **THE COURT:** Yeah, I'm sorry. You guys are so steeped

25    in this case and as you well know, I'm not. Are you saying

1    that when you were asked in an interrogatory, "Where are places

2    that you claim you might've been exposed," Ahnerts turned over

3    a list of possible locations?

4              **MR. MC COY:**  Right, exactly.

5              **THE COURT:**  You don't want the defendants to put that

6    list of possible locations into evidence?

7              **MR. MC COY:**  Right, just that list, exactly.

8              **THE COURT:**  Gentleman --

9              **MR. MC COY:**  That's all it's about.

10             **THE COURT:**  -- anybody planning to put in the list?

11             **MR. RHOADES:**  Well, I think any signed discovery

12   response from the plaintiffs indicating that they believe that

13   he was exposed to asbestos at certain jobsites should be,

14   certainly, fodder for at least cross-examination, if not

15   outright admissible.  It's a signed document from the

16   plaintiffs.

17             **MR. MC COY:**  The relevance of something which is just

18   claimed versus something that there's evidence on is, I mean,

19   it just doesn't have any relevance.  I mean, we were asked to

20   do that.  We have to do it because that's a proper discovery

21   question.

22             **MR. RHOADES:**  Because you have --

23             **MR. MC COY:**  But as far as using the document later

24   at trial, it doesn't give a license to use everything that's in

25   the discovery questions.

1          **MR. RHOADES:**  What it does is shift that the burden

2     to the defendants to try and dig up evidence.  I mean

3     essentially, the plaintiff wants to use the shotgun approach in

4     the discovery phase and then force the defendants to use the

5     scalpel approach at trial.

6          **THE COURT:**  Okay.  I'll differ ruling on number eight

7     because I have a thought, but I can't articulate it right now.

8          Number nine --

9          **MR. MC COY:**  And the reason why we filed these,

10    Judge, is because all these things have happened before, so.

11         **THE COURT:**  I know.  And I get that this is a

12    prophylaxis, but sometimes the problem with the prophylaxis is

13    that if you're trying to prevent every disease in the world,

14    you can't really target the prophylaxis.

15         **MR. MC COY:**  Right.  Well, we tried to limit it to

16    the ones that are most, I mean --

17         **THE COURT:**  Okay, but --

18         **MR. MC COY:**  -- in interviews with jurors and stuff,

19    the ones that seem to make differences.

20         **THE COURT:**  And I may end up ruling in your favor.  I

21    don't know, Mr. McCoy.  But right now, I need to get after the

22    train that just escaped me in my head.

23         Number nine asks me to exclude any evidence that the

24    plaintiff received or was entitled to receive any kind of

25    benefits and then lists various collateral sources of benefits

1    where they could've come from.

2            Pabst responded by saying that they don't oppose the

3    motion, but there could be some certain conditions that could

4    come up that would make them want to revisit it, and so they

5    wanted to leave open the possibility of revisiting it.

6            Sprinkmann and WEPCO said that they don't oppose it

7    as it relates to hospital benefits, medical life insurance

8    proceeds, but they do oppose barring Social Security and

9    pension benefits.  The plaintiff doesn't actually go into

10   specific details about what benefits they're talking about and

11   if they're talking about income-type benefits like Social

12   Security or pension benefits, I guess, is what I'm

13   understanding the defendants are objecting to.  Is that -- are

14   you seeking to bar income type benefits?

15       **MR. MC COY:**  I don't know.  There's no claim for lost

16   income so, I don't know how that would matter here in this

17   case.  I mean it wouldn't be relevant to put in anything about

18   income.

19       **MR. RHOADES:**  I think Social Security and pensions is

20   right in the title of their brief, which is why we responded

21   the way we did.

22       **MR. MC COY:**  Maybe -- maybe that's our mess-up for

23   having that in there.  Yeah, I mean, we shouldn't -- I mean the

24   point is that that's not relevant because there's no lost

25   income claim.

**THE COURT:**  Well, I'll grant the motion for now and if something ends up coming out that impacts that, we'll go from there.

Number 10 asks me to exclude any evidence the plaintiff received or was entitled to receive money in settlement against other parties, nine parties, and I think this is very similar to the excluding settlement discussions or settlement -- we've already talked about that.  And that's a Rule 408 issue.

The defendants have opposed the motion because they say it could show bias, attack credibility, or establish comparative fault.  The jury should hear that certain parties were parties before their claims were settled and its apportionment of responsibility.  I guess the argument is this goes to damages?  Is that --

**MR. MC COY:**  I think the argument is about --

**THE COURT:**  I'm actually asking Mr. Rhoades, sorry.

**MR. MC COY:**  Oh.

**MR. RHOADES:**  Your Honor, I think this more probably is closely related to the subject matter of Motion Number 12, which deals with this body of bankruptcy trust applications and the application process.  Some of them involve affidavits that he was exposed to a certain product at a certain location.

**THE COURT:**  Oh.

**MR. RHOADES:**  Things like that that are solely done

1  in pursuit of a settlement from a bankruptcy trust of a

2  particular manufacturer or location of which there are dozens

3  in this case.

4          **THE COURT:**  Oh, I thought this -- okay.  I thought --

5          **MR. MC COY:**  Ten is different from 12.  And they're

6  not, they're not the same.

7          **MR. SCHUMACHER:**  It still could be an issue of

8  comparative fault.

9          **MR. MC COY:**  Sure.  That says we don't exclude that.

10  We specifically say that the -- if there's evidence of the

11  exposure, then that doesn't strike -- this motion is not

12  directed at that.  It's not directed at the verdict form.  It's

13  directed at there having been a settlement with somebody

14  before.

15          **THE COURT:**  So you're simply trying to exclude any

16  evidence that the plaintiff settled with somebody else?

17          **MR. MC COY:**  Right, right, that the claim was settled

18  with somebody else and that's all -- that's all it was about.

19  It's not about who goes on the verdict form.

20          **THE COURT:**  So, so what's the relevance of just the

21  fact that they settled with some other nonparty?

22          **MR. RHOADES:**  Well, the Wisconsin Supreme Court has

23  held in another one of these old cases -- although it's still

24  younger than me -- that evidence of a settlement can be used

25  also to show bias of witnesses.  It's --we're not -- we're not

1   -- it can't be used to show liability.  Can't be used to show

2   invalidity of claims, but it can be used to show bias of

3   various witnesses.  It can be used to attack the credibility of

4   a witness.  I mean, part of this is -- as we discussed earlier

5   to a certain nature of -- the prophylactic nature of motions in

6   limine and not knowing exactly what sort of, you know, evidence

7   is going to be put on.  But the evidence of a settlement in and

8   of itself can have probative value.

9           **THE COURT:**  Okay, then I'm going to --

10          **MR. MC COY:**  The bias issue, Judge, would be if

11   somebody got money and -- from a defendant and then attempts to

12   give product exposure information or, you know, previous owner

13   exposure information and some -- and because they got money

14   from this other defendant, they're trying to -- they're biased

15   in that that defendant is one they got money from, but they're

16   going to minimize the testimony of their exposure as to that

17   defendant that was -- or the nonparty that was settled.  The

18   only person who got money, in this case, is Mrs. Ahnert.  She's

19   the only one that might have the bias and she doesn't have any

20   information about any place like that.

21           **THE COURT:**  So, what I --

22          **MR. MC COY:**  So, I just -- I just -- there's no

23   possibility of bias here.

24          **THE COURT:**  So, what I was about to say was that I'm

25   going to defer ruling on this one because I think it's

1  extremely fact-bound as Mr. McCoy's explanation just pointed

2  out.  And so, if indeed Ms. Ahnert is the only person who

3  received a settlement and doesn't have any information, then I

4  think this becomes something of a moot -- moot point.

5           Number 11 asked me to exclude references, other than

6  during jury selection, to the names of people who are potential

7  witnesses or that they are identified in interrogatory answers

8  or other discovery.  And the argument is that, you know, it's

9  not relevant to a jury who we choose to call as witnesses.  And

10  that's not important.

11           And the defendants oppose the motion I believe, if

12  I'm still looking at the right one, because there are witnesses

13  who are identified but are not called and that may have to do

14  with burden of proof.

15           Right now, we don't have witness lists, so we don't

16  know whether or not this is relevant.  Some I'm going to defer

17  ruling on it but I will say this.  It is certainly not uncommon

18  -- and you've all heard it happen in trials and I don't think

19  it's improper -- for an attorney to say, you know, that they

20  could have called so-and-so to come in here and tell you "fill

21  in the blank" that was possible.  And they didn't.  You heard

22  no evidence at all on that whatsoever and that's why they

23  haven't met their burden of proof as to element whatever.  I

24  think that's basically what the defendants' response was to

25  this motion.

         So, if that's what the motion seeks to exclude, I'm
not going to grant the motion in that regard.  It's one thing
if somebody wants to stand up and say, they give us a witness
list that had 100 people on it and they only called four.
Well, that's stupid and irrelevant as most of us know because
that's the way trial practice works.  You have to disclose
every possible witness even if you're not sure you're going to
call him or you may call them in impeachment.  But that's
different than getting up and saying, you know, you didn't hear
-- they didn't call even though Mr. -- what's his name that
starts with the W that I've suddenly lost --

         **MR. MC COY:**  Wetzel?

         **THE COURT:**  No.  Anyway, sorry.

         **MR. RHOADES:**  Oh, Lewitzke?

         **THE COURT:**  Whoever's still with us.

         **MR. RHOADES:**  WEPCO.

          **THE COURT:**  No.  Even though there is -- no.  It
probably doesn't start with a W at this point and so we're all
grasping at straws that don't even exist but we've got a
witness, the witness is alive and kicking.  The plaintiff
could've called that witness to come in and testify to a very
specific fact and for whatever reason didn't.  I don't think
there's anything improper about a party saying they could've
called Mr. Jones.  They didn't call Mr. Jones.  You didn't hear
anything from Mr. Jones and so you don't have that evidence in

1  front of you.  That is -- I think that is appropriate, but

2  again, I'll defer specific rulings until I see who we may be

3  talking about.

4          Now, here's number 12 that Mr. Rhoades just made

5  reference to, which is this, the bankruptcy trust funds and the

6  motion specifically says that the plaintiff submitted claims to

7  several bankruptcy trust funds and there are documents that are

8  submitted in support of those claims and those documents were

9  produced to the defendants.

10         The plaintiff's argument is counsel prepared most of

11  these documents and so it's not necessarily something that was

12  prepared by Mr. Ahnert by Ms. Ahnert and the fact that they

13  submitted those claims to the trust isn't admissible at trial.

14  Again, this is in reference to the fact that the claims

15  asserted is not -- is not relevant.  I'm not sure I follow that

16  argument, but there are several other arguments as to why this

17  is not relevant.

18         However, defendants have opposed that motion and

19  their real basis for opposing is to say, you know, if there are

20  other people -- places other than these defendants were

21  Mr. Ahnert was exposed to asbestos or possibly claimed that he

22  was exposed to asbestos, that's also relevant.  Because again,

23  we're talking about causation.  I think this is a document-

24  specific issue, obviously, and I'll look more closely at it

25  with regard to specific documents, but I'm not going to

1  preclude generally any reference to any documents connected to

2  claims submitted to any of these bankruptcy trusts because of

3  Mr. Ahnert at some point, or Ms. Ahnert were claiming that he

4  was exposed to asbestos other places than these defendants,

5  that is relevant.

6            The next motion 13 asked me to exclude any evidence

7  about how Mr. McCoy or any of the other plaintiffs' lawyers

8  were compensated and the defendants don't oppose that.  So,

9  I'll grant that motion.

10           The same thing for 14, as to exclude any evidence

11  about the time and under the circumstances why Mr. Ahnert

12  employed a lawyer -- doesn't oppose that either.  So, I'll

13  grant that motion.

14           Fifteen, that Mr. McCoy's firm represents or has been

15  referred to other asbestos cases.  They want to exclude -- the

16  defendant -- the plaintiff wants to exclude reference to that.

17  Pabst doesn't oppose that, so I don't have a problem with that.

18  So, I will grant that motion.

19           Sixteen asks that I preclude any evidence that

20  asbestos lawsuits or that the plaintiff's claims are in any way

21  lawyer-made lawsuits or somehow or another that attorneys are

22  out there trying to generate money by finding these lawsuits.

23  Pabst doesn't oppose that motion.  And I agree.  I'll grant

24  that motion.

25           Number 17, the plaintiff asks to exclude statements

1    about asbestos exposure at locations or from products that

2    weren't disclosed or found to be irrelevant or speculative

3    during the discovery process.

4         And Pabst basically responds by saying yeah, I mean,

5    obviously we have to lay a foundation for any evidence that

6    it's relevant and we'll do that.  And if we don't, then we

7    ought not be able to put it in and that that's not really -- a

8    foundation issue is not a motion in limine issue.  And I agree

9    with that and I will rule on foundation during trial.

10        So, I will deny 17.  And to the extent that if

11   something comes up at trial specifically with regard to

12   foundation with a particular witness or particular piece of

13   evidence, of course, I'll take that up at trial.

14        Eighteen asks me to exclude evidence that the

15   plaintiff was required to present documentary evidence from the

16   defendant in order to prove the presence of asbestos in

17   proximity to the plaintiff.

18        The defendants have opposed this motion because it is

19   the plaintiff's burden to show that Mr. Ahnert was exposed to

20   asbestos-containing products and that it was a substantial

21   factor in causing the disease and they cite to a case from the

22   Western District of Wisconsin to show that.  As I understand

23   this, I think what the plaintiff is trying to argue is there's

24   no law out there that says I have to present a document, a

25   piece of paper, that -- from the defendant showing that there

1    was asbestos close to Mr. Ahnert.  Other kinds of evidence can

2    be used to show that, witness testimony, whatever else.  Is

3    that what you're arguing, Mr. McCoy?

4             **MR. MC COY:**  Yes, that's right.

5             **THE COURT:**  Okay.  And to that extent, I agree.  And

6    I'll sustain the motion to that extent.  And so, if the

7    defendants get up and say, you know, they have to give you a

8    document and they didn't, that's inappropriate.  Now, if the

9    defendants get up and say, you know, the testimony is not

10   believable or the testimony is not reliable and you haven't

11   seen anything else, you've seen no documentary evidence, you've

12   seen no whatever, I think that's a perfectly appropriate

13   argument.  And I think they can make that argument.  But there

14   is no law or statute that I'm aware of that says you have to

15   produce a piece of paper in order to prove that there was

16   asbestos present.

17            So, I'll grant the motion to that extent.

18            Number 19, asks that I exclude evidence that the

19   plaintiff was required to present documentary evidence from the

20   defendant -- that was just 18, sorry.

21            **MR. MC COY:**  Nineteen is different.

22            **THE COURT:**  I haven't flipped the page.

23            **MR. MC COY:**  Right.

24            **THE COURT:**  They want to exclude evidence that as to

25   Pabst, the plaintiff doesn't have any business records like

1   sales or invoices or contracts which show that Pabst purchased

2   asbestos for use at the Pabst Brewery and I guess, again, this

3   is in anticipation of the fact that Pabst is going to argue,

4   hey look, you can't show that we bought any asbestos-containing

5   materials and it says that, you know, in order to make that

6   argument, Pabst has got to show that there was some sort of

7   preservation policy or whatever else.

8           I'm going to deny this motion because, again, I don't

9   think that the blanket proposition that Pabst can't get up and

10  say you haven't seen any business records is an appropriate

11  one.  Of course, it's a subject for discussion in terms of

12  Pabst saying, hey look, if Pabst presents witnesses that say we

13  have a document preservation policy and we would've had all

14  these invoices and we would've kept all the stuff and we didn't

15  and so that shows that we didn't have it, I think that that's

16  appropriate testimony.  And they can present that.  If they

17  don't lay a foundation, the plaintiff can obviously argue that

18  there's no foundation for the testimony and I'll take that up

19  just like I would any other foundational objection.  But I'm

20  not gonna, at this stage, make a blanket ruling that they can't

21  testify, Hey the plaintiff hasn't shown you any business

22  documents of that nature showing that we bought anything and

23  that's because there isn't any.  They can make that argument if

24  they support it with the appropriate foundation.

25          And I think with that that we've touched on

1    everything, even if I have it necessarily ruled on it.

2           So, unless anybody can think of anything that I've

3    missed, I think the last issue that we want to address is that

4    there are a couple of these that I asked you for more

5    information on.  For example, the dates with regard to those --

6    oh, shoot.

7           **MR. MC COY:**  Mr. Ahnert's work at Pabst do you mean?

8           **THE COURT:**  Thank you, thank you, Mr. McCoy.

9           **MR. MC COY:**  Yeah, I have a list of a few, Judge.

10   Maybe -- maybe we should just -- I mean I would suggest either

11   Your Honor puts it in a text order as to which ones need more

12   briefing or that we get together collectively with our notes

13   and give you our list of what it should be.

14          **THE COURT:**  Yeah.  And I can -- I can go through and

15   remind myself because I have better notes and I think other

16   people have kept notes besides me because they know.  But what

17   I wanted to talk about was the timing in terms of when you-all

18   would present that information and perhaps the best way to do

19   that is for you all to propose a time to me once you've had a

20   time to look at what I'm asking for because some of it you may

21   need a little more time to collect than others.

22          **MR. MC COY:**  I would say on the list of items that do

23   need more briefing, I'd say that it could be done within two

24   weeks and then --

25          **THE COURT:**  You don't even remember --

1          **MR. RHOADES:**  Yeah.  I'm not agreeing -- I'm not

2    agreeing to that right here.

3          **MR. MC COY:**  We should, we should actually get the

4    transcript I suppose first.  So that might be --

5          **THE COURT:**  I think that might help everybody.

6          **MR. MC COY:**  Right.

7          **THE COURT:**  Because then whatever gobbledygook came

8    out of my mouth, would at least be --

9          **MR. MC COY:**  Right.  So, I'd say within two weeks

10   after the transcript for sure.

11          **THE COURT:**  Well, I'm not going to bind the

12   defendants to that right now because, again, they need to go

13   back and look at what they've got to collect and figure out

14   what they've got to collect.  And I think you need to do the

15   same thing.

16          So, what I propose is that you-all get the transcript

17   and then submit a document to me once you've had an opportunity

18   to talk about it.  If you can agree on a time frame for

19   providing me the additional information, great.  If you can't,

20   then say the plaintiff proposes X and the defense proposes Y.

21   And then I'll do something.

22          **MR. MC COY:**  Right.

23          **THE COURT:**  Okay.  Mr. McCoy, assuming that your

24   brain function is far better than mine, anything else that you

25   can think of that you can trust me to try and take care of this

1   afternoon?

2          **MR. MC COY:**  No, nobody wants to listen to me

3   anymore, Judge, based on, based on that last reaction.

4          **THE COURT:**  That's okay.

5          **MR. MC COY:**  So I have -- I have -- no, I have

6   nothing further in my notes right now to be covered.

7          **THE COURT:**  Okay.  You and I are in the same boat in

8   terms of people not wanting to listen to us anymore.

9   Mr. Rhoades?

10          **MR. RHOADES:**  Nothing further, Your Honor, thank you.

11          **THE COURT:**  Okay.  Anything else?

12          **MR. SCHUMACHER:**  Nothing from me, Your Honor.  Thank

13   you for this lengthy time that you spent with us.

14          **THE COURT:**  Well, thank you-all for sticking around.

15   I know you don't have much of a choice, but you guys can just

16   head back to your office.  So, I appreciate everybody sticking

17   around for a long afternoon.  And I apologize for how long it

18   was, but hopefully it will save us time in other -- on other

19   occasions.  Thanks everybody, bundle up, and stay warm.

20          **MS. SPEAKER:**  Thank you.

21          **MR. MC COY:**  Goodbye.

22       **(Proceeding concluded at 5:54 p.m.)**

23

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          January 8, 2018_


TONI HUDSON, TRANSCRIBER